**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
OLGA AKSELROD (NY Bar No. 4132825) (Appearance *Pro Hac Vice*)
oakselrod@aclu.org
VERA EIDELMAN (CA Bar No. 308535)**
veidelman@aclu.org
RACHEL MEEROPOL (NY Bar No. 4100954) (Appearance *Pro Hac Vice*)
rmeeropol@aclu.org
ALEXIS AGATHOCLEOUS (NY Bar No. 4227062)*
aagathocleous@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2659

*Attorneys for Plaintiffs*

*(Additional Counsel on Following Page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ARGHAVAN SALLES; ABIGAIL HATCHER; ANDREA ROSSO; ANN D. COHEN-WILSON; DOLORES ALBARRACÍN; HEIDI MOSESON; JADE PAGKAS-BATHER; JONATHAN KYLE DAW; KATIE EDWARDS; KELTON MINOR; MICHAEL D. GREEN; SARA JACKSON; SUZANNE BELL; JORDAN DOE 1; JORDAN DOE 2; JORDAN DOE 3; and JORDAN DOE 4, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services*; and UNITED STATES DOGE SERVICE,

Defendants.

Case No. 3:26-cv-10510-SK

**NOTICE OF MOTION AND MOTION FOR STAY AND PRELIMINARY INJUNCTION**

Judge: Hon. Sallie Kim
Dept: Courtroom C, 15th Floor
Date: Nov. 16, 2026
Time: 9:30 a.m.

* Application for *Pro Hac Vice* Admission Forthcoming
**Out-of-State Licensee Renewal Pending

*(Additional Counsel on Behalf of Plaintiffs)*

**AMERICAN CIVIL LIBERTIES UNION**
**FOUNDATION OF NORTHERN CALIFORNIA**
GRAYCE ZELPHIN (CA Bar No. 279112)
gzelphin@aclunc.org
CHESSIE THACHER (CA Bar No. 296767)
cthacher@aclunc.org
NEIL K. SAWHNEY (CA Bar No. 300130)
nsawhney@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

**PROTECT DEMOCRACY PROJECT**
SHALINI AGARWAL (DC Bar No. 990963) (Appearance *Pro Hac Vice*)
shalini.agarwal@protectdemocracy.org
2020 Pennsylvania Avenue, NW, Suite 163
Washington, DC 20006
KENNETH PARRENO (TX Bar No. 24130477)*
kenneth.parreno@protectdemocracy.org
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582

**CENTER FOR SCIENCE IN THE PUBLIC INTEREST**
LISA S. MANKOFSKY (DC Bar No. 411931) (Appearance *Pro Hac Vice*)
lmankofsky@cspi.org
OSCAR HEANUE (DC Bar No. 90036939) (Appearance *Pro Hac Vice*)
oheanue@cspi.org
1250 I Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 777-8381

**JACOBSON LAWYERS GROUP PLLC**
DANIEL F. JACOBSON (DC Bar No. 1016621)*
dan@jacobsonlawyersgroup.com
LYNN D. EISENBERG (DC Bar No. 1017511) (Appearance *Pro Hac Vice*)
lynn@jacobsonlawyersgroup.com
STEPHEN K. WIRTH (DC Bar No. 1034038) (Appearance *Pro Hac Vice*)
stephen@jacobsonlawyersgroup.com
5100 Wisconsin Avenue, NW, Suite 301
Washington, DC 20016
Telephone: (301) 823-1148

* Application for *Pro Hac Vice* Admission Forthcoming

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

NOTICE OF MOTION AND MOTION ..... 1

INTRODUCTION ..... 2

STATEMENT OF FACTS ..... 3

A. NIH's Statutory Structure and Science-Based Grantmaking Process ..... 3

B. NIH Replaces Scientific Merit Review with Viewpoint-Based Screening ..... 4

1. NIH Begins Targeting Research Based on Viewpoint ..... 4

2. NIH Implements New Directives to Accomplish the Same Goals ..... 6

3. NIH Creates New Systems to Screen, Renegotiate, and Terminate Grants ..... 7

C. The Challenged Policies Are Disrupting Plaintiffs' Ongoing Research ..... 9

LEGAL STANDARD ..... 9

ARGUMENT ..... 10

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS ..... 10

A. The Challenged Policies and Terminations Violate the First Amendment ..... 10

1. The Challenged Policies and Terminations Violate First Amendment Rules Governing Funding of Private Speech ..... 10

a. NIH Grants Support Private Speech ..... 11

b. The Terminations and Challenged Policies Discriminate Based on Viewpoint ..... 13

i. Defendants Disfavor Particular Messages ..... 14

ii. The Challenged Policies and Terminations Target Viewpoints ..... 16

c. The Challenged Policies and Terminations Are Unreasonable in Light of the Purposes of NIH Funding ..... 18

2. The Policies and Terminations Unconstitutionally Compel Speech ..... 19

3. The Terminations Constitute Retaliation ..... 21

B. The Policies Violate the APA ..... 22

1. The Challenged Policies Are Final Agency Action ..... 23

2. The Challenged Policies Are Arbitrary and Capricious ..... 24

3. The Challenged Policies Strip IC Directors of Their Authority to Make Final Decisions on Awarding Grants and Are Contrary to Law ..... 26

4. Allowing Terminations for Subsequent Changes in Agency Priorities Is Contrary to Law ..... 27

II. THE TUCKER ACT DOES NOT DEPRIVE THIS COURT OF JURISDICTION ..... 28

III. ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM ..... 29

IV. THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION ..... 30

V. THE COURT SHOULD STAY THE CHALLENGED POLICIES UNDER 5 U.S.C. § 705 ..... 31

VI. THE COURT SHOULD WAIVE THE BOND REQUIREMENT ..... 32

CONCLUSION ..... 32

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ..... 20

*Agency for Int'l Dev. v. Alliance for Open Society Intern. Inc.*,
570 U.S. 205 (2013) ..... 19, 20, 21

*All. for the Wild Rockies v. Pena*,
865 F.3d 1211 (9th Cir. 2017) ..... 9

*Am. Acad. of Pediatrics v. HHS*,
816 F. Supp. 3d 27 (D.D.C. 2026) ..... 22

*Am. Ass'n of Univ. Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025),
No. 26-263, 2026 WL 1049175 (9th Cir. Feb. 11, 2026) ..... 28, 32

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
916 F.3d 749 (9th Cir. 2019) ..... 30

*Am. Council of Learned Societies v. Nat'l Endowment for the Humans.*,
No. 25-cv-3657 (CM), 2026 WL 1256545 (S.D.N.Y. May 7, 2026) ..... 12, 13, 16, 18

*Am. Pub. Health Ass'n v. NIH*,
791 F. Supp. 3d 119 (D. Mass. 2025) ..... 6, 24, 28

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ..... 30

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ..... 30

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..... 10, 30

*Bates v. Pakseresht*,
146 F.4th 772 (9th Cir. 2025) ..... 21

*Bennett v. Spear*,
520 U.S. 154 (1997) ..... 23

*Biden v. Texas*,
597 U.S. 785 (2022) ..... 23

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ..... 20

*California v. Wright*,

No. 26-cv-01417-RFL, 2026 WL 1915590 (N.D. Cal. July 2, 2026)........................................ 28, 29

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010)........................................................................................................ 11, 18

*City & Cnty. of San Francisco v. U.S. Dep't of Just.*,
822 F. Supp. 3d 1056 (N.D. Cal. 2026) ........................................................................ 32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)............................................................................................................ 24

*Dep't of Educ. v. California*,
604 U.S. 650 (2025)........................................................................................................ 28

*Dietary Supplemental Coal., Inc. v. Sullivan*,
978 F.2d 560 (9th Cir. 1992) .......................................................................................... 23

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .................................................................................................. 19, 25

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .......................................................................................... 30

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .......................................................................................... 30

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................................ 29

*Gale v. First Franklin Loan Servs.*,
701 F.3d 1240 (9th Cir. 2012) ........................................................................................ 27

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018)........................................................................................................ 19

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ........................................................................................ 32

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) .................................................................................... 11, 22

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001).................................................................................................. 11, 18

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ........................................................................................... 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).................................................................................................... 24, 25

*Nat'l Endowment for the Arts v. Finley*,

524 U.S. 569 (1998) .......... 10, 20

*Nat'l Pub. Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) .......... 22

*New Jersey v. OMB*,
No. 1:25-cv-11816-IT, 2026 WL 2069832 (D. Mass. July 17, 2026) .......... 27, 28

*New York v. U.S. Dep't of Energy*,
No. 6:25-cv-01458-MTK, 2025 WL 3140578 (D. Or. Nov. 10, 2025),
No. 26-214, 2026 WL 1049169 (9th Cir. Apr. 13, 2026) .......... 23

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 6, 28

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .......... 27

*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026) .......... 31

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
465 F.3d 977 (9th Cir. 2006) .......... 23

*Pablo Sequen v. Albarran*,
810 F. Supp. 3d 1084 (N.D. Cal. 2025) .......... 32

*People for the Ethical Treatment of Animals v. Tabak*,
109 F.4th 627 (D.C. Cir. 2024) .......... 18

*President & Fellows of Harvard Coll. v. HHS*,
798 F. Supp. 3d 77 (D. Mass. 2025) .......... 22

*Regan v. Taxation With Representation of Wash.*,
461 U.S. 540 (1983) .......... 10

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*,
800 F. Supp. 3d 351 (D.R.I. 2025) .......... 16, 18

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) .......... 31

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) .......... 10, 11, 14, 17

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 20

*S.F. Herring Ass'n v. Dep't of the Interior*,
946 F.3d 564 (9th Cir. 2019) .......... 23

*Schiff v. U.S. Off. of Pers. Mgmt.*,
784 F. Supp. 3d 380 (D. Mass. 2025) .................... 17, 18

*Serv. Emps. Int'l Union v. United States*,
598 F.3d 1110 (9th Cir. 2010) .................... 26

*Shurtleff v. City of Bos., Massachusetts*,
596 U.S. 243 (2022) .................... 12

*Thakur v. Trump*,
163 F.4th 1198 (9th Cir. 2025) .................... 18

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) .................... passim

*Thakur v. Trump*,
800 F. Supp. 3d 1044 (N.D. Cal. 2025) .................... 32

*United States v. Connolly*,
716 F.2d 882 (Fed. Cir. 1983) .................... 28

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .................... 19

*Washington v. U.S. Dep't of Educ.*,
161 F.4th 1136 (9th Cir. 2025) .................... 31

*Washington v. U.S. Dep't of Educ.*,
167 F.4th 1241 (9th Cir. 2026) .................... 26

*Webster v. Doe*,
486 U.S. 592 (1988) .................... 28

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................... 9

**Statutes**

42 U.S.C. § 282(b)(8)(D)(ii) .................... 25

42 U.S.C. § 282(b)(9) .................... 3

42 U.S.C. § 283p .................... 25

42 U.S.C. § 284(b)(2) .................... 3

42 U.S.C. § 284(b)(2)(B) .................... 26, 27

42 U.S.C. § 284(b)(3) .................... 3, 26

42 U.S.C. § 284(b)(3)(A) .................... 3, 26

42 U.S.C. § 285 .......... 12
42 U.S.C. § 285b .......... 12
42 U.S.C. § 285b-7(b)(1) .......... 12
42 U.S.C. § 285c .......... 12
42 U.S.C. § 285d .......... 12
42 U.S.C. § 285e .......... 12
42 U.S.C. § 285f .......... 12
42 U.S.C. § 285g .......... 12
42 U.S.C. § 285h .......... 12
42 U.S.C. § 285i .......... 12
42 U.S.C. § 285j .......... 12
42 U.S.C. § 285k .......... 12
42 U.S.C. § 285l .......... 12
42 U.S.C. § 285m .......... 12
42 U.S.C. § 285t(b) .......... 25
42 U.S.C § 289 .......... 27
42 U.S.C. § 289a(a) .......... 3
42 U.S.C. § 289a-1(a)(2) .......... 3
5 U.S.C. § 705 .......... 31
5 U.S.C. § 706(2)(A) .......... 24, 26
5 U.S.C. § 706(2)(C) .......... 26
Pub. L. No. 75-244, 50 Stat. 559 .......... 12
Pub. L. No. 79-487, 60 Stat. 421 .......... 12
Pub. L. No. 80-655, 62 Stat. 464 .......... 12
Pub. L. No. 81-692, 64 Stat. 443 .......... 12

**Other Authorities**

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) .......... 4

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ........ 4

Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ........ 4

Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) ........ 5

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) ........ 6

**Regulations**

2 C.F.R. § 200.202(a) ........ 28

2 C.F.R. § 200.203(b)(1) ........ 28

2 C.F.R. § 200.204(a)(8) ........ 28

2 C.F.R. § 200.204(c)(1) ........ 28

2 C.F.R. § 200.340(a)(4) ........ 7, 8, 27

42 C.F.R. § 52h.7 ........ 3

45 C.F.R. § 75.372(a) ........ 7

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 16, 2026, at 9:30 a.m., or as soon thereafter as Plaintiffs may be heard, Plaintiffs Arghavan Salles, Abigail Hatcher, Andrea Rosso, Ann D. Cohen-Wilson, Dolores Albarracín, Heidi Moseson, Jade Pagkas-Bather, Jonathan Kyle Daw, Katie Edwards, Kelton Minor, Michael D. Green, Sara Jackson, Suzanne Bell, Jordan Doe 1, Jordan Doe 2, Jordan Doe 3, and Jordan Doe 4 (collectively, "Plaintiffs"), will and hereby respectfully do move the Court for entry of an order on their own behalf and on behalf of two nationwide classes[1] (1) preliminarily enjoining and staying Defendants National Institutes of Health ("NIH"), Jay Bhattacharya, the Department of Health and Human Servies ("HHS"), Robert F. Kennedy, Jr., and the United States DOGE Services ("USDS") (collectively, "Defendants") from enforcing the Challenged Policies, described in detail below, on First Amendment and Administrative Procedure Act ("APA") grounds, and (2) reinstating the terminated grants on First Amendment grounds.

This motion is brought pursuant to Fed. R. Civ. P. 65(a) and Civil L.R. 65-2 and is based upon this Notice of Motion, Motion, and Memorandum and Points of Authorities; the accompanying Declarations and exhibits[2]; the pleadings and papers on file; any subsequent briefing; and any evidence and oral argument that may be requested or permitted by the Court.

[1] Plaintiffs will be filing a Motion for Provisional Class Certification shortly after filing the instant motion.

[2] In addition to the declarations submitted contemporaneously with this motion, the motion relies upon the declarations and accompanying exhibits submitted with Doe Plaintiffs' Administrative Motion to Proceed Pseudonymously (ECF 6), filed as ECF 7–10.

## INTRODUCTION

Since January 2025, Defendants have systematically terminated and renegotiated NIH grants and denied research proposals in an effort to silence certain disfavored views. NIH grants fund private speech by researchers—the dissemination of results, the publication of manuscripts and articles, presentations at conferences and invited talks, and other research-related speech. But the government now seeks to impose ideological conformity on what grant recipients can communicate.

This began with a series of Executive Orders ("EOs") that sharply criticize diversity, equity, and inclusion ("DEI"), gender identity, and environmental justice. To implement the EOs, Defendants issued directives and protocols and, while doing so, expanded the list of disfavored views to also reach perspectives on vaccines, misinformation, and more. New and continuing grant materials are now screened by an automated tool for a list of 235 forbidden terms, including "Latinx," "lactating person," "systemic racism," and "climate change," as proxies for research-related speech expected to communicate the disfavored views. Researchers on many flagged grants are forced to parrot the government's preferred script—for example, using "pregnant woman" instead of "pregnant person," or "temperature fluctuations" instead of "climate change"—to obtain or retain funding. For other researchers, flagged grants are summarily terminated.

Plaintiffs seek preliminary relief on two categories of claims: First Amendment claims challenging NIH's policies and the resulting terminations, and APA claims challenging solely the policies. With respect to the First Amendment, Defendants' policies and resulting terminations constitute viewpoint-based discrimination in government funding for private speech and compelled speech as a condition of funding, both of which are unconstitutional. The terminations also constitute retaliation for applicants' constitutionally-protected views and research-related speech. While the First Amendment does not prohibit NIH from establishing scientific priorities, NIH may not use ideological criteria to suppress or penalize disfavored views. With respect to the APA, NIH's policies ignore Congress's requirements that agency decisions must be reasoned and reasonable, and that ultimate authority for awarding grants lies with Directors in its Institutes and Centers ("IC" or collectively "ICs"), not political officials. In addition, the policies contravene regulations allowing termination only if a grant no longer effectuates the priorities in place when it was awarded.

Plaintiffs are facing irreparable harm: silenced speech, compelled speech, upended research plans, halted clinical studies, jeopardized employment prospects, and more. In addition, the public is irreparably harmed when scientific work is delayed, distorted, or abandoned for ideological reasons because it loses the benefits, treatments, and cures from that research, potentially forever.

For the reasons set forth more fully below, this Court should stay and preliminarily enjoin NIH's unconstitutional, arbitrary, and unlawful policies and reinstate the unconstitutionally terminated grants.

## STATEMENT OF FACTS

### A. NIH's Statutory Structure and Science-Based Grantmaking Process

"NIH's mission is to seek fundamental knowledge" and its goals include "foster[ing] fundamental creative discoveries." Decl. of Heanue ("Heanue") ¶ 5, Ex. 1. NIH accomplishes this largely through funding extramural research, conducted by non-NIH scientists, at non-NIH labs. A key aspect of this funding is to communicate "the results and accomplishments" of the research "to the public." Heanue ¶ 6, Ex. 2 § 8.2. Recipients "are expected to publish the results of research in peer-reviewed journals and to provide information to the public on the objectives, methodology, and findings of their NIH-supported research activities." *Id.* § 8.4.1; *see also id.* § 8.2.1. In fiscal year 2025, NIH awarded $35.3 billion through 55,394 extramural grants to 2,719 universities, hospitals, and other organizations. Heanue ¶ 7, Ex. 3 at 2.

The granting process begins when NIH announces funding opportunities, and much of NIH's portfolio consists of investigator-initiated proposals. *Id.* at 4. Applications undergo two levels of review: 1) scientific and technical merit review by primarily non-governmental scientists; and 2) for those that survive peer review, consideration by the relevant IC. 42 U.S.C. §§ 282(b)(9), 289a(a), 289a-1(a)(2); 42 C.F.R. § 52h.7; Heanue, Ex. 2 § 2.4. Congress has assigned the ultimate funding decision to the relevant IC Director, who must "review and make the final [award] decision." 42 U.S.C. § 284(b)(2), (b)(3)(A). And Congress has listed the factors the IC Director considers in making that decision "consistent with the peer review process": the IC's mission and scientifically developed priorities, similar projects funded elsewhere, and the advice of the IC's staff and advisory council. *Id.* § 284(b)(3).

Once NIH selects a project, it issues a Notice of Award ("NOA") to the recipient institution and principal investigator ("PI"). Pursuant to the NIH Grants Policy Statement ("NIH GPS") which sets out

grant terms, researchers generally own the resulting expression, including through copyright. Heanue, Ex. 2 § 8.2.1. In addition, "each publication, press release, or other document about research supported by an NIH grant" must include a disclaimer that says "The content is *solely* the responsibility of the authors and does not necessarily represent the officials views of the [NIH]." *Id*. (emphasis added).

Project periods commonly span one to five years, during which NIH intends to support the research without requiring researchers to re-compete for their awards. 42 C.F.R. § 52.6(c). Instead, funding ordinarily issues following annual progress reports submitted by the researchers. *Id*.; Heanue, Ex. 2 § 8.4.1.1. Historically, this is not a moment to renegotiate the scope of an award. *See, e.g.*, Decl. of Bell ("Bell") ¶ 18; Decl. of Jackson ("Jackson") ¶ 22; Decl. of Doe 3, ECF 9 ("Doe 3") ¶ 17.

**B. NIH Replaces Scientific Merit Review with Viewpoint-Based Screening**

Starting in January 2025, NIH upended this grantmaking process. Although the language of the directives and policies has evolved over the past 19 months, the central criterion—alignment with the Administration's preferred views in research-related speech—has not.

*1. NIH Begins Targeting Research Based on Viewpoint*

The change began with a series of Executive Orders. In January 2025, Executive Order 14151 directed agencies to terminate all "equity-related" awards, including grants to "advance DEI, DEIA, or 'environmental justice' programs . . . or activities." Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025). Executive Order 14173 described DEI as "dangerous, demeaning, and immoral"; "corrosive[ ] and pernicious"; and contrary to "traditional American values," and instructed the Office of Management and Budget to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear," from federal grant procedures. Exec. Order No. 14173, §§ 1, 3(c), 90 Fed. Reg. 8633, 8633–34 (Jan. 21, 2025). And Executive Order 14168 declared that federal funds "shall not be used to promote gender ideology," defined as the "false claim" that a person can identify as a gender different from the person's sex. Exec. Order No. 14168, §§ 2(f), 3(g), 90 Fed. Reg. 8615, 8615–16 (Jan. 20, 2025).

On February 21, 2025, then-Acting NIH Director Matthew Memoli issued the first NIH-specific directive ("Memoli Directive") implementing those orders. Heanue ¶ 8, Ex. 4. The Memoli Directive

classified studies "based on diversity, equity, and inclusion (DEI) and gender identity" as "low-value and off-mission research programs" NIH would no longer support. *Id*. at 2.

NIH immediately put that policy into practice. On February 22, a DOGE representative sent Memoli a list of 18 funding opportunities that "may be worth . . . reviewing to make sure they align with your directive and priorities." Heanue, ¶ 9 Ex. 5. Minutes later, Memoli directed that all 18 be taken down. *Id*. Four days later, Executive Order 14222 instructed agency heads to "terminate or modify" existing grants "in consultation with the agency's DOGE Team Lead" where needed to "advance the [Administration's] policies." Exec. Order No. 14222, § 3(b), 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025). On February 28, 2025, DOGE representative Rachel Riley told the Deputy Director of NIH's Office of Policy for Extramural Research Administration ("OPERA") that several grants "will need to be terminated" by the end of the day. Heanue ¶ 10, Ex. 6 at 7–8. Memoli then sent NIH staff a list of 16 grants for termination by "COB," and Riley sent more that evening under the subject line "Grants for immediate termination today." Heanue ¶ 11, Ex. 7; Heanue ¶ 12, Ex. 8. An accompanying template termination letter repeated the Memoli Directive's general criticisms of gender-identity research without any analysis of the particular project. Heanue, Ex. 8 at 13–14. On March 24, Memoli reported that NIH had "been asked to terminate" 120 additional grants by the end of that day. Heanue ¶ 13, Ex. 9.

At the same time, NIH converted the Memoli Directive into a review system governing every new and continuing award. Staff were instructed in internal guidance issued on March 4 to "completely excise all DEI activities." Heanue ¶ 14, Ex. 10 at 2. Projects whose "sole purpose" was deemed DEI-related could not be funded; for others, ICs could try to negotiate out the disfavored aims or activities. *Id*. at 2–3. But the guidance went beyond that, requiring that one category of projects—flagged because they contained language purportedly associated with DEI, such as "terminology related to structural racism"—be reworded to remove the "DEI language" even though, in NIH's view, the projects did "not support DEI activities." *Id*. at 3. Thus, even words that did not describe any funded activity could prevent an otherwise approved project from receiving funding.

NIH issued several additional versions of the guidance between March and May 2025 (collectively and including the March 4 guidance, "Award Assessments Guidance"). *See* Heanue ¶ 15, Ex. 11; Heanue ¶ 16, Ex. 12; Heanue ¶ 17, Ex. 13; Heanue ¶ 18, Ex. 14. This Guidance extended the

same machinery to additional disfavored views, including the "health effects of climate change" and "ways to improve vaccine interest." *See, e.g.*, Heanue, Ex. 14 at 21. Under this system, NIH personnel were directed to alter, withhold, or terminate projects that Defendants expected to express the disfavored views in research results, publications, and other speech.

*2. NIH Implements New Directives to Accomplish the Same Goals*

That first regime did not survive judicial review. After a bench trial, the District of Massachusetts found "not a shred of evidence" supporting NIH's assertions that "DEI" and "gender identity" research was unscientific, and vacated the Memoli Directive and Award Assessments Guidance. *Am. Pub. Health Ass'n v. NIH* ("*APHA*"), 791 F. Supp. 3d 119, 179, 181–84 (D. Mass. 2025).[3] But Defendants' efforts continued.

On August 7, 2025, the President directed agencies to establish senior-appointee review of grant opportunities and awards, and prohibited funding grants that promote racial preferences, reject a binary conception of sex, treat sex as mutable, or promote "anti-American values." Exec. Order No. 14332, §§ 3(a), 4(b)(ii)(A), (B), (D), 90 Fed. Reg. 38929, 38930–31 (Aug. 7, 2025). The EO also forbade the appointees from deferring to peer review, *id*. § 4(a), (c), and directed agencies to revise existing grants to permit immediate termination for no longer advancing agency priorities or "the national interest." *Id*. § 6(b).

Eight days later, NIH Director Jay Bhattacharya issued a Directive ("Bhattacharya Directive v1") to "clarify specific issues that currently require additional guidance." Heanue ¶ 19, Ex. 15 at 4. NIH revised the Directive on July 2, 2026 ("Bhattacharya Directive v2"), Heanue ¶ 20, Ex. 16, without publicly announcing the changes.

Building off NIH's animus against "gender identity research," Bhattacharya Directive v1 stated that studies identifying "the harms" of gender affirming care were "clearly more promising" than studies of such care as treatment. Heanue, Ex. 15 at 7.[4] Both versions prescribe how researchers may frame the

[3] The Supreme Court later stayed only the portions of the judgment vacating individual grant terminations, leaving vacatur of the directives unstayed. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658–61 (2025).

[4] Bhattacharya Directive v2 now calls research into the treatments' "utility" "more promising" than research involving their "use." Heanue, Ex. 16 at 6. Setting aside the difficulty of studying the utility of a therapy without studying its use, there is no evidence that implementation of the policy has changed.

relationship between race and health. Bhattacharya Directive v1 rejected research that attributes health outcomes to "poorly measured factors like systemic racism" but recognized that "redlining and housing discrimination are clearly defined practices" that can affect health and be discussed. Heanue, Ex. 15 at 6. Bhattacharya Directive v2 goes further, instructing that systemic racism "should not be presented as established background facts or otherwise included in proposed research." Heanue, Ex. 16 at 5.

Effective October 1, 2025, HHS adopted 2 C.F.R. part 200, which permits termination pursuant to an award's terms and conditions—including, "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2026). Before October 1, 2025, HHS regulations permitted the agency to terminate an award only for noncompliance, for cause, or on consent. 45 C.F.R. § 75.372(a) (2024).

*3. NIH Creates New Systems to Screen, Renegotiate, and Terminate Grants*

On November 18, 2025, NIH issued a "Reminder of Compliance Requirements for NIH Extramural Recipients Related to Renegotiated Aims, Objectives, Titles, and Abstracts" ("November Reminder"). Heanue ¶ 21, Ex. 17. The November Reminder memorialized NIH's new reality of "negotiating" changes in grant scope and language to align with the Bhattacharya Directive and "remind[s]" awardees that such changes "become new terms and conditions of award," with which the recipient "must comply." *Id*.

A month later, NIH converted Bhattacharya Directive v1 into an agency-wide screening and enforcement system, reflected in Guidance issued December 12, 2025 ("December 2025 Guidance"). Heanue ¶ 22, Ex. 18. This Guidance, too, requires each IC to review its full portfolio of ongoing awards, and prohibits competing and continuation awards until NIH has assessed the project and addressed any perceived misalignment with NIH's priorities. *Id*. at 2.

The alignment process now begins with a computational text-analysis tool that scans grants for terms associated with potential misalignment with NIH's priorities. *Id*. at 2–3. The screening list was generated from grants terminated since January 2025 and is grouped into the same categories targeted by the vacated Award Assessments Guidance: DEI, gender, climate change, misinformation, and vaccine hesitancy. Decl. of Doe 1, ECF 7 ("Doe 1") ¶ 13, Ex. 2. Among other examples, the screening list includes "gender identity," "systemic racism," "Latinx," "pregnant person," "lactating individual," and

"climate crisis." *Id*. at 12–16. Thus, although the December 2025 Guidance declares the earlier Award Assessments Guidance no longer operative, NIH continues to use its categories and terminology to identify grants for additional scrutiny. *Compare* Heanue, Ex. 18 at 2, *with* Heanue, Ex. 14 at 21.

If the IC identifies any aspect of a project as potentially misaligned, it must be renegotiated, denied, or terminated. Heanue, Ex. 18 at 2, 5. ICs are instructed to focus on the use of terms such as "health equity" and "structural racism," and to replace that language where possible. *Id*. at 3. When the language used in a project's specific aims, abstract, budget, title, and other award materials is revised, in line with the November Reminder, the changes—including the new language—become binding terms of the award and noncompliance may trigger immediate termination. *Id*. at 5; *see also* Heanue, Ex. 17.

The December 2025 Guidance acknowledges that, in some cases, the project's entire premise may depend on the targeted framing, making renegotiation impossible. Heanue, Ex. 18 at 3. It directs ICs to terminate awards misaligned with existing priorities pursuant to 2 C.F.R. § 200.340(a)(4), regardless of the priorities in place when the grant was awarded. *Id.* at 6. And if an existing award's NOA does not contain a provision authorizing termination for nonalignment with agency priorities under 2 C.F.R. § 200.340(a)(4), the Guidance directs the IC to wait until the next budget period, issue a new NOA containing that language, and then terminate. *Id*.

In addition to the new flagging process that occurs at the IC level, NIH has created a level of final extra-statutory review for both new and continuing awards that occurs at the Office of Extramural Research ("OER") and/or HHS. NIH uses "Status 19"—formerly an administrative stage preceding release of funds—as the holding point for this review. Doe 1 ¶ 13, Ex. 3 at 3, 5. For new grants, this final review occurs after scientific peer review and approval by the IC Director. *Id*. at 6. Now, OER and an "HHS counselor" must review the applications before NIH issues the award; if either questions the project, it returns to the program officer for further renegotiation, after which it must pass through Status 19 again. *Id.* at 5–7. This has left hundreds of scientifically-vetted and IC-approved grants delayed for months or blocked altogether. *Id.* at 6; *see also* Doe 1 ¶¶ 16–17; Decl. of Minor ("Minor") ¶¶ 19–21; Decl. of Moseson ("Moseson") ¶¶ 28–31, 37.

Finally, some of NIH's new policies have not been publicly disclosed. Without public acknowledgement, NIH appears to have created limits on research into the public health impacts of

policy interventions, claiming policymakers are not "mission-relevant stakeholder groups." Heanue, ¶ 23, Ex. 19 at 4. But NIH is not using this new justification neutrally, and instead, it appears to be using it to target only that research that could be expected to uncover negative health impacts of policies favored by the Administration or positive impacts of disfavored policies. *See, e.g.*, Moseson ¶¶ 31–32; Decl. of Pagkas-Bather ("Pagkas-Bather") ¶¶ 15–17; Decl. of Ankuda ("Ankuda") ¶ 15.

### C. The Challenged Policies Are Disrupting Plaintiffs' Ongoing Research

Collectively, the Memoli Directive, Bhattacharya Directives v1 and v2, November Reminder, Award Assessments Guidance, December 12 Guidance, and unwritten agency protocols, including keyword flags and OER review, constitute the "Challenged Policies." Plaintiffs are 17 researchers working at universities and nonprofit research institutions in fields ranging from Alzheimer's disease and kidney failure to reproductive health, HIV prevention, violence prevention, and climate-related health risks. They seek relief for themselves and two proposed nationwide classes: the "Termination Class" of researchers whose grants were terminated under the Challenged Policies (which terminations are "the Terminations"), and the "Policy Class" of researchers whose existing or prospective NIH funding is subject to termination, denial, rephrasing or renegotiation under those Policies, including those deterred from applying. Compl. ¶¶ 188–205. As discussed in more detail below, the Challenged Policies are burdening researchers' private expression of disfavored views, *see infra Section* I.A.1, compelling speech as a condition of funding, *see infra Section* I.A.2, and causing irreparable harm, *see infra Section* III.

## LEGAL STANDARD

To obtain a preliminary injunction, a party must show that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) an "injunction is in the public interest." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, a preliminary injunction may issue where a plaintiff shows "serious questions going to the merits," "the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Id*. (marks and citation omitted).

The "likelihood of success on the merits . . . is the most important factor." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). And "[i]t is all the more critical 'when a plaintiff alleges a constitutional violation and injury.'" *Id.* (quoting *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023)). Accordingly, in First Amendment cases, "the moving party bears the initial burden of making a colorable claim that its . . . rights have been infringed, or are threatened . . ., at which point the burden shifts to the government to justify the restriction on speech." *Id.* (marks and citation omitted).

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS

### A. The Challenged Policies and Terminations Violate the First Amendment

The Challenged Policies violate the First Amendment for two reasons. First, by systematically targeting grants that the government suspects will lead to speech that communicates disfavored views, the Challenged Policies violate the First Amendment's prohibitions on viewpoint-based discrimination and unreasonable restrictions in government support for private speech. Second, by requiring researchers to parrot the government's script in their work to get or keep funding, the Challenged Policies impose an unconstitutional condition. The Terminations also violate the First Amendment for those reasons—and for a third one, too: they constitute retaliation for protected speech.

#### *1. The Challenged Policies and Terminations Violate First Amendment Rules Governing Funding of Private Speech*

The Terminations and Challenged Policies discriminate against researchers and projects that Defendants expect to communicate disfavored views through private speech. This violates the First Amendment. "[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts," *Thakur v. Trump*, 176 F.4th 1187, 1200 (9th Cir. 2026) (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995)), and the government may not "aim at the suppression of dangerous ideas" or "leverage its power to award [funds] on the basis of subjective criteria into a penalty on disfavored viewpoints" "even in the provision of subsidies," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)).

Even when it comes to government funds, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the

rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Though the government has broad discretion to choose its message when it is speaking, and it has no affirmative obligation to fund private speech at all, once it "design[s a program] to facilitate private speech," the First Amendment's ban on viewpoint discrimination—both against speech and speakers—governs. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542, 548 (2001). In addition, the government may not "distort [the] usual functioning" of the funded speech. *Id.* at 543.

The same rules are reflected in forum doctrine, which offers an alternative lens for evaluating restrictions imposed on government support for private speech. *Thakur*, 176 F.4th at 1201, n.6. *See also Rosenberger*, 515 U.S. at 835 (applying forum doctrine to "funding of speech"); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 683 (2010) (forum doctrine applies when government "is dangling the carrot of subsidy, not wielding the stick of prohibition"); *Koala v. Khosla*, 931 F.3d 887, 902 (9th Cir. 2019) (government funding is a "metaphysical forum"). "Under th[e forum] framework, restrictions on access to government initiatives 'must be [not only] viewpoint neutral,'" but also "reasonable" in light of the forum. *Thakur*, 176 F.4th at 1201, n.6 (quoting *Martinez*, 561 U.S. at 679).

**a. NIH Grants Support Private Speech**

Through its extramural funding, NIH supports private speech. NIH instructs that funded researchers "are expected" to "provide information to the public on the objectives, methodology, and findings of their NIH-supported research activities," and "to publish the results of research in peer-reviewed journals." Heanue, Ex. 2 § 8.4.1; *see also id.* § 8.2. Researchers thus write articles and manuscripts, present at conferences, and give invited talks in connection with their NIH grants.

Plaintiffs' and class members' NIH grants at issue have already led to hundreds of articles and manuscripts. *See*, *e.g.*, Decl. of Cohen-Wilson ("Cohen") ¶ 14 (over forty articles); Decl. of Rosso ("Rosso") ¶ 14 (nearly a dozen articles); Bell ¶ 15 (seven publications). And they have resulted in a substantial number of conference presentations, invited talks, and plenary sessions. *See*, *e.g.*, Bell ¶ 15 (six academic conferences, seven invited talks); Rosso ¶ 15 (national and international conferences); Moseson ¶ 22 (large, national conference presentation and seventy-five-minute session for hundreds of researchers, clinicians, and advocates); Decl. of Daw ("Daw") ¶ 18 ("several conference papers"); Decl.

of Green (“Green”) ¶ 11 (two lead-author conference abstracts); Doe 3 ¶ 14 (presentations at two national scientific conferences).

This dissemination and discussion of NIH-funded research is private speech. To determine “whether the government intends to speak for itself or to regulate private expression,” courts conduct a “holistic inquiry” that typically considers three factors: “[1] the history of the expression at issue; [2] the public’s likely perception as to who (the government or a private person) is speaking; and [3] the extent to which the government has actively shaped or controlled the expression.” *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). Here, each factor supports a finding of private speech.

Start with history. Since Congress first established the Institutes that would become NIH, it has directed them to study health in-house and to “assist[ ] and foster[ ]” research by others. *See* Pub. L. No. 75-244, 50 Stat. 559 (imposing this requirement on the National Cancer Institute in 1937). *See also* Pub. L. No. 79-487, 60 Stat. 421 (same for mental health in 1946); Pub. L. No. 80-655, 62 Stat. 464 (heart health in 1948); Pub. L. No. 81-692, 64 Stat. 443 (other institutes in 1950). Much like the statutes of the 1930s, 40s, and 50s, today’s statutory regime states that the ICs exist not only to “conduct” but also to “support” research. *See, e.g.*, 42 U.S.C. §§ 285, 285b, 285b-7(b)(1), 285c, 285d, 285e, 285f, 285g, 285h, 285i, 285j, 285k, 285l, 285m. NIH’s extramural funding is that support.

Second, the public is likely to perceive the speech that results from NIH-funded research as private speech. Indeed, NIH requires that “[e]ach publication, press release, or other document about research supported by an NIH award” include the following disclaimer: “‘The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.’” Heanue, Ex. 2 § 8.2.1; *see also id.* § 14.9 (requiring disclaimer for NIH-funded conferences). NIH itself therefore considers the speech to be private, and, given the disclaimers, “[m]embers of the public encountering a book, article, . . . or educational program supported by [NIH] funding would reasonably attribute its content to its author or sponsoring institution, not [the government].” *See Am. Council of Learned Societies v. Nat’l Endowment for the Humans.* (“*ACLS*”), No. 25-cv-3657 (CM), 2026 WL 1256545, at *43 (S.D.N.Y. May 7, 2026) (relying on similar disclaimer to reach this conclusion for National Endowment for the Humanities (“NEH”) funding).

Finally, NIH does not exercise the type of control over the speech that results from NIH funding that is characteristic of government speech. NIH's mission—to "seek fundamental knowledge," "expand the knowledge base," and "foster fundamental creative discoveries"—makes clear its disinterest in shaping or controlling research results, publications, or presentations. *See* Heanue, Ex. 1. *See also ACLS*, 2026 WL 1256545, at *43 (looking to agency's "declarations of purpose" to find that NEH funds private speech). NIH's process and regulations back this up: Extramural grants are often "*investigator-initiated* or *unsolicited*," shaped by the grant applicant's, not the government's, "research idea or training need." Heanue, Ex. 3 at 4 (emphasis in original). NIH does not review articles before they are published or conference presentations before they are made. *See, e.g.*, Heanue, Ex. 2 § 8.2.2 (requiring grantee to publish NIH-funded results on government site only after "the author's final version . . . has been accepted for journal publication"). And researchers generally retain intellectual property rights in the speech they publish as a result of NIH funding. *Id*. § 8.2.1.

**b. The Terminations and Challenged Policies Discriminate Based on Viewpoint**

Though the speech that results from NIH funding is private speech, Defendants are systematically discriminating against it based on actual or perceived viewpoint. As described in more detail below, NIH has targeted views such as (1) the inclusion of historically disadvantaged groups is desirable, and various forms of societal injustice can be relevant to health outcomes (the "DEI" views); (2) gender identity is real, transgender people exist and gender-affirming care can have health benefits; (3) changes in weather are caused by climate change and climate change has health impacts; (4) vaccine hesitancy is undesirable; and (5) the dissemination of inaccurate information can harm public health.

Defendants are unconstitutionally screening for projects and researchers they expect to communicate these views in a wide variety of research areas, based both on their perception of the "specific motivating ideology or the opinion or perspective of the" researchers, *see Rosenberger*, 515

U.S. at 829,[5] and their perception of what the research results and related publications are likely to say given research plans, designs, and motivations.[6]

i. Defendants Disfavor Particular Messages

Though NIH has never clearly explained what it understands "DEI" to be, it has made clear that it views DEI as a disfavored ideology and that it will deny, terminate, or otherwise penalize projects it believes support or are "based on" DEI. *See, e.g.*, Heanue, Ex. 4 at 2 (disfavoring studies "based on" DEI); Heanue, Ex. 16 at 5 (disfavoring research "based on [specific] beliefs" about "race or ethnicity"); Heanue, Ex. 15 at 5 (same for "ideologies"). NIH has penalized grants for using "DEI language," including "statement[s] regarding institutional commitment to diversity," even in projects that "do[ ] not support DEI activities." Heanue, Ex. 10 at 3. And NIH has directed ICs to "[p]ay particular [negative] attention" to phrases it perceives as proxies for pro-DEI views, like "health equity" and "structural racism." Heanue, Ex. 18 at 3. This viewpoint bias is perhaps clearest from the prohibited terms list, which includes many phrases that *support* diversity—"advancing diversity," "bolster diversity," "broaden diversity," "commitment diversity," "embrace diversity," "encourage diversity," "improve diversity," "need diversity," "support diversity"—but none that *oppose* it. Doe 1, Ex. 2 at 12–16.

Plaintiffs' experiences bear out this bias. *See, e.g.*, Green ¶¶ 12–13, 16–17 (NIH twice directed "remov[ing] any DEI language" to retain funding, and funding was approved only after researcher removed "racism," "discrimination in healthcare," "health equity," "health disparities," "race," and "unequal" from grant materials); Decl. of Albarracín ("Albarracín") ¶¶ 13–17 (grant was flagged and researcher retained funding only after removing "health disparities," "ethnic minority," "culturally diverse," "vulnerable," and "diverse backgrounds"); Rosso ¶¶ 16, 17, 20 (NIH required renegotiation

---

[5] Defendants have looked for "statement[s] regarding institutional commitment to diversity," Heanue, Ex. 10 at 3; they have required the removal of "DEI language" from researchers' biosketches, "even [where] the project itself is not focused on DEI," Heanue, Ex. 12 at 6; and they have directed ICs to look for forbidden terms in grants' "fram[ing] or justif[ication]." Heanue, Ex. 18 at 3; *see also* Heanue, Ex. 16 at 5 (prohibiting statements even in a proposal's "background facts").

[6] Defendants single out "study design[s]" that focus on "race and sex" as requiring scientific justification (notwithstanding the rigorous peer review all applications undergo), Heanue, Ex. 15 at 5; Heanue, Ex. 16 at 4–5, and they forbid certain language from being used "to define participant attributes, comparator group attributes, and to whom the study findings apply." Heanue, Ex. 15 at 6; Heanue, Ex. 16 at 6; *see also* Heanue, Ex. 18 at 3–4 (prohibiting "Latinx" to describe populations).

because of "DEI" concern, and grant initially regained funding only after replacing references to "African Americans," "disinvested" communities, "racial disparities" and "structural racism" with language about "socioeconomic differences"); Cohen ¶¶ 16, 18 (NIH required that "language regarding structural racism and health inequity" be cut to continue funding and ultimately terminated grant because the hypothesis' "reliance on racism . . . as key drivers of the hypothesized effects does not align with NIH's priorities"); Decl. of Hatcher ("Hatcher") ¶ 12 (NIH directed researcher to remove "underrepresented," "diverse," "health equity," "structural inequity," and people "marginalized by race, disability, sexuality, and/or poverty" from grant materials); Doe 1 ¶ 12 (application looking at impact of changes in abortion policy flagged for saying "equity" and "structural nature of inequitable outcomes" in project aims section, allowed to proceed only after removal); Jackson ¶ 21 (NIH directed removal of "any DEI language" from annual progress report in order to retain funding); Pagkas-Bather ¶ 12 (NIH instructed researcher to remove clause about "Black and Latinx people").

Similarly, NIH disfavors particular views on gender and sex—including that gender identity exists, that a person can be or identify as transgender, and that gender affirming care can have benefits. As with "DEI," NIH has stated that it must "ensure" it is not supporting studies "based on" gender identity. Heanue, Ex. 4 at 2. It has explicitly favored "research that aims to identify and treat the *harms*" of gender affirming care for minors over "studies that involve the use of [such care] to treat gender dysphoria." Heanue, Ex. 15 at 7 (emphasis added). And it has prohibited and flagged terms like "Latinx," "pregnant individual," and "lactating person," *see* Heanue, Ex. 18 at 3–4; Doe 1, Ex. 2 at 16—all of which stand as proxies for the belief that transgender, non-binary, and gender-nonconforming people exist and are worthy of inclusion.

Plaintiffs' experiences also bear this viewpoint bias out. *See* Hatcher ¶ 12 (NIH directed researcher to remove "sexual gender minority" and "pregnant person"); Moseson ¶ 23 (NIH directed researcher to change "pregnant people" to "pregnant women" in research about abortion care); Albarracín ¶ 17 (researchers removed "transgender," "gender," and "LGBT" from application at NIH's direction); Decl. of Edwards ("Edwards") ¶¶ 15–18 (NIH directed researcher to use "biological sex" instead of "gender"); Pagkas-Bather ¶ 12 (NIH instructed researcher to remove "sexual and gender minorities"); Decl. of Doe 4, ECF 10 ("Doe 4") ¶ 17 (NIH directed researcher not to foreground

LGBTQ populations especially at risk of child sex trafficking and in another grant application to remove "gender" to comply with EO 14151); Doe 3 ¶¶ 16–18 (NIH advised researcher to omit "gender-affirming" language to continue grant funding after months-long delay).

NIH has also penalized the views that extreme weather is connected through the phenomenon of climate change, and that climate change can impact health. *See* Heanue, Ex. 14 at 21 (research looking at "health effects of climate change" is "not consistent with HHS/NIH priorities"). The forbidden terms list includes "changing climate," "climate change," "climate crisis," "environmental justice," "fossil fuel," and "global warming." Doe 1, Ex. 2 at 12. And NIH has advised Plaintiffs studying the health effects of weather to talk about "temperature fluctuations" and "extreme heat," "not climate change." Minor ¶ 22; Bell ¶ 31.

In addition, NIH has expressly stated that "[i]t is the policy of NIH not to prioritize research activities that . . . explore ways to improve vaccine interest and commitment." Heanue, Ex. 11 at 4; Heanue, Ex. 14 at 21. *See also* Albarracín ¶ 26 (application funded after removal of words like "reluctance to vaccinate," "intentions to vaccinate," "vaccination norms"). It has also directed employees to review "grants [that] fight misinformation or disinformation." Heanue ¶ 24, Ex. 20 at 3–5; Decl. of Doe 5 ("Doe 5") ¶¶ 18–19 (grant studying health misinformation on social media terminated as an "attempt[] to influence the public's opinion"); Albarracín ¶ 26 (grant on termination list for connection to misinformation). And it has directed researchers to remove the term "abortion" from grant materials. *See* Bell ¶ 17; Moseson ¶ 23. *See also* Doe 1 ¶ 17 (high-scoring application about impacts of restrictions on abortion care deemed "non-aligned with NIH priorities" for "trying to influence policy").

ii. <u>The Challenged Policies and Terminations Target Viewpoints</u>

Courts considering similar grant policies and terminations by the Trump Administration have consistently held they are viewpoint-based. *See Thakur*, 176 F.4th at 1201 (in this context, "DEI . . . reflect[s a] perspective") (citation modified); *ACLS*, 2026 WL 1256545, at *44 ("DEI is, of course, a viewpoint."); *Rhode Island Latino Arts v. Nat'l Endowment for the Arts* ("*RILA*"), 800 F. Supp. 3d 351, 362 (D.R.I. 2025) (NEA's policy of penalizing applications "deemed to promote gender ideology" is viewpoint-based). *See also Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F. Supp. 3d 380, 393–94 (D. Mass.

2025) (HHS policy of removing all scientific articles that acknowledge "the existence of people who identify themselves as transgender" is viewpoint-based).

This conclusion follows from the Supreme Court's opinion in *Rosenberger*, where the Court considered whether a prohibition on funding religious publications targeted content (the topic of religion) or viewpoint (religious perspectives). Recognizing that religion has been a "subject[] of philosophic inquiry throughout human history," the Court nevertheless concluded that, in context, "viewpoint discrimination [was] the proper way to interpret" the discrimination at issue because the government allowed discussion of all *subjects*, including religion, as long as they were not discussed from "religious editorial viewpoints." 515 U.S. at 831. In reaching this conclusion, the Court rejected the idea that to constitute viewpoint discrimination, the government's disfavor must be focused on one, specific view. Targeting an entire set of perspectives also crosses the line, for debate is also "skewed" when "multiple voices are silenced." *Rosenberger*, 515 U.S. at 831–32. Most relevant for present purposes, the Supreme Court offered up this example: "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Id*. at 831.

Indeed, the Ninth Circuit has already applied *Rosenberger*'s reasoning to hold that grant terminations very similar to those at issue here occurred "because of the recipients' perceived . . . *viewpoints*." *Thakur*, 176 F.4th at 1201 (emphasis added). It based that conclusion on two things that are present here as well. First, a recognition that, in the current funding context, the terms "DEI, DEIA, and environmental justice are inherently directional; they reflect 'perspective[s],' rather than neutral topics." *Id*. (quoting *Rosenberger*, 515 U.S. at 829). Second, evidence showing that the government identified grants for termination based on whether they "focused on or promoted (in whole or in part) 'environmental justice,' [DEI], and 'gender ideology'"; that agencies relied on "keyword searches"; and that agencies "targeted grants with words like 'equity,' 'diversity,' 'inclusion,' and 'justice.'" *Id*. That, the Ninth Circuit concluded, was sufficient to show "that the purpose of the grant terminations was to suppress the particular point of view the grant recipients promoted." *Id*.

And, as the Ninth Circuit made clear in an earlier decision in *Thakur*, that Defendants were guided by EOs that smear these and similar viewpoints "reinforces [the] conclusion" of viewpoint bias.

*Thakur v. Trump*, 163 F.4th 1198, 1206 (9th Cir. 2025). *See also supra* Statement of Facts (describing viewpoint biases of EO 14173, EO 14151, and EO 14168); Heanue, Ex. 4 at 2 (NIH policy is "consistent with" the EOs); Doe 3 ¶ 25 (NIH denied application because it "does not comply with applicable Executive Orders and related policy guidance"). Similarly, the fact that "more than a dozen agencies selected particular grants for termination regardless of the programs through which they were funded, based on their connection to" these same views, as shown by other lawsuits challenging similar policies by other agencies, further evidences the viewpoint bias here. *Thakur*, 163 F.4th at 1205 (considering DEI, DEIA, and environmental justice viewpoints). *See also ACLS*, 2026 WL 1256545, at *44–49 (DEI-based terminations to implement EOs as to NEH grants); *RILA*, 800 F. Supp. 3d at 368 (NEA policy of "disfavor[ing] applications that promote gender ideology"). Thus, the Challenged Policies and Terminations violate the First Amendment's bar on viewpoint discrimination in government facilitation of private speech.

**c. The Challenged Policies and Terminations Are Unreasonable in Light of the Purposes of NIH Funding**

The Challenged Policies and Terminations separately violate the First Amendment's prohibition on restrictions that are unreasonable in light of the purpose of the funding. *See Thakur*, 176 F.4th at 1201, n.6 (quoting *Martinez*, 561 U.S. at 679). Or, put another way, they impermissibly "distort [the] usual functioning" of the "medium of expression." *Velazquez*, 531 U.S. at 543.

Given NIH's mission of expanding knowledge and encouraging scientific discovery, blocking grants because the resulting speech may express views that, while accurate, are disfavored by the government, is unreasonable and distorts the medium of biomedical speech. *See Schiff*, 784 F. Supp. 3d at 394 (crediting argument that removing language that acknowledges the existence of transgender people from HHS forum designed to promote patient safety "directly contradict[s forum's] purpose"); *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 630 (D.C. Cir. 2024) (holding that NIH's practice of removing from its social media posts any comment that contained "the terms 'animal,' 'testing,' and 'cruel'" was not reasonable because, according to NIH, the purpose of the forum was to communicate important public health information and to engage the public on such issues for educational purposes). *See also* Bell ¶ 20 (noting that renegotiation pursuant to the Policies made grant materials less clear and precise); Moseson ¶¶ 24, 36 (forced renegotiation "had nothing to do with the

scientific methods, activities, or rigor of the research—they only served to make the study aims and focus less clear" and "felt designed to obfuscate the intention and aims of our research study"); Green ¶ 20 (limitations on "what demographic groups I can . . . write about . . . will limit the impact of the findings and publications"); Edwards ¶ 18 ("restrictions on the use of the term 'gender' may prevent us from fully examining and reporting [study participants'] experiences").

2. *The Policies and Terminations Unconstitutionally Compel Speech*

The Challenged Policies and Terminations also violate the "cardinal constitutional command" against "[c]ompelling individuals to mouth support for views they find objectionable[.]" *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018). Pursuant to the Challenged Policies, Defendants actively compel speech, requiring that researchers not only *avoid* certain terms but affirmatively *use* their opposites to have a hope of retaining or obtaining funding. Through the renegotiation process, researchers have been forced to say, for example, "pregnant women," not "pregnant people," Moseson ¶ 23; "temperature fluctuations," not "climate change," Minor ¶ 22; "reproductive health," not "abortion," Bell Decl. ¶ 19; and "biological sex," not "gender," Edwards ¶¶ 15–17. *See also* Hatcher ¶ 23, Ex. 2 (forbidden terms include "birthing people," "lactating individual," "climate crisis," and "global warming"); Moseson ¶ 23 (directed to change "policy restrictions [arising from *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ("*Dobbs*")]" to "policy changes"); Bell ¶¶ 27–29 (instructed to state that foreign research is justified because it will improve Americans' health). Defendants also direct researchers to change language in pending applications. *See, e.g.*, Bell ¶ 31 (directed to change "climate change" to "extreme heat" and "pregnant people" to "pregnant women" in application); Edwards ¶¶ 15–17 (directed to use "biological sex" instead of "gender" in application).

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The government can no more compel people "to utter what is not in [their] mind," *id.* at 634, than it can prohibit them from uttering disfavored messages. *See supra* Section I.A.1.

That the government is compelling speech as a condition of government funding cannot save it. *See, e.g., Agency for Int'l Dev. v. Alliance for Open Society Intern. Inc.*, 570 U.S. 205, 213–14 (2013) (a

funding condition "compel[ling] the endorsement of ideas that [the government] approves" "can result in an unconstitutional burden on First Amendment rights") (citation omitted); *Finley*, 524 U.S. at 587 (government cannot "manipulate[]" a subsidy "to have a coercive effect") (citation modified). The Fifth Circuit has held, for instance, that a Texas law that compelled speech from booksellers as a condition of receiving money from the state—requiring them to rate books according to a government rubric in order to be able to sell to state schools—violated the First Amendment, for it "require[d] Plaintiffs to 'either speak as the State demands' or suffer the consequences." *Book People, Inc. v. Wong*, 91 F.4th 318, 324, 338–39 (5th Cir. 2024) (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023)). That Defendants compel researchers' speech, while at the same time requiring them to disclose that the speech reflects their own views and not those of NIH, only highlights the injury. *See supra* Section I.A.1.a. *Cf. Rust v. Sullivan,* 500 U.S. 173, 200 (1991) ("the university is a traditional sphere of free expression so fundamental to the functioning of our society that the [First Amendment restricts the] Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds").

Pursuant to the Challenged Policies, language changes compelled through renegotiation "become new terms and conditions of [the] award," with which the recipient "must comply," presumably determining what researchers must say in resulting presentations, publications, press releases, and more. *See* Heanue, Ex. 17. *See also* Moseson Decl. ¶ 38, Ex. 5 at 6–7 (NOA includes "SPECIAL TERM AND CONDITION" stating that "[t]he recipient has revised the Abstract, Public Health Relevance Statement, and Specific Aims" and "[t]he project must be carried out in accordance with . . . the agreed upon updates"). And Defendants track what all grant recipients say with NIH funds. *See* Heanue, Ex. 2 § 8.2.1 (annual progress reports must include a list of "[p]ublications resulting from . . . [the] NIH grant-supported project" to date). The compelled speech requirement thus acts as "an ongoing condition on recipients' speech and activities, a ground for terminating a grant after selection is complete." *Open Society*, 570 U.S. at 218. *See, e.g.*, Moseson ¶ 41 ("I am fearful that NIH will terminate my funding if I speak or write about my work or present my findings in ways that differ from the language that NIH required us to adopt."); Doe 3 ¶ 30 (noting concern that, after having to renegotiate after first year of funding, "publish[ing] or present[ing] . . . findings from the first year . . . could result in NIH terminating

[the] grant again"); Green ¶ 20 ("I am concerned about being able to describe any work funded by this grant in publications, presentations, or other avenues in a manner that is inconsistent with the language that NIH forced me to adopt in my grant materials."); Albarracín ¶ 27 (same).

The condition also "leverage[s] funding to [compel] speech outside the contours of the federal program," separately and additionally violating the First Amendment. *Open Society*, 570 U.S. at 206. It attaches not only to how individuals can describe their NIH research, but also to how they can describe *themselves*—their backgrounds, motivations, and worldviews—in public-facing grant materials. Though the language appears in the grant materials, it defines the researcher, not just the project. *See id.* at 217, 219 (finding that compelled certification regarding organization's policy beliefs violated the First Amendment even though it appeared in award documents). Requiring a scientist to identify as an extreme weather researcher, rather than a climate change researcher, *see* Minor ¶ 23, or a person who studies "pregnant women," not "pregnant people," resounds outside of the scope of the NIH funding. *See also* Decl. of Salles ("Salles") ¶ 19 (describing inability to accurately describe career focused on gender equity due to prohibited terms list). And while defining oneself in a way that appeals to a funder is part of most funding processes, *having to* define in a particular way is not. Moreover, because many of the compelled terms convey a view—for example, that all pregnant people are women—and are required for that very reason, forcing researchers to use the terms in effect pushes them to "avow . . . belief[s]" contrary to their own. *Open Society*, 570 U.S. at 218. *See also Bates v. Pakseresht*, 146 F.4th 772, 785, 789 (9th Cir. 2025) (requiring person to "reinforce the state's perspective of sexuality and gender identity as evolving concepts" to qualify for foster parenthood unconstitutionally compelled speech). Having to use the government's language in NIH-research-related speech—including about themselves—makes it impossible, or at a minimum intellectually suspect, for researchers to "then turn around and assert a contrary belief . . . on [their] own time and dime." *Open Society*, 570 U.S. at 218.

*3. The Terminations Constitute Retaliation*

Finally, the Terminations separately violate the First Amendment because they constitute retaliation for speech. To succeed on a retaliation claim, the Termination Class must show "(1) [they] engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was

a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Koala*, 931 F.3d at 905 (citation modified).

Courts have consistently held that grant termination constitutes an adverse action. *See, e.g.*, *Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 84 (D.D.C. 2026) (denying "meaningful access to a grant program" is adverse action); *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 54–55 (D.D.C. 2026) (termination of grants constituted adverse action); *President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 121 (D. Mass. 2025) (same).

And, as described in detail above, NIH has chosen which grants to terminate based on the protected views of researchers, the views it expected project results, publications, and presentations to express, and/or the speech that in fact resulted from the funding. *See supra* Section I.A.1.b. *See also* Rosso ¶ 26 (project terminated because, among other things, it defined "structural racism" as "residential segregation, inequitable distribution of resources, and community disruption"); Cohen ¶ 22 (project terminated because of grant's "overall hypothesis . . . 'that neighborhood inequity will modify the risk of cognitive decline,'" reflecting a "reliance on racism" as a causal mechanism); Salles ¶¶ 14–15 (though project was "proceeding well," NIH terminated it using stock anti-DEI language); Decl. of Doe 2 ("Doe 2") ¶ 23 (same); Daw ¶¶ 17–18 (same for grant that "support[ed] project's hypothesis that racial/ethnic disparities in kidney disease incidence and mortality are worsened in counties characterized by higher levels of structural racism"). This evidence, along with that described *supra* Section I.A.1.b, demonstrates that the terminations were substantially motivated by researchers' protected speech conveying such viewpoints.

**B. The Policies Violate the APA**

Plaintiffs and the Policy Class are also likely to succeed on their APA claims because the Challenged Policies are arbitrary and capricious, violate congressional mandates that require IC Directors to make final decisions on grant funding based on set criteria, and violate regulations barring terminations for changes in priorities that postdate the awards.[7]

---

[7] The APA also requires courts to "hold unlawful and set aside" agency action "found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As explained above, the current policies violate the First Amendment, and Plaintiffs are also likely to prevail on their APA claim for that reason.

*1. The Challenged Policies Are Final Agency Action*

As a threshold matter, the Challenged Policies are final agency action within the meaning of the APA because they (1) "mark the consummation of the agency's decisionmaking process" and (2) are those "by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 n.15, 178 (1997) (citation modified). The "finality element must be interpreted in a pragmatic and flexible manner," *Dietary Supplemental Coal., Inc. v. Sullivan*, 978 F.2d 560, 562 (9th Cir. 1992) (citation modified), with a focus on "practical and legal effects." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

The Challenged Policies reflect the consummation of Defendants' decision-making. They identify viewpoints that are "out of alignment with NIH priorities" and that NIH will no longer fund, and detail the steps NIH officials must take to execute that policy, including specific steps for flagging, renegotiating, terminating, and denying grants and applications. Heanue, Ex. 18, at 3, 6. They bind NIH and HHS staff, who are tasked with implementation. *See id*. at 2, 5 (IC staff "must" apply the required process to "*all* competing applications . . . and ongoing projects" and flagged research "must be renegotiated . . . or . . . terminated or not awarded") (emphasis in original); Heanue, Ex. 4 at 3 ("This Directive *shall* be implemented by all relevant NIH personnel") (emphasis added). *See also Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (holding agency memoranda were final agency action because they "bound" agency staff from continuing certain programs) (citation modified).

That Defendants have taken concrete steps to implement the Challenged Policies—detailed in the terminations, renegotiations, and denials discussed above, *see supra* Section I.A.1.b.—further evidences their finality. *See, e.g.*, *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 579–80 (9th Cir. 2019) (agency action final where "enforcement activities confirm[ed] its decision-making process was not only consummated, but operationalized"); *New York v. U.S. Dep't of Energy*, No. 6:25-cv-01458-MTK, 2025 WL 3140578, at *9 (D. Or. Nov. 10, 2025), *appeal dismissed*, No. 26-214, 2026 WL 1049169 (9th Cir. Apr. 13, 2026) (agency action final where it "marks a definitive and specific agency position that [the agency] has subsequently enforced."). This implementation also shows that the Challenged Policies have consequences for researchers.

2. *The Challenged Policies Are Arbitrary and Capricious*

Under the APA, agency actions are unlawful and must be set aside if they are arbitrary and capricious. 5 U.S.C. § 706(2)(A). A final agency action must be supported by "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation modified), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An agency action is also arbitrary and capricious if it "relied on factors which Congress has not intended it to consider." *Id.* The Challenged Policies fail on all accounts.

*First*, Defendants have not offered a reasoned justification for purging certain viewpoints from scientific research. They make broad assertions that the disfavored views "do[] not follow the principles of gold-standard science," or are not "promising." *See* Heanue, Ex. 15 at 6–7; *see also* Heanue, Ex. 16 at 5–6. But Defendants have not explained why this is the case nor have they "examine[d] the relevant data and articulate[d] a satisfactory explanation." *State Farm*, 463 U.S. at 43. Characterizing views as "broad," "poorly defined," or "poorly measured," *see* Heanue, Ex. 15 at 6; Heanue, Ex. 16 at 5, is no substitute for a data-based explanation. *See APHA*, 791 F. Supp. 3d at 182 (finding "not a shred of evidence" to back up claims that "research . . . on [diversity and] gender identity [is] often unscientific [and provides] little . . . return on investment.") (citation modified). Why, for example, should measurable impacts of systemic racism be excluded from research relating to determinants of health? Far from reasoned decisionmaking, the Challenged Policies weaken NIH-funded research by taking certain answers to scientific questions off the table. *See, e.g.*, Rosso ¶ 37, Edwards ¶ 18, Green ¶ 20.

Moreover, some of the Policy changes are so nonsensical that it is hard to imagine a reasoned explanation for them. Why, for example, do Defendants permit research into "extreme weather," but not "climate change"; why allow research into the harms of gender-affirming care but not its benefits?

The new and unexplained limitation on research into the public health impacts of policy interventions is perhaps the most perplexing. According to Bhattacharya, research that aims to provide evidence to policymakers rather than healthcare professionals is "not in-scope." Heanue ¶ 25, Ex. 21 at 17. Why, then, is NIH simultaneously seeking "research that informs financing, incentives, workforce challenges, consumer decision making, and efficiency in care delivery" or research relevant to health

outcomes for which "the pathway can be policy, delivery, financing, or behavior"? Heanue ¶ 26, Ex. 22 at 3–4.

In application, it is apparent that expected outcome drives implementation of this unexplained rule: it is used when research is likely to show the negative impacts of favored policies on public health or the positive impacts of disfavored ones. *See* Moseson ¶¶ 16–19, 23–38 (application blocked for trying to "influence" policy, even though research merely documents impact of *Dobbs* on abortion access and health outcomes); Bell ¶ 11, 13–19 (similar); Doe 1 ¶¶ 9, 17 (similar); Ankuda ¶¶ 9–15 (high-scoring application likely to highlight negative clinical impact of Medicare Advantage plans denied for influencing policy, while applications that minimized critiques of Medicare Advantage plans were funded, as were worse-scoring applications focused on different policy areas); Pagkas-Bather ¶¶ 15–18 (research likely to demonstrate that basic income guarantee improves health outcomes for low-income people with HIV is in jeopardy of termination); Albarracín ¶¶ 20–24 (researcher directed to remove "harm reduction" from application to research substance abuse disorders).[8]

*Second*, by scanning grants for renegotiation or termination based on the use of terms like "minorit[y]," "gender," "racism," "underrepresented," "DEI," "equit[y]," or "LGBT," Doe 1, Ex. 2 at 12–16, the Agency has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. *See, e.g.*, 42 U.S.C. §§ 285t(b); 283p; 282(b)(8)(D)(ii) (describing, respectively, congressional mandates to "give priority to . . . supporting minority health disparities research"; "encourage efforts to improve research related to the health of sexual and gender minority populations";

[8] Defendants may attempt to justify the impacting-policy prohibition by stating that such research does not relate to variables that "could be influenced by biomedical research," Heanue, Ex. 21 at 17, but that is illogical—*see, e.g.*, Rosso ¶ 38 (explaining that biomedical and behavioral interventions cannot be successful without considering social conditions, and that interventions targeted at neighborhoods can be incredibly powerful approaches to improve health)—and it ignores NIH's role of supporting research precisely because it can broadly improve public health, including through providing information to policymakers. *See, e.g.*, Moseson ¶¶ 16, 35 (noting that NIH funds research "in a host of areas that impact policies at all levels of governance, from hospital policies to national and international guidelines," and explaining that grant was submitted in response to program announcement for proposals evaluating the impact of sudden legal or policy changes and specifying policymakers as an intended audience); Pagkas-Bather ¶ 16 (noting that NIH still funds some research that could impact future policy decisions).

and "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities").

*Third*, NIH has implemented a policy not to fund "vaccine hesitancy," "climate change," and "misinformation," without any public acknowledgment whatsoever. Doe 1, Ex. 2 at 5, 12, 16. Indeed, it has publicly stated that the Memoli Directive enacting these prohibitions is no longer in effect. Heanue, Ex. 18 at 2. Defendants' failure to accurately acknowledge the contours of its policy violates one of the most basic requirements of the APA. *See Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1247 (9th Cir. 2026) (affirming arbitrary and capricious holding where Department did not "give the grantees an opportunity to learn about or address the Department's unpublished change in policy affecting its grant continuation process.").

### 3. *The Challenged Policies Strip IC Directors of Their Authority to Make Final Decisions on Awarding Grants and Are Contrary to Law*

Under the APA, a reviewing court may also "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or is in "excess of statutory . . . authority." *Id.* §706(2)(C). Defendants' policy of requiring OER or HHS, rather than IC Directors, to conduct final review of grants flagged for alleged misalignment with agency priorities violates the law in two ways.

*First*, the policy violates Congress' explicit mandate that it is IC Directors who "shall" "review and make the final decision with respect to making [a research grant] award." 42 U.S.C. § 284(b)(3)(A). The word "shall" is mandatory, meaning that the IC Director—and only the IC Director—must review and make the final decision regarding a new grant application. *See Serv. Emps. Int'l Union v. United States*, 598 F.3d 1110, 1113 (9th Cir. 2010). In a similar vein, the statute provides that it is the "[HHS] Secretary, *acting through the [IC] Director*," who "may make grants . . . for research, training, or demonstrations"—regardless of whether they are new or renewal applications. 42 U.S.C. § 284(b)(2), (B) (emphasis added).

*Second*, through empowering OER and HHS to make decisions pursuant to the Challenged Policies, Defendants have flouted the standards Congress imposed on final grant application review. Regarding applications for future grants, 42 U.S.C § 284(b)(3) requires that the IC Director "take into consideration, as appropriate," the IC's mission and strategic plan, "programs or projects funded by other agencies on similar research topics," and "advice by [IC] staff, "advisory council or board"—not

the presence of disfavored views. *Id.* § 284(b)(3)(B). Further, 42 U.S.C. § 289 requires that the IC Director base decisions on technical and scientific peer review of applications. *See id.* § 289; *see also id.* § 284(b)(2)(B). Empowering OER and HHS decisionmakers to rely on unwritten priorities and viewpoint-signifying terms supplants the criteria mandated by Congress.

*4. Allowing Terminations for Subsequent Changes in Agency Priorities Is Contrary to Law*

The Challenged Policies require NIH to terminate grants issued under prior agency priorities if they are purportedly not aligned with the new priorities set forth in the Bhattacharya Directive. *See* Heanue, Ex. 18 at 6. This is also contrary to law. The claimed basis for such terminations—2 C.F.R. § 200.340(a)(4), which allows for termination "if an award no longer effectuates the program goals or agency priorities"—can only be based on priorities in place when the award was issued. *See New Jersey v. OMB*, No. 1:25-cv-11816-IT, 2026 WL 2069832, at *11 (D. Mass. July 17, 2026).

The plain language of Section 200.340(a)(4) compels this conclusion. The provision allows for termination only if an existing grant "no longer effectuates *the* program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). "[T]he definite article 'the' particularizes the subject which it precedes and is a word of limitation." *Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 n.3 (9th Cir. 2012). In contrast to "the indefinite or generalizing force of 'a' or 'an,'" use of "the" followed by a particular noun (*i.e.*, *the* program or *the* agency priorities) indicates that the noun's identity is discrete and certain. *Id. See also Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021) ("using a definite article with a singular noun . . . seems to speak of . . . a discrete thing"). To that end, "*the* program goals or agency priorities" must mean the specific goals and priorities in place at the time of the initial award, 2 C.F.R. § 200.340(a)(4) (emphasis added), not just *any* goals or priorities that an agency could later identify.

The phrase "*no longer effectuates* the program goals or agency priorities" further confirms this interpretation. *Id.* (emphasis added). "No longer effectuates" necessarily implies that the award previously effectuated the agency goals or priorities—meaning they must previously have been in place. *See OMB*, 2026 WL 2069832, at *11.

Further, interpreting Section 200.340(a)(4) to permit termination based on program goals or agency priorities that did not exist at the time the award was issued "would render the other grounds" of Section 200.340(a)—non-compliance with the grant's terms and conditions or consent of the grantee—

"superfluous." *Id*. at *12. Relying on those narrower circumstances would never be necessary if NIH could invoke new goals or priorities to terminate grants whenever it wished.

What's more, "[t]he broader regulatory scheme dictates that an agency may not terminate grants pursuant to" Section 200.340(a)(4) "solely because" the program goals or "agency's priorities have changed," because related regulations prioritize "ensuring that grantees are on notice, before applying, as to what the program goals and agency priorities are for any particular award." *Id.* at *13–14 (citing, *e.g.*, 2 C.F.R. §§ 200.202(a), 200.203(b)(1), 200.204(a)(8), 200.204(c)(1)).

The requirement to terminate grants for non-alignment with the priorities set forth in the Bhattacharya Directive thus violates the APA.

## II. THE TUCKER ACT DOES NOT DEPRIVE THIS COURT OF JURISDICTION

Defendants may argue that the Tucker Act deprives this Court of jurisdiction over Plaintiffs' APA challenges to the Challenged Policies, and First Amendment challenges to the Terminations. Not so. With respect to the APA claims, the Supreme Court has made clear that the Tucker Act does not preclude APA challenges to forward-looking policies. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring); *id*. at 2662–63 (Roberts, C.J., concurring in part and dissenting in part). As Justice Barrett explained, "[t]hat the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear." *Id*. at 2661 (citation omitted). With respect to the First Amendment Terminations claims, as courts in this district have recognized, sovereign immunity—which was the sole basis for the Supreme Court's orders in *APHA,* 145 S. Ct. 2658, and *Department of Education v. California*, 604 U.S. 650 (2025)—is no barrier to "suits alleging that a federal official violated the Constitution." *California v. Wright*, No. 26-cv-01417-RFL, 2026 WL 1915590, at *7 (N.D. Cal. July 2, 2026) (citation modified). Moreover, because Plaintiffs could not assert their First Amendment claims in the Court of Federal Claims, *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983), Congress would have had to clearly state its intent to leave Plaintiffs with no forum for them. *Webster v. Doe*, 486 U.S. 592, 603 (1988); *accord Wright*, 2026 WL 1915590, at *9. It did not. *See Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 958 (N.D. Cal. 2025), *appeal dismissed*, No. 26-263, 2026 WL 1049175 (9th Cir. Feb. 11, 2026) (noting "no evidence," much less a

clear statement). *See also Wright*, 2026 WL 1915590, at *9 (collecting cases from around the country holding that the Tucker Act does not strip district courts of jurisdiction over constitutional challenges to grant terminations).

## III. ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Thakur*, 176 F.4th at 1205 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Ninth Circuit has already applied this rule in the context of viewpoint-based grant terminations. *Id*. The Terminations and Challenged Policies are halting research-related speech every day. *See, e.g.*, Daw ¶ 19; Doe 1 ¶ 19; Doe 2 ¶¶ 25–28. Until the forced renegotiations are enjoined, researchers will continue to reasonably fear they must use the government's preferred script when they speak, write, or present findings. Moseson ¶ 41; Albarracín ¶¶ 14–17, 19, 22-24, 26-27; Edwards ¶¶ 14, 16–18; Bell ¶¶ 17, 19, 32; Green ¶ 20; Doe 3 ¶ 30. That may result in "misattribut[ing]" or "not account[ing] for" important biomedical explanations. Rosso ¶ 37. And, as long as the Challenged Policies are in place, some researchers cannot fairly compete or apply for NIH funding at all. *See, e.g.*, Hatcher ¶¶ 23–29; Moseson ¶ 42; Albarracín ¶¶ 27, 29; Edwards ¶¶ 19–24; Salles ¶ 19; Bell ¶¶ 30–32; Daw ¶ 22; Doe 1 ¶¶ 20–22; Doe 2 ¶¶ 33–34; Doe 4 ¶¶ 12–15, 24, 29; Doe 5 ¶¶ 22–24.

In addition to these impacts on speech (and the related negative effects on public health from failing to accurately describe findings), the Challenged Policies and Terminations are stopping necessary data collection and undermining the relationships on which community research depends. Cohen ¶¶ 24–28 (unless funding is restored in the next few months, "the time gap of our longitudinal data will become too large to continue data collection," and "absence from the community of greater than a year will do tremendous damage to future recruitment efforts for clinical trials"); Salles ¶ 17 (without funding, planned two-year follow-up to assess lasting change cannot happen, sharply limiting the value of work already completed); Rosso ¶¶ 31–35 (cancellation of grant in fifth year "jeopardizes" the ability to analyze already-collected data and undoes "over 10 years" of building community trust); Daw ¶¶ 20–21. As long as the Terminations remain in place, interrupted follow-ups and unfinished analyses also

jeopardize participants' access to information about their health. Rosso ¶ 32 (noting inability to "determine whether participants have dementia" and advise them accordingly); Cohen ¶¶ 24, 26.

NIH's viewpoint-driven terminations and disruptions have also impacted projects, staffing, and career trajectories in ways that, without prompt relief, will never be repaired. *See* Salles ¶ 16 ("[m]y department . . . has given me an extremely short amount of time to find further funding or else lose my job"); Rosso ¶ 38 ("I am now considering whether I will have to pivot my research away from social factors"); Doe 2 ¶¶ 25–29 (describing resulting staffing changes and shortages, running out of bridge funding, and "compounding" "enormous negative consequences for my job security and career development"); Green ¶¶ 19–21 (detailing negative impact of funding disruptions on career trajectory and noting "health insurance coverage gap" and lost income from delays); Doe 3 ¶ 32 (forced redirection "has cost me the specialized expertise I spent my career building"); Jackson ¶ 27 (expecting to have to lay off two employees and possibly having to leave her current research field if funding does not resume soon); Daw ¶ 19 (noting team members had to spend more time on responsibilities outside of research relating to grant to make up for lost funding); Doe 5 ¶¶ 21, 24 (describing loss of staff and repurposing startup funds that will soon run out, after which project cannot continue; consequently "applying for research grants abroad" and "considering moving out of the United States"). *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Plaintiffs' entire careers may be constrained by professional opportunities they are denied today.").

A later judgment cannot restore speech withheld, time-sensitive work abandoned, community trust lost, training forgone, or career opportunities lost. *See id.*; *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

## IV. THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

The balance of the equities and public-interest factors—which merge in actions against the government—both strongly favor a preliminary injunction. *Baird*, 81 F.4th at 1040. Initially, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (*en banc*) (citation modified); *see Thakur*, 176 F.4th at 1205–06; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677–78 (9th Cir. 2021), *overruled on other grounds by Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622 (9th Cir. 2026)

(public has a strong interest in ensuring that federal agencies follow the law). Furthermore, absent an injunction, Defendants' policies will not only continue to harm researchers, *see supra* Section III, but also substantially harm the public, who will lose the benefits of the delayed, distorted, or cancelled research—and who may never recover the knowledge, treatments, and cures that otherwise would have been produced. *See e.g.*, Salles ¶ 17 (termination means public will not learn if intervention has long-term impact on sexual harassment); Rosso ¶¶ 32–33 (data gathered over four-plus years will not be shared with community and planned publications suggesting targets for later-life cognitive protection will not occur); Edwards ¶ 24 (limitations on research will "hinder the development of effective prevention strategies" and "reduce the positive impact of this research on the health of LGBTQ+ youth and/or Indigenous youth"); Albarracín ¶ 29 ("[D]ecades of building trust in science among the communities we serve have been and will continue to be severely disrupted by the NIH dictating which viewpoints are acceptable to study").

On the other side of the scale, the requested injunction would impose no meaningful harm to Defendants. Defendants have no legitimate interest in continuing a likely unlawful practice. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Even with an injunction, NIH would retain its discretion to make lawful funding decisions and adopt lawful scientific and programmatic priorities. Enjoining the Challenged Policies would not disburse funds, and so would create no irreparable fiscal injury. *See Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1141 (9th Cir. 2025). And *Thakur* confirms that any fiscal concerns from reinstating terminated grants do not overcome the constitutional injuries and public interests in favor of addressing the constitutional violations. 176 F.4th at 1205–06.

## V. THE COURT SHOULD STAY THE CHALLENGED POLICIES UNDER 5 U.S.C. § 705

The Court should also stay the Challenged Policies under 5 U.S.C. § 705, which authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "The scope of interim relief under Section 705 is consistent with the scope of final relief under 5 U.S.C. § 706 . . . of the APA, which grants federal courts the authority to 'hold unlawful and set aside agency actions' on a nationwide basis when the challenged action is held unlawful." *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026) (citation modified). Thus, unlike preliminary injunctions, a

§ 705 stay need not be limited to party-specific relief, but "[t]he standard for granting a § 705 stay is essentially the same as the standard for granting a preliminary injunction." *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1133 (N.D. Cal. 2025). For the same reasons a preliminary injunction is warranted, the Court should grant a stay of the Challenged Policies.

## VI. THE COURT SHOULD WAIVE THE BOND REQUIREMENT

The Court should exercise its discretion to waive a bond under Fed. R. Civ. P. 65(c) because there is no "realistic likelihood of harm to the defendant from enjoining his or her conduct," *City & Cnty. of San Francisco v. U.S. Dep't of Just.*, 822 F. Supp. 3d 1056, 1069 (N.D. Cal. 2026) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)), and "requiring a bond would stifle Plaintiffs' enforcement of their rights under the APA and the First Amendment." *Thakur v. Trump*, 800 F. Supp. 3d 1044, 1074 (N.D. Cal. 2025). At most, if the Court is inclined to find some bond is warranted, it should "request mere nominal security" of no more than $100 from Plaintiffs. *See Am. Ass'n of Univ. Professors*, 815 F. Supp. 3d at 977; *Thakur*, 800 F. Supp. 3d at 1074.

## CONCLUSION

For all the reasons discussed herein, the Court should grant Plaintiffs' motion for a preliminary injunction and stay the Challenged Policies.

Dated: September 24, 2026

Respectfully submitted,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
RACHEL MEEROPOL (NY Bar No. 4100954)
rmeeropol@aclu.org
OLGA AKSELROD (NY Bar No. 4132825)
oakselrod@aclu.org
VERA EIDELMAN (CA Bar No. 308535)**
veidelman@aclu.org
ALEXIS AGATHOCLEOUS (NY Bar No. 4227062)*
aagathocleous@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2659

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA**
NEIL K. SAWHNEY (CA Bar No. 300130)
nsawhney@aclunc.org
GRAYCE ZELPHIN (CA Bar No. 279112)
gzelphin@aclunc.org
CHESSIE THACHER (CA Bar No. 296767)
cthacher@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Attorneys for Plaintiffs*

**ATTESTATION**

Pursuant to N.D. Cal. Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories whose signatures are indicated within this e-filed document.

Date: September 24, 2026

Neil K. Sawhney