**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
OLGA AKSELROD (NY Bar No. 4132825) (Appearance *Pro Hac Vice*)
oakselrod@aclu.org
VERA EIDELMAN (CA Bar No. 308535)
veidelman@aclu.org
RACHEL MEEROPOL (NY Bar No. 4100954) (Appearance *Pro Hac Vice*)
rmeeropol@aclu.org
ALEXIS AGATHOCLEOUS (NY Bar No. 4227062) (Appearance *Pro Hac Vice*)
aagathocleous@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2659

*Attorneys for Plaintiffs*

*(Additional Counsel on Following Page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ARGHAVAN SALLES; ABIGAIL HATCHER; ANDREA ROSSO; ANN D. COHEN-WILSON; DOLORES ALBARRACÍN; HEIDI MOSESON; JADE PAGKAS-BATHER; JONATHAN KYLE DAW; KATIE EDWARDS; KELTON MINOR; MICHAEL D. GREEN; SARA JACKSON; SUZANNE BELL; and MIKAELA SMITH, *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services*; and UNITED STATES DOGE SERVICE,<br><br>Defendants. | Case No. 3:26-cv-10510-VC<br><br>**AMENDED COMPLAINT**<br><br>**Class Action** |

*(Additional Counsel on Behalf of Plaintiffs)*

**AMERICAN CIVIL LIBERTIES UNION**
**FOUNDATION OF NORTHERN CALIFORNIA**
GRAYCE ZELPHIN (CA Bar No. 279112)
gzelphin@aclunc.org
CHESSIE THACHER (CA Bar No. 296767)
cthacher@aclunc.org
NEIL K. SAWHNEY (CA Bar No. 300130)
nsawhney@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

**PROTECT DEMOCRACY PROJECT**
SHALINI AGARWAL (DC Bar No. 990963) (Appearance *Pro Hac Vice*)
shalini.agarwal@protectdemocracy.org
2020 Pennsylvania Avenue, NW, Suite 163
Washington, DC 20006
KENNETH PARRENO (TX Bar No. 24130477) (Appearance *Pro Hac Vice*)
kenneth.parreno@protectdemocracy.org
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582

**CENTER FOR SCIENCE IN THE PUBLIC INTEREST**
LISA S. MANKOFSKY (DC Bar No. 411931) (Appearance *Pro Hac Vice*)
lmankofsky@cspi.org
OSCAR HEANUE (DC Bar No. 90036939) (Appearance *Pro Hac Vice*)
oheanue@cspi.org
1250 I Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 777-8381

**JACOBSON LAWYERS GROUP PLLC**
DANIEL F. JACOBSON (DC Bar No. 1016621) (Appearance *Pro Hac Vice*)
dan@jacobsonlawyersgroup.com
LYNN D. EISENBERG (DC Bar No. 1017511) (Appearance *Pro Hac Vice*)
lynn@jacobsonlawyersgroup.com
STEPHEN K. WIRTH (DC Bar No. 1034038) (Appearance *Pro Hac Vice*)
stephen@jacobsonlawyersgroup.com
5100 Wisconsin Avenue, NW, Suite 301
Washington, DC 20016
Telephone: (301) 823-1148

## INTRODUCTION

1. The National Institutes of Health ("NIH") was long considered the world's leading and most prestigious funder of biomedical and behavioral research, with its support for promising scientists from across the globe regularly leading to the discovery and communication of new ways to treat disease and improve public health. This was consistent with the agency's mission of seeking fundamental knowledge, fostering creative discoveries, and supporting innovative research strategies.

2. To facilitate the agency's support of science insulated from partisan preconceptions, Congress carefully crafted a series of guidelines and procedures. Principal investigators ("PIs") develop in-depth applications for projects to be hosted at research institutions, exhaustively detailing the public health problem and proposed approach. These applications must advance through two rounds of independent and extremely rigorous peer review, driven by non-government scientists, after which subject-matter experts at NIH Institutes and Centers ("ICs") make a final funding decision based on which projects will best advance the research goals identified through IC-specific planning processes.

3. Most NIH awards provide five years of funding, and agency regulations prohibit mid-stream termination of grants without cause. Along with peer review, these provisions work to ensure space for the researchers supported by NIH funding to complete and publish their work safe from political interference. Success in securing funding also drives early-career scientists' professional trajectory.

4. No longer. Beginning in January of 2025, the Trump Administration issued a series of Executive Orders imposing government-wide ideological litmus tests on all new and continuing grants. Over February and March of 2025, Department of Government Efficiency

("DOGE") actors and NIH leadership used keyword searches for terms related to "DEI" and "gender identity" to abruptly terminate thousands of projects perceived or expected to communicate viewpoints disfavored by the Administration.

5. The purge continued through the summer of 2025, with NIH identifying additional terms likely to indicate perspectives unpopular with the Administration and ultimately canceling over four thousand clinical trials, training programs, and research projects. Along with disfavored viewpoints related to DEI and gender identity, NIH targeted research likely to result in speech reflecting the viewpoints that climate change is real and impacts health and that vaccine hesitancy and the dissemination of inaccurate information can harm public health.

6. While the first wave of terminations slowed by the fall of 2025, partially in response to multiple court orders, recently viewpoint-based terminations have restarted and new awards are also impacted. Pursuant to both written and unwritten final policy, researchers with existing NIH grants or pending applications are now subjected to an algorithmic screen for a list of 235 disfavored terms that serve as proxies for the disfavored viewpoints, including "gender," "equity," "diverse," "racist," "queer," "trans," and "climate change." NIH requires the removal of all flagged terms upon threat of termination or funding denial. Researchers must instead parrot NIH's preferred phrasing in public-facing grant materials, limiting researchers' ability to communicate clearly about their work to the public and to each other in a manner consistent with their viewpoint.

7. And, contrary to governing statutes, even when researchers submit to coerced "renegotiation" over the specific words used to describe their projects, NIH and HHS leadership subject projects approved at the IC level for new or continuation funds to a final extra-statutory review—blocking some projects from funding completely.

8. Plaintiffs are individual researchers, accomplished in their fields and with a proven track-record of receiving NIH awards, who seek to represent two nationwide classes of researchers to challenge ongoing and widespread violations of the First Amendment and the Administrative Procedure Act ("APA"). Plaintiffs recognize that the government may set funding priorities and decide among competing proposals consistent with the First Amendment. What the First Amendment does not allow is the government's use of its funding power to target or silence the expression of disfavored viewpoints within the biomedical research community. Nor may NIH, consistent with the APA, contradict Congressional mandates designed to prevent the politicization of the NIH award process, ignore regulations limiting the circumstances in which termination is allowed, or impose arbitrary and capricious grant-screening mechanisms without explanation or even public disclosure.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution and the APA, 5 U.S.C. §§ 551 et seq. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers and agencies of the United States, no real property is at issue in this case, and one or more Plaintiffs are residents of this District.

## PARTIES

### *A. Plaintiffs*

11. Plaintiff **Arghavan Salles** is a surgeon and Clinical Associate Professor at Stanford University Department of Medicine. She was the PI of a five-year NIH grant to

Stanford to develop an evidence-based intervention to address sexual harassment in the biomedical research field. In June of 2025, more than halfway through her project term, her award was abruptly terminated as "DEI-related." Her scaled-back research is now hanging on by a thread, and her position at Stanford is in immediate jeopardy. Her attempts to secure new awards have also been impacted by NIH's new policies. She submitted an application to NIH for an investigator award in January 2026, but it required a description of her previous work. Salles has studied gender equity and sexual harassment for over 15 years; to avoid being flagged by NIH's AI tool she had to describe her work and her research plans without using the terms "gender," "equity," or "sexual." Without the freedom to precisely describe her past research, it was impossible to explain its relevance to her proposed future research, likely rendering her application significantly less competitive.

12. Plaintiff **Abigail Hatcher** is an independent public-health researcher and an unpaid adjunct at the University of North Carolina at Chapel Hill School of Public Health, where she focuses on violence prevention and perinatal mental health. In September 2024, Hatcher applied with another co-investigator for an R25 award to train early-stage investigators from underrepresented low- and middle-income settings in the United States and South Africa on gender-based violence and the social and structural determinants of HIV, through providing two-year scientific-writing fellowships. Based on NIH's screening of grant applications for misalignment with agency priorities, Hatcher understood that, to have a realistic chance at receiving NIH funds, she would need to edit her application materials to omit words like "underrepresented minorities," "racism," "stigmatized identities," "Black," and "Brown." These changes obscured the work and made the application less competitive. Given this experience,

Hatcher has abandoned work on an R01 application focused on race, gender, and equity connected to perinatal violence and is considering leaving research altogether.

13. Plaintiff **Andrea Rosso** is an Associate Professor in the Department of Epidemiology at the University of Pittsburgh, where she leads the Brain, Environment, Aging, and Mobility Lab. In 2022, she and two other PIs were awarded a five-year R01 grant to focus on two disinvested neighborhoods in Pittsburgh and conduct cognitive, blood pressure and sleep assessments, assessments of life and residential history, and qualitative interviews to reveal opportunities and barriers experienced by African Americans in achieving optimal cognitive health in late life, all toward understanding how factors like structural racism contribute to higher rates and earlier onset of Alzheimer's disease. She attempted to renegotiate her grant to align with NIH priorities, but instead it was abruptly terminated on August 24, 2026. Without the final year of funding, Rosso and her team may be unable to assess the data they gathered to determine if individuals who participated in the study for four years have dementia and should follow up with their doctors. The termination also threatens Rosso's ability to complete the final phase of the research, publish papers, and educate participants and other community members about the findings.

14. Plaintiff **Ann D. Cohen-Wilson** (who goes by "Ann D. Cohen" professionally) is an Associate Professor at the University of Pittsburgh, where she co-directs the Alzheimer's Disease Research Center, among other roles. In 2022, after three years spent developing and refining her application, Cohen was awarded a five-year R01 grant—Predictors of Altered CNS Structure, Function, and Connectomics in the Elderly using a Health Disparities Framework—that focuses on the structural and social determinants of health to determine which factors confer a risk for Alzheimer's disease. Three years into the study, and after the publication of more than

40 articles, Cohen received a “renegotiation” request from her NIH Program Officer (“PO”), who informed her that “NIH funds may not be used to support any DEI related activities.” Cohen removed from her project aims and narrative statements about her plans to collect information about measures of inequality, like poverty, segregation, and mortgage redlining, but the grant was nevertheless terminated in July of 2026 for non-alignment with NIH priorities. The abrupt termination of the grant has placed collected blood samples at risk of destruction; threatens the integrity of the entire longitudinal study, as it requires participants to come back every 18 to 24 months for imaging; and will keep her from publishing additional findings.

15. Plaintiff **Dolores Albarracín** is a professor at the University of Pennsylvania whose research seeks to understand how people respond to persuasive communications, the dynamics of misinformation and conspiracy theories, and how to develop effective interventions to change behaviors that are detrimental for individuals and society at large. Albarracín has previously sought and received NIH funding for different lines of her research focusing on vaccine hesitancy, understanding misinformation and disinformation, substance use harm reduction, and HIV in populations with heightened infection risks. However, her ability to seek NIH funding has been significantly curtailed because of NIH policies targeting research in these and other areas likely to reflect viewpoints that the Administration does not like. For example, in early 2025, Albarracín submitted an application for funding to test the effectiveness and dissemination of a digital intervention to promote HIV testing and linkage to pre-exposure prophylaxis. The application scored well, but in April of 2026 she received an email from her PO indicating that revision was necessary to align it with NIH priorities. Specifically, her team planned to oversample ethnic minority men because they are at a higher risk for contracting HIV and not receiving treatment, and, consistent with science of HIV prevention, focusing on them is

an evidence-based approach to intervening to curb the HIV epidemic. Based on her PO's recommendation, Albarracín removed terms in her grant materials, including "health disparities," "ethnic minority," "Black [person]," and "culturally diverse." After making these changes, Albarracín's application was approved for funding, but she remains concerned that the revisions will limit the benefit to public health from work on this grant. Deemphasizing populations at risk for HIV undermines the research's scientific value and impact, which reduces the benefit to those populations and the opportunities for publication. Albarracín is particularly concerned with how to train the next generation of psychologists and college students to address health disparities if the concept is removed from academic research.

16. Plaintiff **Heidi Moseson** is an Epidemiologist and Senior Research Scientist at Ibis Reproductive Health ("Ibis") in Oakland, California. Moseson is a Multiple PI ("MPI") on an NIH grant entitled "Time Sensitive Research on Barriers to Pregnancy Care" awarded to Indiana University in 2024, with Ibis as a sub-awardee. In August of 2025, when she was seeking to transition to the second part of the 5-year project, NIH requested that she remove the word "abortion" from the transition application and change references to "policy restrictions" and "pregnant people" to "policy changes" and "pregnant women." Moseson was extremely conflicted about making these changes, as they seemed intended to diminish the harm of abortion-related restrictions and minimize or erase the existence of pregnant people who identify as transgender men or other gender diverse identities, but she decided that losing the funding would cause greater harm. She was again forced to renegotiate upon threat of termination in July of 2026, when seeking the third year of funding. This time an NIH employee at the Office of Extramural Research ("OER") emailed her PO instructing the PO to work with Moseson to clarify how her research would inform work within the healthcare system, not through policy

changes. With great trepidation, Moseson and her team made the necessary changes and received a new Notice of Award ("NOA"), which included a term stating that the grant could only be used "to support activities within the revised scope of the award." Moseson is fearful that NIH will terminate her funding if she speaks or writes about her work in ways that differ from the language that NIH required her to adopt and otherwise remains extremely concerned that the award will be terminated.

17. Plaintiff **Jade Pagkas-Bather** is an Associate Professor in the Infectious Disease and Global Health section of the Department of Medicine at the University of Chicago. In the summer of 2025, she followed her PO's advice to edit her application for NIH funding to study the impact of a basic income guarantee on young people living with HIV, removing all references to race and gender, including a statement that Black and Latinx people living with HIV experience higher rates of poverty. The grant was awarded, but Pagkas-Bather was advised by her PO that it is now in danger of imminent termination. If this occurs, participants who are relying on the income guarantee to meet basic needs will be negatively impacted and Pagkas-Bather will be unable to carry out the aims of the project or publish the results of the research—a significant setback for her career.

18. Plaintiff **Jonathan Kyle Daw** is a Professor of Sociology and Demography at Pennsylvania State University. Daw was the PI on a four-year R01 grant to uncover the causes of racial and ethnic disparities in kidney failure and treatment outcomes by examining how certain variables—such as educational attainment, home ownership, rates of incarceration, health insurance access, and poverty—affect kidney failure and treatment outcomes. In late April 2025, with substantial work done on this project—including conference papers already developed and community advisory board meetings in progress across two states—Daw's award and an

administrative "diversity supplement" allowing the team to bring on an additional researcher were both abruptly terminated as "DEI-related." Despite the lost funding, Daw and his team have been able to work with scaled back time to continue his potentially life-saving research, but they have been delayed in publishing final results and limited in their ability to share their analysis with impacted communities. And while Daw will still seek NIH funding for other work, until NIH's policies change, he will avoid submitting any applications in his primary area of focus—documenting and addressing the concrete health impacts of structural racism.

19. Plaintiff **Katie Edwards** is a professor of Social Work at the University of Michigan. Edwards has a pending application for a R21 grant to evaluate and disseminate data gathered through an educational program on Pine Ridge Indian Reservation aimed at reducing sexual violence among Indigenous youth. In August 2026, she was told by her PO that she could not use the word "gender" in the application and had to replace it with "biological sex" to align with Administration priorities. Edwards is concerned with how this issue will limit the scope of her publications and findings moving forward. Some of the study participants identify as transgender, Two-Spirit, or nonbinary and a prohibition on the use of "gender" may not allow for her to fully examine and report their experiences. Concerns over being forced to remove LGBTQ+ individuals from her research and parrot the Administration's perspective on gender to the public has led her to hold off resubmitting a different application—for an R01 grant to evaluate the efficacy of a pilot program to address dating violence and problem drinking among sexual and gender minority youth—despite the application's relative success in the peer review process.

20. Plaintiff **Kelton Minor** was awarded the prestigious NIH Director's Early Independence Award in 2024 to study "The Behavioral Cost of Carbon," with a goal of

generating the first empirical estimate of how incremental increases in greenhouse gas emissions impact human health-related behaviors, including sleep, alcohol consumption, and physical activity. In March 2025, Minor's award was terminated as part of the Trump Administration's enforcement action against Columbia University for alleged antisemitism. Minor's faculty onboarding as an assistant professor was halted, and he was let go by Columbia as a result. By the time the award was reinstated several months later, Minor had accepted a new position as a tenured Associate Professor at the University of Copenhagen. Minor secured approval from the Laureate Institute for Brain Research ("LIBR") in Tulsa, Oklahoma to host the award. Requests to transfer NIH awards are normally granted as a matter of course, but NIH informed Minor several months later that the LIBR transfer application was "out of alignment with the NIH's priorities" due to his award's focus on the "effects of carbon emissions and climate change on human behavior" and that he should "refram[e]" the description of his research "to make it clear that [he is] assessing the effects of temperature fluctuations on human behaviors, not climate change directly." Minor worked around the clock to comply with NIH's request, rewriting the description of his proposed research to remove all mentions of "climate," "carbon," and "climate change" from his award including removing references to his own and other peer-reviewed scientific publications containing those terms. After months of delay, NIH denied the transfer application and Minor expects the reinstated grant to be terminated any day. He has not been able to begin his important and timely research.

21. Plaintiff **Michael D. Green** is a postdoctoral fellow in the Department of Health, Behavior, and Society at John Hopkins University's Bloomberg School of Public Health. In 2024, Green received an up-to-six-year F99/K00 fellowship to conduct his dissertation research on the association between healthcare discrimination and adverse cardiovascular events, and then

in a postdoctoral position, to conduct new research and training in cognitive impairment and decline, including with conditions like Alzheimer's disease and related dementias. In July 2025, after completing his first year of research, he received an email from NIH indicating that he would have to "revise the current abstract, specific aims, grant, and annual progress report to remove any DEI language" to proceed with funding consideration for the second year. In line with his impression of what NIH was targeting, and in response to this email, Green removed specific population groups to be studied (such as "Black adults") and removed words such as "racism" and "discrimination in healthcare" among other edits, and received the additional year of funding. In early 2026, he was again forced to renegotiate to remove terms from his grant materials, including "discrimination," "health equity," "health disparities," "race," and "unequal." He was delayed from starting his postdoctoral fellowship for approximately four months due to the process. He fears the impact of these continued disruptions on his career trajectory and that his grant will be terminated if his research products communicate about his grant-funded work and training in a manner that is inconsistent with the language that the Administration forced him to adopt.

22. Plaintiff **Sara Jackson** is an Assistant Professor at the University of Utah College of Nursing. She received an NIH grant in 2024 to serve as the PI on a five-year study of financial hardship among people living with dementia and their care partners, with a non-exclusive focus on LGBTQ+ individuals. In 2026, after submitting what would historically have been a routine application for the third year of funding, she was told by NIH that in order to align with the agency's new priorities, she would have to remove all "DEI activities and programs and DEI-related language" from her award materials. This included rewriting several already-completed research aims to erase all mention of LGBTQ+ people. Jackson was unwilling to do so. Her grant

funding lapsed as of June 30, 2026, and she has had no update from NIH on the outcome of the long overdue non-competitive renewal for the third year of funding. She fears her grant will be terminated, and without the third year of funding she has had to make plans to lay off staff and discontinue her research. Without continued NIH funding, Jackson will have to inform people who shared private and painful stories about dementia that their contribution will not be used, and Jackson will likely have to pivot to other areas of research that are not currently being targeted by NIH.

23. Plaintiff **Suzanne Bell** is an Associate Professor at the Johns Hopkins Bloomberg School of Public Health. She examines patterns of contraceptive use, abortion, and infertility and factors that contribute to health disparities. Bell has an R01 grant to investigate the impact of the Supreme Court's decision in *Dobbs v. Whole Women's Health Organization* and resulting restrictions on access to abortion on fertility, severe maternal morbidity, and infant birth outcomes in states that enacted abortion restrictions. In the first year of funding, Bell's research team conducted quick and effective data analysis that resulted in a peer-reviewed publication and two companion papers in *The Journal of the American Medical Association* ("*JAMA*"), a high-impact medical journal. In the summer of 2025, she was advised by her PO that the grant had been flagged as non-aligned with NIH priorities and that she should remove any mention of abortion or *Dobbs* to avoid potential termination of the grant. She was torn about making the changes but felt compelled to do so to protect research she felt strongly about. After she made the requested changes, she received continuation funds, but is worried about whether her grant will be terminated based on how she writes and speaks to the public about her work.

24. Plaintiff **Mikaela Smith**[1] is a research scientist at a university who, like Plaintiff Bell, studies how policy impacts or inhibits access to reproductive health care, among other issues. She applied for an R03 award in 2025 and scored highly throughout the peer-review process. Her PO told her the application was likely to be funded, but Smith would need to remove the phrases "equity" and "structural nature of inequitable outcomes" to avoid signaling potential misalignment with NIH priorities. Smith made these changes, and in spring of 2026, Smith was informed that her application was approved by her IC, and she would likely receive a Notice of Award—NIH's official documentation of grant funding—shortly. But this never occurred; instead, Smith learned that the award was blocked by NIH officials outside her IC.

*B. Defendants*

25. Defendant NIH is an agency of the United States, established pursuant to 42 U.S.C. § 281, and is housed within the United States Department of Health and Human Services ("HHS").

26. Defendant Jay Bhattacharya is the Director of NIH and is sued in his official capacity.

27. Defendant HHS is an agency of the United States that houses NIH. HHS is a department of the executive branch of the United States.

28. Defendant Robert F. Kennedy, Jr. is the Secretary of HHS and is sued in his official capacity.

29. Defendant United States DOGE Service ("USDS") is a component of the

[1] Plaintiff Mikaela Smith previously sought to proceed pseudonymously, as "Jordan Doe 1." Plaintiffs Jordan Doe 2–4 have chosen to withdraw from suit rather than disclose their identities, upon the Court's denial of Plaintiffs' Administrative Motion to Proceed Pseudonymously. ECF 74.

Executive Office of the President established by Executive Order No. 14158 on January 20, 2025. Pursuant to E.O. 14158, USDS works with "DOGE Teams" established at each agency to carry out the President's Department of Government Efficiency Initiatives. USDS and agency DOGE Teams are hereinafter collectively referenced as "DOGE."

## FACTUAL ALLEGATIONS

### *A. NIH Support for Research*

30. NIH exists to "seek fundamental knowledge about the nature and behavior of living systems" and to help "appl[y] that knowledge to enhance health, lengthen life, and reduce illness and disability."[2]

31. To accomplish its mission, NIH aims to "foster fundamental creative discoveries, innovative research strategies, and their applications as a basis for ultimately protecting and improving health" and to "expand the knowledge base in medical and associated sciences."[3]

32. NIH has an operating budget of $47.493 billion as appropriated by Congress.[4] A small portion, approximately 11 percent, of this budget is spent on "intramural" research—that is, research conducted in-house by "scientists in [NIH's] own laboratories, mostly on [the] NIH campus in Bethesda, Maryland."[5] That research is not at issue in this case.

33. The vast majority of NIH appropriations—nearly 82 percent—is allocated for funding "extramural" research at institutions and organizations outside of the agency. This case is about that "extramural research."[6]

---

[2] *Mission and Goals*, Nat'l Insts. of Health (Mar. 2, 2026), https://perma.cc/US7D-QYTH.
[3] *Id.*
[4] Joe Angert & Kavya Sekar, Cong. Rsch. Serv., R43341, *National Institutes of Health (NIH) Funding: FY1996-FY2026* (May 18, 2026), https://perma.cc/68MH-8KUX.
[5] *New to NIH*, Nat'l Insts. of Health (May 19, 2026), https://perma.cc/C4PV-RLQY; *see also Budget*, Nat'l Insts. of Health (June 13, 2025), https://perma.cc/GRZ4-8V8A.
[6] *Fiscal Year 2025 By the Numbers: Extramural Grant Investments in Research*, Nat'l Insts. of Health (Mar. 12, 2026), https://perma.cc/9P8B-STE5 [hereinafter *Fiscal Year 2025*].

34. NIH provides between 50,000 and 60,000 grants a year to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions across the country.[7]

35. Through decades of consistent growth, NIH became the largest funder of biomedical research in the world, and NIH research grants have become the lifeblood of American biomedical and public health research. The billions of dollars in funding they have traditionally provided each year have contributed to medical and scientific breakthroughs that expand knowledge, inform public debate and public policy, save lives, and vitalize the economy.

36. The creation and communication of scientific knowledge is one of the core purposes of NIH funding. Toward this end, NIH requires that "the results and accomplishments of the activities that it funds should be made available to the public," including "in the form of journal articles or other publications."[8] This can also include manuscripts or working papers. Relatedly, Congress has mandated that "all investigators funded by the NIH submit . . . to the National Library of Medicine's PubMed Central an electronic version of their final, peer-reviewed manuscripts upon acceptance for publication, to be made publicly available."[9]

37. Plaintiffs' experiences demonstrate how this works in practice. For example, Salles' NIH award was intended to fund the testing of a novel, evidence-based intervention to address sexual harassment in biomedical research as part of a randomized controlled trial with the expectation that she would publish the findings.

38. Plaintiff Jackson received NIH funding to create and validate a new and inclusive measure of financial hardship for people living with dementia and their caregivers—one that

---

[7] *Id.*; *see also Budget*, *supra* note 5.
[8] Nat'l Insts. of Health, *NIH Grants Policy Statement* § 8.2 (Mar. 2026), https://perma.cc/Y28B-S9LZ.
[9] 42 U.S.C. § 282c note (Public access to funded investigators' final manuscripts).

would recognize the specific disease trajectory of particular forms of dementia and also expand the concept of who offers care—in order to lay the groundwork for future intervention studies designed to reduce financial and health inequities among this population. She then planned to publish the new measure and other results.

39. One of Plaintiff Bell's NIH awards resulted in seven publications in the first two years of the grant, including in *JAMA* and *The American Journal of Public Health*, and a second award resulted in nine publications. Plaintiff Cohen's research on the structural and social determinants of health in the development of Alzheimer's disease has resulted in more than 40 articles in scholarly journals. Plaintiff Rosso's work on structural racism and disparities in Alzheimer's disease and related health outcomes had already resulted in the publication of nearly a dozen articles before it was terminated in its final year.

40. Plaintiffs also disseminate the results of NIH-funded work at conferences. For example, just one of Plaintiff Bell's grants resulted in presentations at six academic conferences, and she and her MPI have been invited to give talks on the work funded by that grant at seven universities and research organizations. Likewise, prior to the termination of Plaintiff Daw's grant, he presented on his grant-funded work at several conferences.

41. NIH policy also requires that "all NIH-funded awardees and investigators conducting clinical trials . . . register [their trials] and report [summary] results of their trial in Clinicaltrials.gov," thereby ensuring that information about NIH-funded clinical trials is publicly disseminated.[10]

---

[10] Nat'l Insts. of Health, NOT-OD-16-149, *NIH Policy on the Dissemination of NIH-Funded Clinical Trial Information* (Sep. 16, 2016), https://perma.cc/2QGZ-HKEF.

42. Throughout NIH's history, Congress has ensured that the agency would fund research by non-government scientists, nonprofits, universities, and other institutions based on scientific merit, not politics.

43. The first "National Institute of Health" was established in 1930, when Congress enacted the Ransdell Act. The Ransdell Act directed the Surgeon General to "select persons who show unusual aptitude in science" to direct the Institute and authorized the creation of "fellowships" for "individual scientists."[11]

44. Since then, Congress has repeatedly increased its investment in NIH, including by funding additional ICs that operate within NIH and offer funds to outside, non-government researchers to study the diseases and health issues within their particular area of focus.[12]

45. For example, in 1937, Congress established the National Cancer Institute not only to "conduct[ ] researches, investigations, experiments, and studies relating to the cause, diagnosis, and treatment of cancer," but also to "assist[ ] and foster[ ] similar research activities by other agencies, public and *private*."[13] That authorizing statute created a National Advisory Cancer Council consisting of six "leading medical or scientific authorities who are outstanding in the study, diagnosis, or treatment of cancer in the United States," each of whom would hold office for three years, and were tasked with, among other things, choosing which applications for grants "for research projects relating to cancer" "from any [public or private] university, hospital, laboratory, . . . other institution, . . . or . . . individuals" to fund based on their "promise of making valuable contributions to human knowledge."[14]

---

[11] Ransdell Act, Pub. L. No. 71-251, 46 Stat. 379 (1930) (codified at 42 U.S.C. § 21 *et seq*.).
[12] *NIH Budget History*, Nat'l Insts. of Health (Sep. 2025), https://report.nih.gov/nihdatabook/category/1.
[13] National Cancer Institute Act, Pub. L. No. 75-244, 50 Stat. 559 (1937) (emphasis added).
[14] *Id.*

46. Similarly, in 1946, Congress enacted the National Mental Health Act, which established a National Advisory on Mental Health Council, comprised of six members "selected from leading medical or scientifical authorities who are outstanding in the study, diagnosis, or treatment of psychiatric disorders," each of whom would hold office for three years, and were tasked with making recommendations to the Surgeon General regarding "grants in aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals . . . with respect to mental health."[15]

47. Other acts authorizing new institutes and the funding of private research based on the recommendations of non-government experts followed.[16]

48. Today, NIH is an agency of HHS, comprised of the Office of the Director, as well as 27 ICs, each of which focuses "on a specific disease area, organ system, or stage of life"[17] and each of which has a Director appointed for a five-year term.[18]

49. Twenty-four of the twenty-seven ICs, as well as several divisions within the Office of the Director, post opportunities for funding for researchers outside of the agency. These ICs define their general purpose as "the conduct *and support* of research."[19]

50. Subject to the purposes and mandates articulated by Congress, NIH awards considerable funding for independent research through grants for scientific and biomedical research projects, which usually are designated as part of the R-series of grants (e.g., "R01,"

---

[15] National Mental Health Act, Pub. L No. 79-487, 60 Stat. 421 (1946).
[16] *See*, *e.g.*, National Heart Act, Pub. L. No. 80-655, 62 Stat. 464 (1948) (authorizing the National Heart Institute); National Dental Research Act, Pub. L. No. 80-755, 62 Stat. 598 (authorizing the National Institute of Dental Research in 1948); Omnibus Medical Research Act, Pub. L. No. 81-692, 64 Stat. 443 (establishing the National Institute of Neurological Diseases and Blindness and other institutes in 1950).
[17] *New to NIH*, *supra* note 5.
[18] 42 U.S.C. § 284(a)(2)(A).
[19] *See, e.g.*, *id.* §§ 285, 285b, 285b-7(b)(1), 285c, 285d, 285e, 285f, 285g, 285h, 285i, 285j, 285k, 285l, 285m (emphasis added).

"R15," etc.). R-series grants are the most prevalent type of NIH award, comprising more than 60 percent of total annual extramural research funding.[20]

51. Other grants (*e.g.*, T-series grants, or P-series grants) go to institutions that serve as coordinating centers that provide support, organize conferences, and assist researchers in applying for NIH funding in order to help advance studies in a particular field. Training awards—"institutional training grants" (T32s)—are typically applied for by the senior investigator who heads a training or research center on behalf of a larger set of researchers at an institution, and can be used to cover the costs of predoctoral or postdoctoral students.

52. There are also individual grants, typically classified as F-series ("Fellowship") grants, or K-series ("Career Development") grants, that can be used to provide stipends to researchers at all stages of their career, cover tuition and costs, and fund other expenses. This includes support for individuals in the early stages of their research careers as well as research, scholarship, or teaching by "promising . . . scientists."[21]

53. Congress has thus long required NIH and its ICs to fund private research based on scientific merit. Through the excellence-based standards for reviewing grant applications, the scientific credentials of the non-government experts considering the applications, and term appointments disconnected from any electoral timeline, it established a firewall between an administration's *political* preferences and NIH's *scientific* peer review process. The goal of NIH funding is to pursue knowledge and accurate answers about public health, not take perspectives or possibilities off the table due to the government's viewpoint-based disfavor.

[20] *R01-Equivalent Grants: Funding as a Percentage of All Research Grants*, Nat'l Insts. of Health (Jan. 2026), https://report.nih.gov/nihdatabook/report/33.

[21] *NIH Director's Early Independence Award: Program Snapshot*, Nat'l Insts. of Health (July 16, 2026), https://perma.cc/39KA-VJZT [hereinafter *NIH Director's Early Independence Award*].

54. Thus, across each type of award, scientific merit and not political viewpoint governs grant approvals. Statutes mandate that, when reviewing applications for research grants, NIH must do so by "technical and scientific peer review groups and scientific program advisory committees."[22] For individual grants, the focus is on individuals with "intellect" and "scientific creativity."[23]

55. Topics and priorities for funding must also be guided by scientific, not political, considerations. Congress has mandated a process of "scientifically based strategic planning" at NIH,[24] the goals of which must be to "provide direction to the biomedical research investments made by [NIH]," "leverage scientific opportunity," and "advance biomedicine."[25] NIH must develop a strategic plan no later than every six years, in consultation with IC directors, researchers, patient advocacy groups, and industry leaders, and must submit that plan to Congress.[26] The strategic plan must "identify strategic research priorities" based on "an assessment of the state of biomedical and behavioral research"; "priorities and objectives to advance the treatment, cure, and prevention of health conditions"; "emerging scientific opportunities, rising public health challenges, and scientific knowledge gaps"; and "the identification of . . . scientific needs."[27]

56. Congress also mandates specific strategic plans for each IC.[28] Congress has authorized ICs to fund research through grants consistent with those plans,[29] if they have been

[22] 42 U.S.C. §§ 289a(a)(1)(a), 282(b)(16), 284(c)(3)(A).
[23] *NIH Director's Early Independence Award*, *supra* note 21.
[24] 42 U.S.C. § 282(b)(5)–(6).
[25] *Id.* § 282(m)(1).
[26] *Id.* § 282(m)(1), (4).
[27] *Id.* § 282(m)(2).
[28] *Id.* § 282(m)(3).
[29] *Id.* § 284(b)(2).

"recommended after technical and scientific peer review."[30]

57. To address NIH's historical failure to ensure equal emphasis on health issues relevant to diverse racial, ethnic, gender and sexual identity groups, and given the unequal burdens of disease, Congress created the National Institute on Minority Health and Health Disparities and mandated "minority health disparities research."[31] It also requires ICs to "utilize diverse study populations, with specific consideration to biological, social, and other determinants of health that contribute to health disparities" and "encourage efforts to improve research related to the health of sexual and gender minority populations."[32]

*B. NIH Grant Process*

58. In line with NIH's mission and Congressional mandates, ICs post Notices of Funding Opportunities ("NOFOs"), alerting researchers to the availability of funds.

59. Through the NOFOs, NIH "look[s] for grant proposals of high scientific caliber."[33]

60. "Much of what NIH supports are investigator-initiated or unsolicited research," which "originate from [the grant applicant's] research idea or training need, yet also address the scientific mission of the NIH and one or more of its [ICs and Offices]."[34]

61. Other NOFOs are issued "to encourage and stimulate research and the submission of research applications in [specific] areas" identified by ICs.[35]

62. HHS regulations provide that "all" applications "shall be evaluated" and that the

---

[30] *Id.* § 284(b)(2)(A).
[31] *Id.* §§ 281(b)(24), 285t(a).
[32] *Id.* §§ 282(b)(8)(D)(ii), 283p.
[33] *New to NIH*, *supra* note 5.
[34] *Id.*
[35] *Id.*

agency will either "1) approve, 2) defer because of either lack of funds or a need for further evaluation, or 3) disapprove support of the proposed project in whole or in part."[36]

63. Funding awards are determined through a rigorous and competitive application process focused on scientific merit, as determined with the help of non-government experts.

64. The NIH Director must "require appropriate technical and scientific peer review" for applications.[37] The "underlying basis" for the peer review system is "to provide a fair and objective review process in the overall interest of science."[38]

65. This occurs through a two-step, highly standardized process set forth in the Public Health Service Act, its enacting regulations, and detailed NIH protocols.

66. In the first phase, the Center for Scientific Review receives applications, can conduct an initial technical review for scientific merit, and then assigns applications to one or more ICs for potential funding and to a scientific review group (commonly known as a "study section") to review the scientific merit of the application.[39] Each study section is composed of approximately twenty scientific reviewers who are experts in their field and who analyze and score the proposals.[40] They are "primarily nongovernment experts qualified by training and experience in [the relevant] scientific or technical fields"[41] tasked with "giv[ing] expert advice on the scientific and technical merit of grant applications."[42]

67. Grant applications are scored according to established review criteria set forth in

---

[36] 42 C.F.R. § 52.5.
[37] 42 U.S.C. § 289a(a)(1).
[38] *NIH Grants Policy Statement*, *supra* note 8, § 2.
[39] *Id.* § 2.4.1.1.
[40] *See* 42 C.F.R. § 52h (describing requirements for membership in scientific review groups).
[41] *Id.* §§ 52h.2(k), 52h.4.
[42] *Id.* § 52h.2(k).

regulations and the NOFO.[43] In particular, the study sections "assess the overall impact that the project could have on the research field, taking into account:

- The significance of the goals of the proposed research, from a scientific or technical standpoint;
- The adequacy of the approach and methodology proposed to carry out the research;
- The innovativeness and originality of the proposed research;
- The qualifications and experience of the principal investigator and proposed staff;
- The scientific environment and reasonable availability of resources necessary to the research;
- The adequacy of plans to include both genders, minorities, children and special populations as appropriate for the scientific goals of the research;
- The reasonableness of the proposed budget and duration in relation to the proposed research; and
- The adequacy of the proposed protection for humans, animals, and the environment, to the extent they may be adversely affected by the project proposed in the application."[44]

68. For fellowships, reviewers also "gauge the likelihood the fellowship will enhance [the applicant's] potential for and commitment to a productive research career. For postdocs, they also assess whether [the applicant has] what it takes to be an independent researcher."[45]

69. Scored applications are then moved on to IC-specific advisory councils, made up of "senior scientists with broad experience and members of the public with general knowledge

[43] *First Level: Peer Review*, Nat'l Insts. of Health (Apr. 28, 2026), https://perma.cc/FZ2A-2XHC.
[44] 42 C.F.R. § 52h.8.
[45] *See*, *e.g.*, *Fellowship Grants (F)*, Nat'l Inst. of Allergy & Infectious Diseases (Mar. 6, 2026), https://perma.cc/27TL-ABQ8.

of, and interest in, the IC's mission."[46] The advisory councils also "review [applications] for scientific and technical merit."[47]

70. IC Directors are the final decision-makers. Pursuant to NIH's authorizing statute, IC Directors "make grants . . . for research, training, or demonstrations."[48] Grants under $50,000 require recommendation after technical and scientific review, while grants over $50,000 also require advisory council recommendation.[49] And "[b]efore an [R-series] award is made by a national research institute or by a national center . . . the Director of such national research institute or national center shall, consistent with the peer review process . . . review and make the final decision with respect to making the award."[50]

71. No statutory authority permits individuals outside the awarding ICs—such as OER, others at HHS, or DOGE—to usurp IC Directors' final role as the decider of which peer-review-recommended grants to fund.

72. The statute also lists the factors that IC Directors "shall, consistent with the peer review process . . . take into consideration, as appropriate," including the mission of the IC, the awards made by other agencies on similar topics, and the advice of the IC's staff and advisory council or board.[51]

73. Upon selection, a successful applicant receives an NOA. The NOA identifies the institutional grantee, which is the entity that actually receives the award and funding.

---

[46] *NIH Grants Policy Statement*, *supra* note 8, § 2.4.3.
[47] *Id.* § 2.4.
[48] 42 U.S.C. § 284(b)(2).
[49] *Id.*
[50] *Id.* § 284(b)(3).
[51] *Id.* § 284(b)(3)(B).

Universities and hospitals where researchers are based are the most common funding recipients, but some non-profits or other entities also receive NIH funding.

74. The NOA also names one or more PIs—the researchers directly responsible for proposing projects, overseeing the design and implementation of studies, managing research from the application stage through the end of a grant, and publishing the results. Further, the NOA specifies the amount of the award, its duration, and all other terms and conditions with which the grantee and research team must comply.[52]

75. Importantly, the terms and conditions make clear that work produced using grant funds is the author's work, not the agency's. The NOA requires that "[e]ach publication, press release, or other document about research supported by an NIH award must include . . . a disclaimer such as . . . . 'The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.'"[53]

76. Likewise, NIH grantees retain intellectual property rights for work generated via NIH funds. As the Grants Policy Statement ("GPS"), which is referenced in each NOA, states: "In general, recipients own the rights in data resulting from a grant-supported project. . . . Except as otherwise provided in the terms and conditions of the award, any publications, data, or other copyrightable works developed under an NIH grant may be copyrighted without NIH approval."[54]

[52] *See Sample Notice of Award*, Nat'l Insts. of Health (Feb. 21, 2024), https://perma.cc/8WCV-FGWP. The terms and conditions typically require compliance with conditions like registration requirements for federal grantees (for example, registering with the System for Award Management); anti-discrimination, anti-harassment, and disability rights laws; and ensuring no financial conflicts of interest. They may also include special terms governing issues such as protections for human research subjects.

[53] *Id.*; *see also NIH Grants Policy Statement*, *supra* note 8, §§ 8.2.1, 14.9 (requiring a similar disclaimer for grant-funded conferences).

[54] *NIH Grants Policy Statement*, *supra* note 8, § 8.2.1.

77. When NIH approves a grant, it specifies a "project period" for which NIH intends to "support the project without requiring the project to recompete for funds."[55] Because medical research takes time, most project periods span multiple years and are generally awarded for one to five budget periods, each normally 12 months in duration.[56] NOAs generally list the maximum funds available for a budget period and note the anticipated levels of future support for the subsequent years of the project.

78. PIs must submit annual non-competitive renewal ("NCR") applications for the next budget period, and upon approval NIH issues a new NOA. NCRs generally require submission of a Research Performance Progress Report ("RPPR"), in which PIs describe the progress made on the aims of the grant and output such as publications or presentations, identify any significant changes to the project or challenges encountered, and describe plans for the subsequent budget year of the grant.[57] Historically, NCRs were nearly always granted and did not involve a reevaluation of the aims of the grant or the language used to describe the project.

79. Finally, the NOA also provides the grantee and PIs with contact information for their PO, who is the main point of contact throughout the lifespan of the award. Generally, POs are trained scientists well-versed in handling the subjects covered by the grants for which they are responsible.

*C. HHS Regulations Governing Grant Terminations*

80. Terminations at NIH were historically rare. Prior to January of 2025, NIH terminated around 20 grants a year on average, "and usually only because of serious problems,

[55] 42 C.F.R. § 52.6(c).
[56] *Id.*; *see also Research Project (R01)*, Nat'l Insts. of Health (2026), https://perma.cc/B9YR-XJY4.
[57] *Research Performance Progress Report (RPPR)*, Nat'l Insts. of Health (Sep. 4, 2024), https://perma.cc/2KNX-3ZW4.

such as flagrant misconduct, fraud, or an ethical breach that could harm study participants."[58] The standard approach at NIH had long been to not terminate existing grants even if they address a low programmatic or agency priority. As a former NIH official who worked at the agency for several years described, "I have been involved with legitimate grant terminations," and, "I can count them on the fingers of one hand."[59]

81. Until October of 2025, HHS regulations limited termination of an award to three circumstances: (1) the grantee "fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of" the grantee.[60] Termination based on a determination that a grant "no longer effectuates the program goals or agency priorities" was not authorized.

82. On October 1, 2025, HHS regulations came into effect adopting the Office of Management and Budget Guidance for Federal Financial Assistance, published at 2 C.F.R. part 200 ("OMB Guidance"), including its termination provisions.[61] Under the current regulations, HHS can now terminate an award for non-compliance with the grant's terms and conditions, with the consent of the awardee, or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or

---

[58] Katherine J. Wu, *The NIH's Grant Terminations Are 'Utter and Complete Chaos'*, The Atlantic (Mar. 14, 2025), https://perma.cc/X45F-B6MK.

[59] *Id.*

[60] 45 C.F.R. § 75.372.

[61] 2 C.F.R. § 300.106 (codifying HHS adoption of OMB Guidance. HHS codified some modifications to the OMB Guidance in 2 C.F.R. § 300, but the modifications are not related to the termination provisions in the OMB Guidance, which HHS adopted in full); *see also* Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055 (Oct. 2, 2024) (HHS interim final rule stating that adoption of OMB Guidance is "effective October 1, 2025, except for amendatory instruction 2, which is effective October 1, 2024").

agency priorities."[62] The regulation requires that the agency "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[63]

*D. NIH's Current Approach*

83. Historically, the longstanding firewall between an administration's political choices and NIH's scientific peer review process ensured the agency fulfilled its mission of enhancing human knowledge and fostering creative discoveries by prioritizing scientific inquiry, not political ideology, and avoided the massive waste and disruption to researcher careers, participant well-being, and public health that would accompany mid-stream research terminations.

84. Since January of 2025, however, operations at NIH have been upended by a series of Executive Orders, interventions by DOGE, and new HHS/NIH policies, both written and unwritten. Instead of making decisions based on scientific excellence, NIH terminated thousands of research grants through keyword searches designed to ferret out disfavored viewpoints on (1) diversity, equity, and inclusion ("DEI"); (2) gender identity; (3) climate change; (4) vaccine hesitancy; and (5) misinformation.

85. NIH also upended funding decisions moving forward, creating a new ideological litmus test where research that could result in outcomes, conclusions, or even discussions reflecting viewpoints the Administration disagrees with—including that societal injustice can be relevant to health concerns and that gender identity is real and transgender people exist—will not be funded, thus blocking the discussion or expression of certain ideas within the biomedical research community. The new policies require researchers to purge their grant materials of an

[62] 2 C.F.R. § 200.340(a)(1), (2), (4).
[63] *Id.* § 200.340(b).

ever-evolving list of forbidden terms, instead parroting the government's preferred phrasing, and researchers reasonably fear termination for using language inconsistent with the government's script when discussing their NIH funded research at conferences or in publications.

86. As detailed below, this upheaval is being carried out pursuant to a series of priorities published by NIH Directors in February and August of 2025, internal agency guidance documents disseminated in March, April, May and December of 2025, and unwritten agency protocols (together, "the Challenged Policies").

*E. The Executive Orders*

87. The changes in NIH's grant process began with Executive Order No. 14151, dated January 20, 2025 and entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," ("DEI EO") which instructed the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear," "terminate" all "'equity-related' grants" and compile "a list of all . . . Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services or activities" since 2021.[64] The "purpose" of the Order is to "end" "diversity, equity, and inclusion" programs purported to be "illegal and immoral."[65]

88. Next came Executive Order No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which directed

[64] Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).
[65] *Id.*

that "federal funds shall not be used to promote gender ideology."[66] The Order defines "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."[67]

89. Executive Order No. 14173 followed the next day, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." It characterized DEI as "dangerous, demeaning, and immoral"; "corrosive[ ] and pernicious"; and contrary to "the traditional American values of hard work, excellence, and individual achievement," and required the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."[68]

90. Then Executive Order No. 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," directed each agency head, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify . . . such covered contracts and grants to . . . advance the policies of my Administration" within 30 days.[69] It was issued on February 26, 2025.

[66] Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) [hereinafter *Defending Women*].

[67] *Id.*

[68] Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14173, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025).

[69] Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14222, § 3(b), 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

91. Finally, Executive Order No. 14332, "Improving Oversight of Federal Grantmaking" required every federal agency to designate a "senior appointee" responsible for creating a review process to ensure new funding opportunities and previously-awarded grants "demonstrably advance the President's policy priorities."[70] In contrast to the centrality of the peer review process mandated by Congress to serve as the primary touchstone for determining whether an application is scientifically meritorious, the Order states that peer review recommendations are to "remain advisory" and "not ministerially ratified, routinely deferred to, or otherwise treated as de facto binding by senior appointees or their designees." Grants "shall not be used to fund, promote, encourage, subsidize, or facilitate," *inter alia*, "racial preferences," "denial . . . of the sex binary in humans," "the notion that sex is a chosen or mutable characteristic," or "anti-American values."

### *F. January—July 2025: NIH Establishes a System of Viewpoint Discrimination*

92. To implement the January 2025 Executive Orders, on February 21, 2025, Dr. Matthew Memoli, then-Acting Director of NIH, issued a Directive entitled "Restoring Scientific Integrity and Protecting Public Investment in NIH Awards" ("Memoli Directive"), instructing that NIH will no longer "support[] low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity."[71] According to NIH:

> Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, DEI studies are often used to support unlawful discrimination on the

---

[70] Improving Oversight of Federal Grantmaking, Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025).

[71] Off. of the Dir., Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *Restoring Scientific Integrity and Protecting Public Investment in NIH Awards* (Feb. 21, 2025), https://perma.cc/G8Y7-K8A2. This document is incorporated by reference herein.

> basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.
>
> Likewise, research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs either.[72]

93. While "DEI" is not defined in the Memoli Directive, the Ninth Circuit has found that it reflects "a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against."[73] In the context of the Executive Orders, it is an inherently directional term that is aimed at particular perspectives, rather than a neutral topic.

94. Under the Memoli Directive, studies that could result in outcomes, conclusions, or even discussions that reflect, or the government perceives to reflect, the views that it is desirable to establish a group culture of equitable and inclusive treatment, that scientific research and the scientific research community should include people who have historically been excluded from such research or discriminated against, and that various forms of injustice including systemic racism can impact health outcomes, will no longer be supported by NIH.

95. These views may be reflected in (or read into) everything from the background motivations researchers offer for their grant proposals, to their articulation of what they hope the research will be used for in the future, to simply the words they choose to describe their work.

96. In turn, those views are communicated to the larger scientific and lay community through public-facing grant materials, the focus and content of researcher interactions with

[72] *Id.*

[73] *Thakur v. Trump*, 176 F.4th 1187, 1202 n.7 (9th Cir. 2026).

community members and study participants, consultations and presentations to interested colleagues at conferences, workshops and in the classroom, and the publication of interim and final research results.

97. For example, Plaintiff Salles' research on interventions to address sexual harassment in NIH training programs is informed by her viewpoint that the historical exclusion of women and others who experience sexual harassment from the biomedical research field is undesirable. Her work built upon evidence gathered by previous researchers to demonstrate the negative impact of these disparities and—had it not been terminated—would have allowed her to express her views regarding best practices to diversify the biomedical research field. Plaintiff Hatcher's work to train a diverse cohort of HIV researchers in South Africa and the United States stems from and advances the perspective that disparities in training opportunities limit whose knowledge is reflected in research. Likewise, Plaintiffs Cohen, Daw, and Rosso's research on how structural racism contributes to diseases related to aging and kidney health builds on and contributes to the hypothesis that racism is a determinant of health, and interventions to address health disparities require understanding and addressing measurable impacts of racially discriminatory practices. Defendants' actions take these pivotal perspectives off the table; they will no longer receive NIH support because NIH does not want such perspectives expressed.

98. The Memoli Directive also fails to define "research programs based on gender identity," but Executive Order No. 14168 makes clear that agencies must consider gender identity a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity."[74]

---

[74] *Memoli Directive*, *supra* note 71; *Defending Women*, *supra* note 66, 90 Fed. Reg. at 8615.

99. Under the Memoli Directive, studies that reflect the viewpoint that a person may identify with a gender that is different from their sex assigned at birth, or that merely acknowledge the existence of transgender people, will no longer be supported by NIH.

100. For example, Plaintiff Jackson's focus on the financial burdens borne by people living with dementia and their care contributors, including analysis of how those burdens specifically impact LGBTQ+ people, communicates her recognition (among many other equity-focused viewpoints) that transgender people exist and should not be excluded or erased from the scientific enterprise. Plaintiff Pagkas-Bather's focus on HIV and STI prevention among multiply marginalized individuals communicates her perspective that identity, including transgender identity, can impact health and resource vulnerability.

101. These viewpoints were also reflected in many then-ongoing grants being researched by potential class member PIs, like "Effects of exogenous testosterone therapy on communication in gender diverse speakers," which recognized that gender-diverse individuals are underserved, and sought to provide the first ever evidence-based assessment of treatment for voice-masculinization, and "Understanding the effects of cross-sex hormone therapy on vaginal mucosal immunity," which sought to determine whether gender-affirming hormone therapy might contribute to transgender individuals' disproportionate acquisition of HIV.

102. HHS implemented the Memoli Directive through two parallel channels: DOGE-directed removals of funding opportunities and grant terminations, and internal NIH grant-review guidance that barred or conditioned new and continuing awards.

103. First, in the days following the issuance of Executive Order No. 14222, DOGE employees working with HHS began a hectic process of sending the agency lists of funding

opportunities and grants to terminate for any connection, or perceived connection, to disfavored views related to the topics listed in the Memoli Directive and the Executive Orders.

104. On February 22, 2025, Brad Smith (a DOGE representative) emailed Memoli with a list of 18 funding opportunities, explaining that they "may be worth your team reviewing to make sure they align with your directive and priorities."[75] Less than 30 minutes later, Memoli responded that every single one should be taken down.

105. Then, on February 28, 2025, Liza Bundesen, Deputy Director of NIH Office of Policy for Extramural Research Administration ("OPERA") met with Rachel Riley, who introduced herself as being part of DOGE. Riley said she was working with HHS, and informed Bundesen that a number of grants "will need to be terminated" by the end of the day and that Memoli would be sending an e-mail with a list of such grants shortly.[76]

106. Memoli then emailed Bundesen a list of 17 grants for termination by "COB."[77] Riley and Smith were listed in the cc field.[78] Riley sent additional grants directly to Bundesen and other NIH staff later that evening, all under the email subject line "FW: Grants for immediate termination today."[79]

107. These included a grant to develop an online sexual education tool for transgender and gender expansive youth, and grants titled "Effects of Social Networks and Policy Context on

[75] Email from Brad Smith to Matthew Memoli on Feb. 22, 2025, Administrative Record at NIH_Grants_003752–53, *Am. Pub. Health Assoc. v. Nat'l Insts. of Health*, No. 25-cv-10787 (D. Mass. 2025) ("APHA"), https://perma.cc/G8WN-J42M.

[76] Dep. of Liza Bundesen Tr., 36:3–37:24, Dkt. No. 276-8 (Apr. 4, 2025), *State of Washington v. Trump*, No. 25-cv-00244 (W.D. Wash. Apr. 30, 2025).

[77] Email from Matthew Memoli to Liza Bundesen on Feb. 28, 2025, Administrative Record at NIH_GRANTS_002469–87, *APHA*, No 25-cv-10787, https://perma.cc/XN2B-MHS2.

[78] *Id.*

[79] Email from Rachel Riley to Liza Bundesen on Feb. 28, 2025, Administrative Record at NIH_Grants_002296–2302, *APHA*, No. 25-cv-10787, https://perma.cc/DV8Z-7S2M [hereinafter *2/28/25 Riley Email*].

Health among Older Sexual and Gender Minorities in the U.S. South," "The effects of gender-affirming sex steroids on brain development in adolescents," and "Trajectories of Adaptation to Traumatic Stress in a Vulnerable Population."[80]

108. Riley forwarded a sample termination letter attached to these emails, which included the same "gender identity" deprioritization language stated in the Memoli Directive.[81] The sample termination letter provided no grant-specific analysis, no explanation for NIH's change in position from its earlier determination that the grant met NIH's high standards for funding, and no acknowledgment of the researcher's reliance interest or the impact of termination. Instead, it simply stated that "research programs based on gender identity are often unscientific."[82]

109. DOGE continued to direct the termination of grants over the 30-day period set forth in Executive Order No. 14222. For example, on March 11, 2025, Riley emailed Memoli and others under the subject line "Shortlist of SGM [sexual and gender minorities] for tonight," attaching six awards for termination "if you are comfortable."[83] And on March 24, 2025, Memoli emailed Jon Lorsch (then-Acting Director of NIH) and Bulls to state that NIH had "been asked to terminate" a list of 120 grants by the end of the day.[84]

---

[80] *Id*. at NIH_GRANTS_002297, 2300–01.

[81] *2/28/25 Riley Email*, *supra* note 79, at NIH_GRANTS_002296; Email Attachment from Rachel Riley to Liza Bundesen on Feb. 28, 2025, Administrative Record at NIH_GRANTS_002303–04, *APHA*, No. 25-cv-10787, https://perma.cc/W3WW-4CQC.

[82] *Id.*

[83] Email from Rachel Riley to Michelle Bulls & Matthew Memoli on Mar. 11, 2025, Administrative Record at NIH_GRANTS_003820, *APHA*, No. 25-cv-10787, https://perma.cc/Z5SY-K4YV.

[84] Email from Matthew Memoli to Jon Lorsch & Michelle Bulls on Mar. 24, 2025, Administrative Record at NIH_GRANTS_002562, *APHA*, No. 25-cv-10787, https://perma.cc/2TK9-UGZ5.

110. Several of the termination letters received by researchers during this first wave of terminations display metadata indicating they were authored by Joshua A. Hanley, a DOGE official, despite being signed by Michelle Bulls, an NIH employee. According to a public financial disclosure report, Hanley was a political appointee on the DOGE team at the General Services Administration.[85]

111. At the same time that DOGE was directing the initial wave of terminations, NIH developed an internal process to ensure that all research reflecting the disfavored viewpoints would be purged and that new awards would be prohibited. On March 4, 2025, the earliest publicly-disclosed version of internal NIH guidance to implement the Memoli Directive, titled "Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025" ("3/4/25 Award Assessments Guidance"), was forwarded by Bulls to all Chief Grant Management Officers.[86]

112. The 3/4/25 Award Assessments Guidance directed that "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). . . . Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims" and "assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used

[85] U.S. Off. Gov't Ethics, OGE Form 278e, *Executive Branch Personnel Public Financial Disclosure Report* (Aug. 2024), https://perma.cc/BSL9-BWLZ.

[86] Email from Michelle Bulls to Chief Grant Management Officers on Mar. 4, 2025, Administrative Record at NIH_GRANTS_002135, *APHA*, No. 25-cv-10787, https://perma.cc/P7LF-WQFV; Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *Staff Guidance –Award Assessment for Alignment with Agency Priorities - March 2025* (Mar. 4, 2025), https://perma.cc/J7BX-3FPG. The latter document is incorporated by reference herein.

to support these activities."[87] It also instructed officials to "completely excise all DEI activities."[88]

113. The 3/4/25 Award Assessments Guidance identified four categories of awards and mandated actions for each category deemed "DEI related":

- "Category 1" — the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above." For projects construed as Category 1, "ICs must not issue the award."

- "Category 2" — the project "partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this [sic] means DEI activities are ancillary to the purpose of the project [sic]. In some cases, not readily visible [sic]. This category requires a scientific assessment . . . ." For projects construed as Category 2, "[i]f the IC and the applicant/recipient cannot reach an agreement" to renegotiate the scope of the project, "or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award." For any such ongoing project, "the IC must work . . . to negotiate a bilateral termination of the project," but "[w]here bilateral termination cannot be reached, the IC must unilaterally terminate the project." A subcategory (Category 2B) addresses grants "where the DEI language in certain sections . . . has to be removed even though the project itself is not focused on DEI," including in the "Resource Section," "Biosketch" and "RPPR."

- "Category 3" — the project "does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities and Other Resources' attachment and terminology related to structural racism—this is not all-inclusive)." For projects construed as Category 3, ICs "must request an updated [application or progress report] with the DEI language removed," and only once the language has been removed may the IC "proceed with issuing the award."

- "Category 4" — the project does "not support any DEI activities." ICs "may proceed with issuing the award."[89]

114. Between March and May of 2025, NIH issued several more iterations of the Award Assessments Guidance; each version added detail and additional areas of forbidden

[87] *Id.*
[88] *Id.*
[89] *Id.*

research, without altering the granting restrictions imposed by the first iteration. By the May 15, 2025 version ("5/15/25 Award Assessments Guidance"), the document had grown to 30 pages, including 8 appendices.[90] The new versions of the document included additional topics about which NIH would no longer fund specific views.[91]

115. The Award Assessments Guidance also provided "[g]uidance for staff to use when terminating awards": "This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues (sic)] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated [Refer to Appendix 3 for language provided to NIH by HHS]."[92] Appendix 3, in turn, instructs staff to utilize the DEI and gender identity[93] template language when terminating grants as well as:

- **Vaccine Hesitancy**: It is the policy of NIH not to prioritize research activities that focuses [sic] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

- **COVID**: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

[90] Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT* (May 15, 2025), https://perma.cc/MM3J-GLV2. This document is incorporated by reference herein.

[91] *See* Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025* (Mar. 25, 2025), https://perma.cc/KR7Z-AS34 [hereinafter *3/25/25 Award Assessments Guidance*]; Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT* (May 7, 2025), https://perma.cc/MEN8-4RVD [hereinafter *5/7/25 Award Assessments Guidance*]. These documents are incorporated by reference herein.

[92] *3/4/25 Award Assessments Guidance*, *supra* note 86, at NIH_GRANTS_002140.

[93] *Id.* at NIH_GRANTS_002141; *5/15/25 Award Assessments Guidance*, *supra* note 90, at NIH _GRANTS_003536.

- **Climate Change**: Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change.
- **Influencing Public Opinion:** "This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion."[94]

116. While the later iterations of the Guidance retained the same "Gender Identity" template language from the Memoli Directive, at some point that category was re-labeled as "**Gender-Affirming Care.**"[95]

117. The policy created an ideological litmus test for NIH-funded research. Plaintiff Minor's research, for example, refers to "climate change" as a driver of extreme temperatures, and he planned to study its impact on human behaviors like sleep and alcohol consumption. But NIH appears to equate use of the term "climate change" with a belief in the fact that human behavior is causing a long-term shift in temperature and weather patterns; under NIH policy, researchers espousing that viewpoint can no longer be funded.

118. The termination of research examining vaccine hesitancy also imposed a viewpoint-based hurdle. NIH targeted research likely to communicate the perspective that improving vaccine uptake is desirable, like one putative class member's research into rural-urban disparities in early childhood vaccination timeliness and parental vaccine hesitancy and immunization adherence, or another putative class member's project to address COVID 19 vaccine hesitancy in rural communities.

119. Public reporting on NIH's terse prohibition of research "related to attempts to influence the public's opinion" demonstrates that it too targets disfavored viewpoints. An email sent to NIH staff in March of 2025 asked personnel to respond with information on "grants [to

[94] *5/15/25 Award Assessments Guidance*, *supra* note 90, at NIH _GRANTS_003536.
[95] *Id*. at NIH_GRANTS_003536.

fight] misinformation or disinformation."[96] The email went on to list examples including public health messages about the "dangers of Covid or not wearing masks."[97] Keywords include "media literacy," "disinformation," "misinformation," "lockdown," "social media," "masks," etc.[98]

120. As a result of these new policies, during the first half of 2025 DOGE and NIH terminated thousands of NIH grants, including active clinical trials and potentially life-saving cancer, heart disease and Alzheimer's research.

121. Plaintiff Salles' research to design evidence-based interventions to address sexual harassment in the biomedical research field and Plaintiff's Daw's research into kidney health disparities were among these thousands. As were the two class member grants identified *supra*, involving critical research into the health of transgender individuals. A class member who researched the prevalence of disease-related misinformation on social media platforms and how individuals process and assess information quality and source credibility when interacting with social media content had their grant terminated as "attempting to influence public opinion."

122. The Executive Orders led to similar viewpoint-based purges at other federal agencies. Over a three-day period in April of 2025, for example, the National Endowment for the Humanities and DOGE terminated at least 1,400 grants based on their perceived promotion of "environmental justice," "diversity, equity, and inclusion," and "gender ideology."[99] Similarly, the National Science Foundation terminated more than 1,700 grants with titles that include

---

[96] Anil Oza, *Hours after NIH director confirmed, the agency tackles one of his priorities — ending 'censorship' in science*, STAT (Mar. 26, 2025), https://perma.cc/R6DB-2CJW.
[97] Max Kozlov (@maxkozlov.bsky.social), Bluesky (Mar. 26, 2025, 2:14 PM), https://perma.cc/6KUN-SQA8.
[98] *Id.*
[99] *Am. Council of Learned Societies v. Nat'l Endowment for the Humans.*, No. 25-cv-3657, 2026 WL 1256545, at *7–*15 (S.D.N.Y. May 7, 2026).

keywords like "diversity" "equity" and "gender" by April 2025.[100]

123. On June 16, 2025, Judge Young of the District Court for the District of Massachusetts held a full hearing and bench trial in *American Public Health Association. v. National Institutes of Health*, No. 25-cv-10787 ("APHA"), and vacated the Memoli Directive and all iterations of the Award Assessment Guidance as arbitrary and capricious in violation of the APA.

*G. August 2025–Present: NIH Supplements the Original Directives with New Directives, Guidance, and Policies to Accomplish the Same Goals*

124. The June 16 judgment did not end NIH's use of viewpoint-based priorities. Instead, starting in August 2025, Defendants began purporting to replace the vacated directives with a series of new directives, guidance, and policies.

125. On August 15, 2025, NIH's new Director, Jay Bhattacharya, issued a directive to "clarify specific issues that currently require additional guidance" titled "NIH Priorities and Internal Review of Intramural and Extramural Programs" ("Bhattacharya Directive v1").[101] NIH revised the text of this Directive on July 2, 2026 ("Bhattacharya Directive v2").[102]

126. Bhattacharya Directive v1 instructs that "research that aims to identify and treat the harms" caused by "puberty suppression, hormone therapy or surgical intervention" is a clearly "more promising" avenue of research than studies that involve the use of such therapies to treat gender dysphoria, gender identity disorder or gender incongruence in minors.[103]

[100] *Thakur v. Trump*, 787 F. Supp. 3d 955, 972 (N.D. Cal. 2025), *aff'd in part*, *rev'd in part and remanded*, 176 F.4th 1187 (9th Cir. 2026).
[101] Off. of the Dir., Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *NIH Priorities and Internal Review of Intramural and Extramural Programs* 3 (Aug. 15, 2025), https://perma.cc/CA7M-8CWW. This document is incorporated by reference herein.
[102] Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *Advancing NIH's Mission Through a Unified Strategy* (July 2, 2026), https://perma.cc/3WDE-NSJT. This document is incorporated by reference herein.
[103] *Bhattacharya Directive v1*, *supra* note 101, at 6.

127. Under this endorsement of a single hotly contested viewpoint, studies that communicate a researcher's view that gender-affirming care *could* be useful in treating transgender youths will no longer be supported by NIH; studies that reflect the opposite view will.

128. Perhaps in recognition that it is illegal (not to mention bad science) for an agency to fund the speech of those who espouse a particular hypothesis while defunding all those who it believes might conclude the opposite, NIH edited the language of the Directive. Now, Bhattacharya Directive v2 states that "research that aims *to identify the utility*" of "puberty suppression, hormone therapy or surgical intervention" is "more promising" than "studies that *use*" these treatments.[104]

129. While the initial version of the Bhattacharya Directive was accompanied by a press release, there was no public acknowledgement of its purported change nearly a year later. There is no indication that the Agency's actual implementation has changed between the two versions.

130. The policy discriminates based on viewpoint—favoring research that promotes the hypothesis that gender-affirming care causes harm over research promoting the hypothesis that it could be beneficial— leaving researchers unable to fairly compete for NIH funding for research that neutrally seeks to understand the impacts of gender-affirming care for minors without endorsing a predetermined message that such care is harmful.

131. Both versions of the Bhattacharya Directive also address other priorities, including limitations on health disparities research. While acknowledging that personal characteristics such as race and sex "may" be relevant to health outcomes, they limit the ability

[104] *Bhattacharya Directive v2*, *supra* note 102, at 4 (emphasis added).

of researchers to identify racism as a possible determinant of health. Bhattacharya Directive v1 states that NIH will not support "research based on ideologies that promote differential treatment of people based on race or ethnicity" or that attribute "worse health outcomes in a particular population to poorly measured factors like systemic racism," but it also acknowledges that "redlining and housing discrimination are clearly defined practices that can measurably impact the health of minority populations. The NIH will support scientifically rigorous research programs that explore such cases as one reason among many for poor health outcomes for Americans."[105]

132. Bhattacharya Directive v2 goes further, making explicit what was implicit in NIH's initial termination as DEI-related of hundreds of minority health and health disparity grants: that NIH will no longer support research that discusses social determinants of health, especially vis-à-vis communities of color. It states that "research based on beliefs that promote differential treatment or unnecessary classification of people based on race or ethnicity" will not be supported, removes the recognition that clearly defined aspects of systemic racism such as redlining and housing discrimination can measurably impact health outcomes, and fully disallows reference to systemic racism in research, stating "unproven factors like systemic racism-should not be presented as established background facts *or otherwise included in proposed research*."[106]

133. Shortly after publishing Bhattacharya Directive v1, on November 18, 2025, NIH issued a "Reminder of Compliance Requirements for NIH Extramural Recipients Related to Renegotiated Aims, Objectives, Titles, and Abstracts."[107] This "November Compliance

[105] *Bhattacharya Directive v1*, *supra* note 101, at 4–5.
[106] *Bhattacharya Directive v2*, *supra* note 102, at 4. (emphasis added).
[107] Nat'l Insts. of Health, NOT-OD-26-007, *Reminder of Compliance Requirements for NIH*

Reminder" acknowledges "negotiated" changes in scope that arose in fiscal year 2025 to align grants with the Bhattacharya Directive and "remind[s]" awardees that such changes "become new terms and conditions of award, and the recipient must comply with those changes" upon threat of termination under 2 C.F.R. 200.340(a)(1) (for non-compliance).

134. On December 12, 2025, NIH issued final staff guidance titled "Reviewing Grants for Priority Alignment" ("December 12 Staff Guidance").[108]

135. The December 12 Staff Guidance states that the Bhattacharya Directive superseded the Memoli Directive, and the Memoli Directive is no longer in place. It also purports to supplant all iterations of the Award Assessment Guidance issued by NIH between March and May 2025, discussed *supra*.

136. The December 12 Guidance applies to all existing and new awards and requires program officers to "review their full portfolio of ongoing awards for alignment" with the Bhattacharya Directive.[109] Program officers may not issue any competing or non-competing awards "until the final project has been assessed, and all areas of non-alignment have been addressed."[110]

137. To assess alignment, ICs "must first conduct an evaluation using a computational text analysis tool to scan for terms that may be potentially associated with misalignment with the agency's priorities."[111]

---

*Extramural Recipients Related to Renegotiated Aims, Objectives, Titles, and Abstracts* (Nov. 18, 2025), https://perma.cc/3E9D-BSZ9. This document is incorporated by reference herein.

[108] Nat'l Insts. of Health, U.S. Dep't of Health & Hum. Servs., *Staff Guidance – Reviewing Grants for Priority Alignment* (Dec. 12, 2025), https://perma.cc/6932-EBLE. This document is incorporated by reference herein.

[109] *Id.* at 1.

[110] *Id.*

[111] *Id.*

138. "Any projects that are identified by the text analysis tool as potentially unaligned with agency priorities must be manually reviewed, renegotiated or, if renegotiation is not possible, terminated as outlined below."[112] The December 12 Guidance instructs to "pay particular attention to the use in grants of poorly defined, non-scientific terms or variables . . . to frame or justify the research" and provides as "frequent examples" the terms "health equity" and "structural racism."[113]

139. Even though the entire peer review process is designed to ensure scientific justification for any proposed research, the December 12 Guidance specifically notes that "health disparities research," research that "focus[es] on or include[s] specific populations," or a clinical study that states "plans to increase the diversity of its patient base" can only be funded if shown to be "scientifically justified."[114] It also bars the use of "LatinX" as a term that is not "clearly defined" and "standardized."[115]

140. The text analysis tool was created from a database of the words that appeared frequently in the grants terminated in 2025.

141. According to public reporting, it was part of a screening process formalized by NIH leaders to check grant applications against a list of viewpoint signifying "disfavored words."[116] By February 2026, the list included at least 235 terms, which, according to an internal NIH document, serve as an "indicator that the grant likely needs, at a minimum, a revision to align its terminology with NIH priorities."[117]

---

[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] Max Kozlov, *Inside the New Political Screening That's Stalling NIH Grants*, Nature (June 26, 2026), https://perma.cc/BPZ9-U73P. This document is incorporated by reference herein.
[117] *Id.*

142. Notably, flagged terms are grouped into several of the same categories listed in the supposedly abandoned Award Assessment Guidance documents: (1) DEI; (2) gender; (3) climate change; (4) misinformation; and (5) vaccine hesitancy.[118] NIH's continued use of terms identified in the earlier Guidance—but not included in the Bhattacharya Directives or the December 12 Guidance—to flag grants for policy misalignment contradicts NIH's statement that the earlier policies have been superseded.

143. The viewpoint-signifying terms (with NIH's categorization of the term in parenthesis) include:

- "dei" (DEI)
- "diverse individual" (DEI)
- "advancing diversity" (DEI)
- "bolster diversity" (DEI)
- "broaden diversity" (DEI)
- "commitment diversity" (DEI)
- "embrace diversity" (DEI)
- "encourage diversity" (DEI)
- "improve diversity" (DEI)
- "need diversity" (DEI)
- "support diversity" (DEI)
- "equit" (DEI)
- "underrepresent" (DEI)
- "minorit" (DEI)
- "racist" (DEI)
- "latinx" (DEI)
- "gender" (Gender)
- "transgender" (Gender)
- "sex assigned" (Gender)
- "sexual gender minorit" (Gender)
- "SGM" (Gender)
- "lgb" (Gender)
- "queer" (Gender)
- "pregnant individual" (Gender)
- "pregnant person" (Gender)
- "lactating person" (Gender)
- "climate change" (Climate Change)
- "changing climate" (Climate Change)
- "climate crisis" (Climate Change)
- "climate justice" (Climate Change)
- "environmental justice" (Climate Change)
- "fossil fuel" (Climate Change)
- "global warming" (Climate Change)

[118] *Id.*; *5/15/25 Award Assessments Guidance*, *supra* note 90, at NIH_GRANTS_003536.

- "vaccine acceptance" (Vaccine Hesitancy)
- "vaccine refusal" (Vaccine Hesitancy)
- "vaccine hesitant" (Vaccine Hesitancy)
- "misinform" (Misinformation)
- "disinform" (Misinformation)[119]

144. Because the text analysis tool casts such a wide net, every application or award that relates in any way to NIH's disfavored viewpoints is flagged by this screening process.

145. If a grant award or application contains any of the disfavored terms, it is classified as "not clean."[120] For most projects, being flagged triggers a process wherein the researcher must renegotiate the scope or language of the project with the PO to avoid funding denial or termination. POs must report their work on flagged grants in a "decision memo."[121]

146. If a researcher complies with the requirement to renegotiate, NIH issues an award with an NOA that includes a term requiring compliance with the renegotiated grant language.

147. The December 12 Guidance reiterates what the November Compliance Reminder made clear, that "all changes in scope that were agreed upon . . . become new terms and conditions of award, and the recipient must comply with those changes. If NIH discovers that recipients and/or subrecipients have not complied with the new terms and conditions of their award, NIH can immediately take enforcement action. . . ."[122] The NOAs issued after renegotiation also include special terms reflecting the requirement for recipients to comply with the renegotiated language. For example, one Plaintiff who renegotiated an existing award received a revised NOA stating "the project must be carried out in accordance with the revised plan/section" and "NIH funds may only be used to support activities within the revised scope of the award as described . . . . NIH funds may not be used to support activities that are not

---

[119] Kozlov, *supra* note 116.
[120] *Id.*
[121] *Id.*
[122] *December 12 Staff Guidance*, *supra* note 108, at 4.

consistent with the revised scope of the award." Another Plaintiff who renegotiated application language received an NOA stating "[t]he revised aims, abstract, and PHR are incorporated as terms and conditions of the award and the recipient must comply with these changes" and included a cite to the November Compliance Reminder.

148. Other applications and grants are simply blocked or terminated, without the opportunity for renegotiation. NIH's terminations and threats of termination rest on reference to "the termination provisions of 2 C.F.R. 200.340, including .340(a)(4), which permits terminations for non-alignment with agency priorities."[123]

149. Such terminations are not limited to awards that were made after the Bhattacharya Directive was issued and do not align with those agency priorities. Instead, the December 12 Guidance illegally directs the termination of any allegedly non-aligned grant irrespective of the agency priorities in existence at the time the award was made.

150. New and continuing awards flagged through NIH's screening tool are also subjected to a final, unprecedented round of review outside the ICs, including at the OER.

151. For new awards, this final review occurs after two rounds of scientific peer review and final approval by the IC Director—the process Congress prescribed by statute.

152. Flagged grants, even those renegotiated to remove all disfavored terms, are held up in so-called "Status 19," during which NIH leaders and an "HHS counselor" conduct a further review.[124] Where the NIH leader or HHS counselor question whether a project should be funded, it is sent back to the PO to renegotiate the scope of the project. If the researcher revises the award materials or application, it returns for another round of Status 19 review.[125]

[123] *Id.* at 5.
[124] Kozlov, *supra* note 116.
[125] *Id.*

153. This process is resulting in some grants being blocked indefinitely despite approval by the IC Director.

154. Recent reporting has revealed a flowchart that reflects the agency review process for grants held up in Status 19 review.[126]




155. Finally, some aspects of NIH's discriminatory policy have not yet been disclosed in writing. Without public acknowledgment, NIH appears to have initiated limits on research into the public health impacts of policy interventions, allegedly on the justification that all NIH research must be for the benefit of "mission-relevant stakeholder groups," excluding policymakers.[127]

156. While such a policy could theoretically apply neutrally, NIH is using this new justification to block or otherwise jeopardize funding of research that could be expected to uncover negative health impacts of *favored* policies, like Plaintiffs Bell and Moseson's analysis

[126] Paige W. Cunningham (@pw_cunningham), X (Aug. 17, 2026, 1:57 PM), https://perma.cc/ZG7K-K7SN; Paige Winfield Cunningham, *'Graveyard for Grants': NIH Is Holding Up Medical Research Funding*, The Washington Sun (Aug. 17, 2026), https://perma.cc/HC5P-BEV7.
[127] Max Kozlov, *NIH Limits Funding for Research on the Health Effects of Public Policy*, Nature (Aug. 11, 2026), https://perma.cc/UER7-6XEU. This document is incorporated by reference herein.

of the impact of the *Dobbs* Supreme Court decision on infant mortality rates and pregnancy outcomes,[128] or one putative class member's proposed research on the impacts of Medicare Advantage plans, as well as research that might demonstrate the positive health impacts of *disfavored* policy, like Plaintiff Pagkas-Bather's research on the impact of a basic income guarantee on young people living with HIV. At the same time, there has been no reported implementation of this new policy to limit research likely to demonstrate the negative health implications of policy opposed by the Trump Administration or the positive impacts of policy supported by the Trump Administration.

*H. Impact on Plaintiffs*

157. The new reality created by the Challenged Policies is negatively impacting researchers at every phase of the award process. First, some researchers are scrubbing their grant applications of viewpoint-signifying terms, as they understand this would negatively impact their ability to compete for NIH funding. Plaintiffs Salles, Hatcher, Albarracín, Bell, and Smith, for example, have self-censored their grant materials to remove words they would normally use to describe their proposed research, like "underrepresented minorities," "gender," "transgender," "sexual," "equity," "racism," "climate change," and "pregnant people," even when the changes render their proposals less clear or accurate.

158. Plaintiff Salles, for example, submitted an application for an R35 "Investigator-Focused Award." A critical portion of the application requires describing the investigator's previous work. Salles was unable to precisely describe her fifteen years of experience researching gender equity and sexual harassment without using the words "gender," "equity," or

---

[128] Relatedly, the same researchers were asked to remove the term "abortion" from their grant materials before NIH begin iterating its current public policy concern.

"sexual." She therefore had to describe her previous research in vague terms, for example referring to "mistreatment" instead of "sexual harassment."

159. If not for NIH's changed priorities, Salles would have described her previous work in detail: assessing implicit bias, microaggressions, sexual harassment, and other discriminatory behavior that asymmetrically impacts outcomes for professionals based on their gender and other aspects of identity. And she would have proposed interventions in line with that work. Instead, she pivoted to a proposal about civility, bullying, and research misconduct, an area of research with only tangential relation to her expertise. That likely made for a weaker application.

160. Salles later learned that the R35 application was "not discussed" at study section, meaning it is currently considered uncompetitive for funding. She has no idea how she will ever be competitive for NIH funding if she remains unable to clearly describe her past work.

161. Similarly, Plaintiff Smith has been putting together an R01 application and is self-censoring to avoid any mention of "policy" and "abortion" from all her application materials, despite the difficulty this poses for accurately describing her proposed research.

162. When researchers decline to self-censor prior to initial submission or fail to adequately scrub their applications of all disfavored terms, the applications are flagged by the algorithm, and the researchers are instructed by their POs to make changes. Plaintiff Smith, for example, was told by her PO to remove the phrases "equity" and "structural nature of inequitable outcomes" from her grant application, to "clarify" that her project did not misalign with NIH priorities.

163. Similarly, Plaintiff Hatcher understood the priorities alignment screening to mean that, to have any chance at receiving NIH funds, she would need to edit her application materials

to omit “underrepresented minorities,” “social and structural determinants of health,” “gender-based violence,” “systemic racism,” “sexuality,” “stigmatized identities,” “intersection,” “particularly women,” “African,” “Black,” “Brown,” and “minoritized.” Hatcher’s initial training proposal sought to address the demonstrated loss of scholars across race and gender lines through the postdoctoral stage by targeted mentorship around research in an important and understudied area—the intersection of violence and HIV. The sanitized version of the proposal is impossible to distinguish from any other HIV-training application, making it significantly less competitive.

164. At the instruction of her PO, Plaintiff Pagkas-Bather removed all references to sexual and gender minorities from an application focused on HPV prevention, even though prior NIH reviewers wanted more of a focus on transgender women, who have an elevated incidence of HPV, and HPV screening guidelines reference transgender women. In light of public reporting on NIH grant screening, Pagkas-Bather also removed the word “vaccine,” despite the fact that HPV is best prevented through vaccination.

165. Plaintiff Bell was also advised to self-censor by her PO. She applied for two NIH awards in 2026—an R01 in June 2026 to study the impact of extreme heat on human fecundity and an R21 in July 2026 to study gendered experiences of infertility stigma. To continue to compete for NIH funding she edited sections of both applications to align with NIH’s current priorities, including omitting references to “climate change,” “pregnant people,” and “gender” even though retaining the terms would allow for a more precise description of her work.

166. Sometimes removing the flagged term is enough to allow the application to move forward. Plaintiff Bell was informed by her PO after she submitted the annual progress report necessary to receive a second year of funding for a current grant that the award had been placed on a flagged list with other abortion related grants. She was told that she would need to remove

any mention of abortion or the *Dobbs* case from the public facing portions of her award materials, as well as the specific aims section. Bell had misgivings about changing her language in this way but complied to protect her research. She shifted characterization of her work to omit mentions of abortion and *Dobbs* and to focus more broadly on the impact of reproductive and pregnancy health policy changes on fertility and perinatal outcomes. Once she did this, her NCR was granted, but she worries that her grant will be terminated based on how she writes and speaks about her work to the public.

167. These changes have serious consequences for the research and the researcher's communications moving forward. While Plaintiff Edwards complied with her PO's instruction to remove "gender" from an application for funding to evaluate and disseminate results of an education program to reduce sexual violence among Indigenous youth, she is concerned that even if the application is funded, exclusion of any discussion of or reference to demographic populations, especially those demographic populations who would most benefit from the interventions being studied, would compromise the relevance and efficacy of the research.

168. Plaintiff Green has similar concerns. While he has thus far managed to stave off termination of his fellowship through self-censoring to remove references to minority demographic groups from his grant materials, if he is limited in what demographic groups he can study, he worries that will limit the impact of the findings and publications that result from his research.

169. Plaintiff Albarracín is concerned with the related problem that graduate and undergraduate students and other early career researchers (e.g., postdoctoral fellows) will miss out on training or work around essential concepts in her field—like harm reduction and the

practice of oversampling to address health disparities—at a critical stage of their academic career, given the removal of these concepts from NIH funding research.

170. Other plaintiffs have been unwilling or unable to make the changes necessary to continue to compete for funding. For example, Plaintiff Jackson was told to remove all "DEI language" from her grant materials in order to "proceed with funding consideration." She felt that it would be dishonest to rewrite her research aims to remove mention of already completed focus groups with LGBTQ+ individuals and informed NIH she wanted to continue with her award as originally agreed upon.

171. Her budget period ended and she has not received the continuation award necessary to fund the third year of her five-year grant.

172. Still other plaintiffs have made the requested changes and their grants were terminated anyway, or they have been blocked from a fair opportunity to compete for NIH funding because of the viewpoint communicated (or perceived as likely to be communicated) in their proposed or ongoing research.

173. Plaintiff Cohen followed her PO's instructions to remove all references to Black communities experiencing racism and a health disparities framework, and her grant was terminated regardless, pursuant to NIH's policy to disallow *any* research that references structural racism, even when based on concrete, measurable variables.

174. Plaintiff Smith's grant application was denied *after approval by the IC*, for "trying to influence public policy." This despite the fact that Smith's grant is not intended to advocate for any particular policy decision; rather, her work focuses on the impact of *Dobbs v. Jackson Women's Health Organization* on access to reproductive health care, with the goal of providing objective evidence for policymakers and health care professionals.

175. Plaintiff Moseson fears her research will meet the same fate. She is also studying the impact of *Dobbs*, and, despite a successful renegotiation in 2025, she learned in July of 2026 that OER was again seeking changes to her award materials upon threat of termination. Specifically, OER demanded changes clarifying how her research would inform interventions within the healthcare system, as opposed to legislative changes. This was particularly perplexing given that her proposal already did highlight interventions within the healthcare system, and further, the call for proposals to which Moseson applied specifically requested research documenting the impact of policy or legislative changes and that named policymakers as a target audience. Though she received a new NOA after the changes were made, she fears imminent termination, and she is fearful that NIH will terminate her grant if she speaks or writes about the work or presents her findings in ways that differs from the language that NIH required her to adopt.

176. Plaintiff Minor's award is also in immediate jeopardy. His project, "The Behavioral Cost of Carbon," aims to generate the first empirical estimate of how incremental increases in greenhouse gas emissions impact human health-related behaviors, including sleep, alcohol consumption and physical activity. In March of 2026, at OER's direction, Minor rewrote his award to remove all mentions of "climate," "carbon," and "climate change" to attempt alignment with NIH priorities. After months of delay, NIH denied his transfer application, purportedly because the revised award differed from the original peer-reviewed project—even though he made the revisions at OER's direction.

177. NIH is not only requiring the deletion of prohibited terms and reframing of research aims, but is also coercing researchers to parrot its new priorities to avoid mid-stream termination of their grants. Plaintiff Bell, for example, is the PI on a five-year award focusing on

infertility in Uganda. She is currently entering the fifth and final year of the award and is nearly done with all her research aims and training objectives, including development of a novel infertility stigma scale for use in general reproductive-aged female populations.

178. In July 2026, she was told by her PO that she would need to make changes to the public-facing portions of her award materials and the specific aims section to justify her continued work in a foreign country, specifically how the research would benefit Americans.

179. Bell does not want to make these changes. Non-public facing aspects of the award materials *already* explain the scientific basis for the research location and how it can impact public health more generally. Bell, like many other American researchers who work with foreign populations, feels strongly that public health is inherently global and that foreign research is valuable in itself, not simply by reference to how it may benefit Americans. But she also cannot risk jeopardizing the final year of her five-year project, which would result in a significant waste of time and resources if she is unable to complete outstanding analyses and papers with the already collected data.

180. Other researchers are not even given the opportunity to make changes. For example, as Plaintiff Rosso approached the fifth year of her award—*Longitudinal Examination of Neighborhood Disadvantage, Cognitive Aging, and Alzheimer's Disease Risk in Disinvested, African American Neighborhoods*—she reached out to her PO to submit revised research aims, to preemptively try to more clearly align with NIH priorities. She received no response. That final year of funding, due February 1, 2026, did not materialize and her PO confirmed that the grant was "under review" despite the PO and grants management having signed off.

181. In May, she again attempted to submit revisions, removing all references to disfavored terms, including removing references to "African Americans," "discrimination,"

"lived experiences," "disinvested communities," "neighborhood segregation," "racial disparities," and "structural racism," and replacing them with language about low-socioeconomic status and economic disadvantage. NIH made no substantive response, instead terminating the award in the final year of funding. The Bhattarcharya Directive v2, which NIH claimed was the justification for her termination, states that "[o]verly broad or subjective assumptions – such as attributing, without evidentiary basis, worse health outcomes in a particular population to poorly measured or unproven factors like systemic racism" should not be included in proposed research.[129] But Rosso's award specifically sought to assess whether and to what degree defined aspects of systemic racism, like residential segregation, influence cognitive health.

182. Finally, NIH's policies have led some Plaintiffs to curtail or fully abandon their quest for NIH funding altogether. Plaintiff Edwards has declined to resubmit a previously developed application for funding and is hopeless about her chances to compete for future NIH funds in her area of expertise. Plaintiff Albarracín has significantly scaled back her quest for NIH funding on misinformation and vaccine hesitancy despite her conviction that these issues are important to public health. Since scrubbing her pending NIH application of any reference to people of color and racial inequities, Plaintiff Hatcher has chosen not to submit new applications for NIH as she feels she would be unable to do so without compromising her ethical principles.

## CLASS ALLEGATIONS

183. Plaintiffs bring this action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and two nationwide classes.

**Class 1: Researchers Whose Projects Were Terminated (the "Termination Class")**

184. The Termination Class Representative Plaintiffs (Arghavan Salles, Andrea Rosso,

[129] *Bhattarcharya Directive v2*, *supra* note 102, at 4.

Ann Cohen, and Jonathan Kyle Daw) bring this action on behalf of themselves and all others similarly situated.

185. The Termination Class is defined as: All principal investigators, multiple-principal investigators, researchers, or project leaders for NIH research grants identified for termination based on the Challenged Policies, whose grants remain terminated.

186. The Termination Class satisfies the prerequisites of Rule 23(a).

187. The Termination Class satisfies the numerosity requirements of Fed. R. Civ. P. 23(a)(1) because it is so numerous that joinder of all members is impracticable. Currently, more than 1,000 grant-funded projects remain terminated due to NIH's mass viewpoint-driven termination of research grants.[130] In addition to the large number of affected projects, joinder is also impracticable because individuals impacted by the terminations live in every state in the United States.

188. The Termination Class meets the commonality requirements of Fed. R. Civ. P. 23(a)(2). The members of the proposed class are subject to a common practice: illegal, unreasoned termination of their grants, and their claims are linked by common legal questions: whether the terminations of their grants pursuant to the Challenged Policies violate the First Amendment and/or are arbitrary and capricious and not in accordance with law under the APA.

189. The Termination Class meets the typicality requirements of Fed. R. Civ. P. 23(a)(3) because the claims of the Termination Class Representative Plaintiffs are typical of the claims of the class. Every researcher whose grant was identified for termination based on the Challenged Policies is experiencing the same types of injury as the Termination Class Representative Plaintiffs (including, but not limited to, loss of their research grant), based on the

[130] *Grant Disruptions: National Institutes of Health*, Grant Witness (Aug. 24, 2026), https://grant-witness.us/nih-data.html.

same HHS/NIH policies, and the infliction of those injuries by Defendants is unconstitutional and unlawful under the Constitution and the APA as to the entire class.

190. The Termination Class meets the adequacy requirements of Fed. R. Civ. P. 23(a)(4). The Termination Class Representative Plaintiffs seek the same relief as the other members of the class—among other things, declaratory and injunctive relief under the First Amendment and APA and vacatur under the APA, setting aside and enjoining the terminations as to all class members. In defending their rights, Termination Class Representative Plaintiffs for this class will defend the rights of all proposed class members fairly and adequately. The Class Representative Plaintiffs for the Termination Class are members of the class, and their interests do not conflict with those of other class members.

191. The Termination Class further meets the requirements for certification under Fed. R. Civ. P. 23(b)(2) because, by terminating research awards pursuant to the Challenged Policies, Defendants have acted on grounds that apply generally to the class that can be remedied by the requested injunctive and declaratory relief.

**Class 2: Researchers Subject to the Challenged Policies (the "Policy Class")**

192. All Plaintiffs are Policy Class Representative Plaintiffs, and they bring this action on behalf of themselves and all others similarly situated.

193. The Policy Class is defined as: All persons who have an existing NIH grant and/or who applied or will apply for an NIH grant whose grant or application is subject to termination, denial, rephrasing, or renegotiation based on the Challenged Policies; and all persons who would apply for an NIH grant but for the Challenged Policies.

194. The Policy Class satisfies the prerequisites of Rule 23(a).

195. The Policy Class satisfies the numerosity requirements of Fed. R. Civ. P. 23(a)(1) because it is so numerous that joinder of all members is impracticable. NIH provides between 50,000 and 60,000 grants a year to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions in every state.[131] The number of individuals who apply for grants is far greater.

196. While it is impossible to know precisely how many of these thousands of researchers are currently being impacted by the Challenged Policies, over fiscal years 2025 and 2026, disfavored words—such as "Equity," "Disparities," "Racial," and "Gender"—were removed from more than a thousand different existing grant titles according to data collected from NIH Reporter. For example, "An Academic and Community Alliance to Eliminate *Disparities* throughout the Fibroid Experience" was changed to "An Academic and Community Alliance to Eliminate *Differences* throughout the Fibroid Experience" and "Promoting *Equity* of Cancer Screening and Follow-Up for Lung Cancer" was changed to "Promoting *Improvements* in Screening and Follow-Up for Lung Cancer in Rural Communities"[132] Moreover, the Challenged Policies will impact any individual who conducts research perceived to communicate disfavored viewpoints who applies for an NIH grant in the future.

197. The Policy Class meets the commonality requirements of Fed. R. Civ. P. 23(a)(2). The members of the proposed class are all subject to NIH review for disfavored views under the Challenged Policies, and every member of the class must modify their speech to conform with the Challenged Policies and Defendants' preferred viewpoints or lose previously granted funds or the opportunity to compete for funding. Moreover, they are linked by common questions of

---

[131] *Fiscal Year 2025*, *supra* note 6; *see also Budget*, *supra* note 5.

[132] Jeremy M. Berg, *Characterizing Coerced Word Removal from NIH Grants in Fiscal Year 2026,* Stand Up For Sci. Found. (Sep. 11, 2026), https://perma.cc/4X43-6N9X.

law: whether the disfavoring of certain perspectives and prohibiting certain words and phrases as proxies for disfavored viewpoints violates the First Amendment and is arbitrary and capricious under the APA, and whether the imposition of a newly created, extra-statutory review process and termination for failure to meet new agency priorities is not in accordance with law, and contrary to statute in violation of the APA.

198. The Policy Class meets the typicality requirements of Fed. R. Civ. P. 23(a)(3) because the Policy Class Representative Plaintiffs, by way of the viewpoint-based review of their research, have been harmed in the same manner as other members of the class. Every member of the proposed class is experiencing the same type of injury (including, but not limited to, violation of their rights under the First Amendment and the APA), based on the same NIH policies, which are illegal as to the entire class.

199. The Policy Class meets the adequacy requirements of Fed. R. Civ. P. 23(a)(4). The Policy Class Representative Plaintiffs seek the same relief as the other members of the class, including declaratory and injunctive relief prohibiting implementation of the Challenged Policies. In defending their rights, the Class Representative Plaintiffs for this class will defend the rights of all proposed class members fairly and adequately. The Class Representative Plaintiffs for the Policy Class are members of the class, and their interests do not conflict with those of other class members.

200. The Policy Class further meets the requirements for certification under Fed. R. Civ. P. 23(b)(2) because, by applying the Challenged Policies to block certain disfavored viewpoints, Defendants have acted on grounds that apply generally to the class that can be remedied by the requested injunctive and declaratory relief.

## CLAIMS FOR RELIEF

201. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs in the claims for relief set forth below.

### FIRST CLAIM FOR RELIEF
### Violation of the First Amendment – Challenged Policies
### Viewpoint Discrimination in Funding for Private Speech
### (All Plaintiffs & Policy Class Against All Agency Defendants)

202. The Challenged Policies violate the First Amendment by imposing viewpoint-based bars or penalties on government funding designed to facilitate private speech. Defendants are discriminating against Plaintiffs and the proposed class by inhibiting their ability to fairly compete for or retain NIH funding based on the fact, or Defendants' perception, that Plaintiffs' research-related speech will communicate disfavored views concerning (1) DEI, (2) gender identity, (3) climate change, (4) vaccines, and (5) misinformation.

203. These include the views that: (1) the inclusion of historically disadvantaged groups is desirable, and various forms of societal injustice can be relevant to health outcomes; (2) gender identity is real, transgender people exist and gender-affirming care can have health benefits; (3) changes in weather are caused by climate change and climate change has health impacts; (4) vaccine hesitancy is undesirable and (5) the dissemination of inaccurate information can harm public health.

204. Under the Challenged Policies, Defendants are screening applicants, applications, and existing awards for disfavored views, including by relying on terms such as "DEI," "gender identity," "systemic racism," "Latinx," "pregnant person," "climate change," and more, as proxies for the views they seek to block researchers from communicating in connection with their research.

205. For some researchers, this viewpoint discrimination means their application will be denied, or their grant will be terminated. For others, it means that they will be forced to scrub their application and grant materials of all disfavored viewpoint-signifying words and use government-directed language to compete for funding and retain existing funding. And through both paths, Defendants are signaling that researchers are not free to use disfavored viewpoint-signifying words to publicly describe and disseminate their NIH-funded work.

206. The Challenged Policies block, chill, and/or alter researchers' communications to the public—from the initial grant announcement to the public, articulated in researchers' own words; through their public-facing communicative research activities; on to final publications—based on viewpoint.

207. The Supreme Court has made clear that, when the government creates a program "designed to facilitate private speech, not to promote a governmental message," it cannot pick and choose which projects to fund based on the viewpoint the recipient would express (or be expected to express) in or about their work. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). Defendants can set priorities regarding what topics to fund consistent with the First Amendment, but what they cannot do is set or implement priorities in a manner aimed at suppressing disfavored viewpoints from being communicated through private speech.

208. "'Viewpoint discrimination' represents an even more 'egregious form' of content regulation from which governments must nearly always 'abstain.'" *Chiles v. Salazar*, 607 U.S. 627, 628 (2026) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

209. The First Amendment's prohibition on viewpoint discrimination applies where, as here, the government is discriminating in the provision of government support for private

expression. The government has unparalleled financial resources, and when it uses them not to express its own views, but to support private speech, it cannot leverage that funding to skew the marketplace of ideas to suppress views the government disfavors.

210. NIH's extramural research funding is not designed to "communicate a government message." NIH's GPS confirms as much, directing grantees to include a disclaimer in publishing their research findings that "[t]he content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health."[133]

211. Equally, "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" on funding, "[t]he government must abstain." *Rosenberger*, 515 U.S. at 829. Yet the Challenged Policies also specifically target grants for disfavor because of the (actual or perceived) viewpoints of the researchers.

212. The requirement that government support for private speech "must be reasonable and viewpoint neutral" is also reflected in forum doctrine. *See Thakur v. Trump*, 176 F.4th 1187, 1201 n.6 (9th Cir. 2026).

213. By imposing viewpoint-based bars or penalties on government funding designed to facilitate Plaintiffs' and the Policy Class's private speech, Defendants are engaging in viewpoint discrimination barred by the First Amendment.

**SECOND CLAIM FOR RELIEF**
**Violation of the First Amendment – Challenged Policies**
**Compelled Speech Condition**
**(All Plaintiffs & Policy Class Against All Agency Defendants)**

214. The Challenged Policies violate the First Amendment by imposing an unconstitutional condition on NIH funding: Parrot the government's ideological script on matters

---

[133] *See Sample Notice of Award*, *supra* note 52; *see also NIH Grants Policy Statement*, *supra* note 8, §§ 8.2.1, 14.9 (requiring a similar disclaimer for grant-funded conferences).

of public concern in NIH grant materials—say, for example, "pregnant woman," not "pregnant person"; refer to "extreme heat," not "climate change"; talk about "reproductive care," not "abortion"; and do not say "Latinx" or "structural racism"—or face denial.

215. Though the compelled speech must be uttered in NIH award documents, it implicates the recipient's speech outside of the program. The condition attaches not only to how individuals describe their research, but also to how they describe themselves in public-facing materials describing the grant, including how they describe their past work and their motivations for the proposed or funded research. Researchers also reasonably fear termination for using language inconsistent with the government's script in public communications related to or arising from the NIH funded research, including at conferences or in publications.

216. In addition, NIH forbids researchers from using terms precisely because, in context, they convey particular viewpoints regarding matters of public concern—for example, that transgender men can be pregnant, that demographic categories should be gender-inclusive, or that climate change explains extreme heat. By requiring applicants to "adopt—as their own—the Government's" preferred terminology and, accordingly, its "view[s] on . . . issue[s] of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

217. Had the government "enacted [this policy] as a direct regulation of speech, [it] would plainly violate the First Amendment." *Agency for Int'l Dev.*, 570 U.S. at 213. That it comes in the form of a condition attached to government funding cannot save it, for the government cannot "compel[ ] a grant recipient to adopt a particular belief as a condition of funding." *Id.* at 218.

218. Therefore, Defendants are violating the First Amendment by imposing an unconstitutional condition for access to government funds on Plaintiffs and the Policy Class.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Challenged Policies Contrary to Constitutional Right**
**(All Plaintiffs & Policy Class Against All Agency Defendants)**

219. A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

220. NIH's Challenged Policies are final agency action under the APA.

221. For the reasons described in the First and Second Claims for Relief, the Challenged Policies are contrary to constitutional right, and the Court must hold them unlawful and set them aside.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Challenged Policies Arbitrary and Capricious**
**(All Plaintiffs & Policy Class Against All Agency Defendants)**

222. Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

223. The Challenged Policies are final agency action under the APA.

224. The Challenged Policies are arbitrary and capricious for the following reasons. First, NIH is reviewing applications and awards using a computational text analysis tool to scan for terms that are proxies for disfavored viewpoints.

225. NIH has offered no explanation, reasoning, nor individualized assessment to explain why applications and awards that include the list of prohibited words, including, *inter alia*, “minority” “gender,” “racism” “underrepresented,” “DEI,” “equity,” “Latinx” and others misalign with agency priorities such that awards and applications including such words will not be funded and/or will require additional levels of NIH review.

226. Second, such terms were not intended by Congress for NIH to consider for the purposes of not funding grants. To the contrary, Congress has explicitly instructed NIH to consider “diversity” and minority health, among other health disparity issues. *See, e.g.*, 42 U.S.C. §§ 281(b)(24), 282(b)(8)(D)(ii).

227. Third, NIH’s policy of not funding projects it labels “climate change,” “influencing public opinion,” “misinformation” and others without publicly acknowledging these prohibitions in the most recent directives and guidance documents and while publicly stating that the Memoli Directive and Award Assessment Guidance from which such prohibitions originally flowed are no longer in effect is unreasonable and unreasoned.

228. Fourth, Defendants’ policy not to fund research that refers to climate change but to allow research into extreme weather is not explained, reasoned or reasonable. Defendants have provided no explanation or reasoning to explain why only the latter is good science.

229. Fifth, Defendants’ policy not to fund research on gender-affirming care for youth unless the research focuses on the harms caused by such care is unreasoned and unreasonable. Limiting research funding to one predetermined outcome is antithetical to the scientific endeavor.

230. Sixth, Defendants’ policy not to fund research on vaccine hesitancy is unexplained, unreasoned and unreasonable.

231. Seventh, Defendants' policy not to fund research into the health impacts of public policy is not explained, reasonable, or reasoned. Defendants have provided no explanation in writing for this change in policy, which inexplicably limits the utility of scientific research.

232. Eighth, Defendants' policy to terminate grants and threaten termination pursuant to a regulation that does not allow such terminations, as explained in the Sixth Claim for Relief, below, is not in accordance with law.

233. For those and other reasons consistent with the allegations herein, Defendants' Challenged Policies violate section 706(2)(a) of the APA.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Challenged Policies Contrary to Law: Statutes**
**(All Plaintiffs & Policy Class Against All Agency Defendants)**

234. The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions" that are "not in accordance with law," 5 U.S.C. § 706(2)(A), or that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

235. The Challenged Policies supplanting IC Directors' authority are final agency actions under the APA.

236. Congress has mandated that IC Directors "make grants . . . for research, training, or demonstrations . . . after technical and scientific peer review." 42 U.S.C. § 284(b)(2)(B). Congress has also made explicit that IC Directors must "review and make the final decision with respect to making the award" for "a grant for a research program or project (commonly referred to as an 'R-series grant')." *Id.* § 284(b)(3)(A). Finally, Congress has set out that IC Directors are to make such decisions "consistent with the peer review process" and specifically consider as appropriate "the mission [of the IC] and the scientific priorities identified in the strategic plan,"

"programs or projects funded by other agencies on similar research topics," and the "advice by [IC] staff and advisory council or board." *Id.* § 284(b)(3), (B)(i)–(iii).

237. Under the Challenged Policies, Defendants have undermined and supplanted the statutorily mandated authority of IC Directors to make final decisions on research grants by requiring final review of grants flagged for potential misalignment with agency priorities to be conducted by OER or HHS. This review has caused grants approved for funding by IC Directors to be indefinitely delayed or blocked, placing final decision-making for flagged grants with OER or HHS, contrary to the process mandated by Congress.

238. The Challenged Policies also contradict congressional mandates as they empower OER and HHS decisionmakers to rely on unwritten priorities and viewpoint-signifying terms, rather than making granting decisions based on the criteria set forth in 42 U.S.C. § 289a.

239. To the extent the Challenged Policies also allow OER, HHS or even IC Directors to disregard the peer review process, they also violate 42 U.S.C. § 289a for that reason.

240. The Challenged Policies are thus "not in accordance with law," and are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

**SIXTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Challenged Policies Contrary to Law: Regulations**
**(All Plaintiffs & Policy Class Against All Agency Defendants)**

241. The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions" that are "not in accordance with law," *Id.* § 706(2)(A), or that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

242. The Challenged Policies directing the termination of grants on a basis that is contrary to HHS regulations are final agency actions under the APA.

243. Under current HHS regulations governing terminations, other than for non-compliance with the grant's terms and conditions or based on the consent of the awardee, HHS can only terminate a grant "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The latter provision is limited to circumstances where a grant no longer effectuates the agency priorities identified at the time the award was made. *See New Jersey v. United States Off. of Mgmt. & Budget*, No. 25-cv-11816, 2026 WL 2069832 (D. Mass. July 17, 2026). It does not allow for termination where an agency changes its priorities after the award is made.

244. The Challenged Policies are thus contrary to law because they direct NIH to terminate awards based on their misalignment with current agency priorities, irrespective of whether the agency priorities were in existence at the time the award was made.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the First Amendment – Terminations**
**Viewpoint Discrimination**
**(Plaintiffs Salles, Rosso, Cohen, Daw & Termination Class Against All Defendants)**

245. Defendants terminated thousands of grants based on the fact, or Defendants' perception, that Plaintiffs' research-related speech would communicate disfavored views concerning issues such as (1) DEI; (2) gender identity; (3) climate change; (4) vaccines; and (5) misinformation.

246. As shown through the Challenged Policies that gave rise to the terminations, as well as their implementation to date, these include the views that: (1) the inclusion of historically disadvantaged groups is desirable, and various forms of societal injustice can be relevant to health outcomes; (2) gender identity is real, transgender people exist and gender-affirming care can have health benefits; (3) changes in weather are caused by climate change and climate

change has health impacts; (4) vaccine hesitancy is harmful to public health; and (5) the dissemination of inaccurate information can harm public health.

247. These terminations penalize federally-funded private speech based on viewpoint, which violates the First Amendment based on the same principles set forth in the First Claim for Relief.

**EIGHTH CLAIM FOR RELIEF**
**Violation of the First Amendment – Terminations**
**Compelled Speech Condition**
**(Plaintiffs Salles, Rosso, Cohen, Daw & Termination Class Against All Defendants)**

248. Defendants have terminated grants based on researchers' refusal or inability to comply with the compelled speech condition set forth above in the Second Claim for Relief.

249. They have terminated grants based on how researchers describe themselves and their body of non-NIH-funded work, as well as the specific words they prefer to use.

250. Rescinding a benefit because recipients refuse to or cannot comply with an unconstitutional condition violates the First Amendment.

**NINTH CLAIM FOR RELIEF**
**Violation of the First Amendment – Terminations**
**Retaliation**
**(Plaintiffs Salles, Rosso, Cohen, Daw & Termination Class Against All Defendants)**

251. Separately, the Terminations violate the First Amendment because they constitute retaliation for protected speech.

252. To succeed on a retaliation claim, Plaintiffs must show "(1) [they] engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019).

253. Terminating grants constitutes an adverse action under the retaliation framework. *See, e.g., Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 84 (D.D.C. 2026); *President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 121 (D. Mass. 2025).

254. Defendants have chosen which grants to terminate based on Plaintiffs' past protected speech and/or what they anticipate Plaintiffs will say in forthcoming protected research. For example, Defendants have terminated grants because of researchers' language about already-completed research, including how they describe completed aims.

255. By terminating grants on the basis of Plaintiffs' and the Termination Class's protected speech, Defendants are retaliating in violation of the First Amendment.

**TENTH CLAIM FOR RELIEF–PRESERVATION ONLY**
**Violation of the Administrative Procedure Act – Terminations**
**Arbitrary & Capricious**
**(Plaintiffs Salles, Rosso, Cohen, Daw & Termination Class Against All Agency Defendants)**

256. Plaintiffs recognize that jurisdiction over this claim is currently foreclosed by the Ninth Circuit's decision in *Thakur v. Trump* which is itself dependent on the Supreme Court's emergency order in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), and bring the claim for preservation purposes only, in the event there is a change in the law.

257. NIH's termination of research grants constitutes final agency action under the APA.

258. First, NIH terminated Plaintiffs' grants based on criteria and factors which run counter to what Congress ordered NIH to consider and are not in accordance with law. Congress has mandated the expenditure of funds by NIH and ICs to promote health equity across health disparity populations including racial and ethnic minority populations, sexual and gender

minority populations, and others. Terminating Plaintiffs' and class members' grants because they promote health equity and/or seek to address diversity in the biomedical research field is contrary to these mandates.

259. Second, NIH's terminations are arbitrary and capricious, because (a) they fail to analyze any relevant data that would contradict the value or rigor of the grants at issue, (b) fail to mention, and do not appear to have considered, how these terminations will affect the reliance interests of Plaintiffs, the institutions that host them, the participants in the terminated studies, and the body of research furthered by the terminated grants and the populations who would have benefitted from that research, and (c) rely on assertions contrary to the prior award determinations and policies, without explaining any error in those determinations or policies.

260. Third, the terminations that occurred between February 28, 2025 and July 1, 2026 are arbitrary and capricious for the additional reason that they utilized template termination letters that fail to provide any reasoning explaining how these studies fall below the agency's standards for scientific research. NIH's repetition of boilerplate and conclusory language across all the termination letters or notices of award is not even close to an adequate explanation as to how any specific study fails to meet agency priorities.

261. For those and other reasons consistent with the allegations herein, Defendants' grant terminations are not in accordance with law and arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Certify the Policy Class and Termination Class pursuant to Fed. R. Civ. P. 23(a)(1)–(4) and 23(b)(2);

B. Appoint the Named Plaintiffs as Class Representatives, and the undersigned Counsel as Class Counsel, upon certification of the Policy Class and Termination Class pursuant to Fed. R. Civ. P. 23(g);

C. Enter Judgment in favor of Plaintiffs and the certified Policy Class and Termination class on the First through Tenth Claim for Relief;

D. Declare that the Challenged Policies violate the First Amendment;

E. Declare that the Challenged Policies are arbitrary and capricious, contrary to law, and contrary to constitutional right under the Administrative Procedures Act, 5 U.S.C. § 706;

F. To remedy Defendants' violations of the First Amendment: (i) preliminarily and permanently enjoin Defendants from applying the Challenged Policies or any substantially similar policy, guidance, or directive to coerce Plaintiffs and the class to avoid disfavored viewpoint-signifying terms, to condition NIH funding on the same, and/or to terminate, block or delay any new or continuation grants; and (ii) order a process for NIH to re-review applications that were denied or deferred based on the Challenged Policies, allow Plaintiffs and the Policy Class the opportunity to restore any grant language that was renegotiated based on the Challenged Policies, and restore all grants that were terminated in violation of the First Amendment;

G. To remedy Defendants' violation of the APA: order vacatur of the Challenged Policies; and vacate all terminations made in a manner that is arbitrary and capricious;

H. Order Defendants to file status reports at regular intervals confirming their compliance with the Court's Order(s) and Judgment(s) in this case;

I. Enjoin Defendants from imposing any negative consequences on Plaintiffs, class-members, and witnesses for involvement in this litigation;

J. Award Plaintiffs' reasonable costs and attorneys' fees; and

K. Issue such other relief to Plaintiffs and the Class as the Court deems just and proper.

Date: October 13, 2026

Respectfully Submitted,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
RACHEL MEEROPOL (NY Bar No. 4100954) (Appearance *Pro Hac Vice*)
rmeeropol@aclu.org
OLGA AKSELROD (NY Bar No. 4132825) (Appearance *Pro Hac Vice*)
oakselrod@aclu.org
VERA EIDELMAN (CA Bar No. 308535)
veidelman@aclu.org
ALEXIS AGATHOCLEOUS (NY Bar No. 4227062) (Appearance *Pro Hac Vice*)
aagathocleous@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2659

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA**
NEIL K. SAWHNEY (CA Bar No. 300130)
nsawhney@aclunc.org

GRAYCE ZELPHIN (CA Bar No. 279112)
gzelphin@aclunc.org
CHESSIE THACHER (CA Bar No. 296767)
cthacher@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Attorneys for Plaintiffs*

**ATTESTATION**

Pursuant to N.D. Cal. Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories whose signatures are indicated within this e-filed document.

Date: October 13, 2026

Neil K. Sawhney