BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
JORDAN A. HULSEBERG (D.C. Bar No. 90033542)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-3856
Email: jordan.a.hulseberg2@usdoj.gov

*Attorneys for United States*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ARGHAVAN SALLES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH, *et al.*,<br><br>Defendants. | Case No. 26-cv-10510<br><br>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF<br><br>Leave to file in excess of pages granted Oct. 15, 2026, ECF No. 83.<br><br>Judge: Hon. Vince Chhabria<br>Location: Courtroom 03, 17th Floor<br>Date: Nov. 18, 2026 Time: 2:00 p.m. |

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF

# TABLE OF CONTENTS


INTRODUCTION ........ 1
FACTUAL AND LEGAL BACKGROUND ........ 2
STATEMENT OF ISSUES TO BE DECIDED ........ 6
LEGAL STANDARD ........ 7
ARGUMENT ........ 7
I. This Court lacks jurisdiction. ........ 7
A. This Court lacks jurisdiction to review grant-termination claims. ........ 7
B. Plaintiffs lack standing to challenge terminated grants. ........ 13
II. Plaintiffs are not likely to succeed on the merits. ........ 16
A. Plaintiffs APA claims are foreclosed ........ 16
i. Plaintiffs do not challenge discrete final agency action ........ 16
ii. The challenged conduct is committed to agency discretion by law ........ 18
iii. The challenged conduct is not contrary to law. ........ 19
iv. The challenged conduct survives arbitrary and capricious review. ........ 23
B. Plaintiffs' First Amendment claims lack merit. ........ 25
III. Plaintiffs do not suffer imminent irreparable harm ........ 28
IV. The balance of the equities weigh in the Government's favor. ........ 30
V. Any injunctive relief should be narrowly tailored. ........ 30
VI. Any injunctive relief should be accompanied by a bond and no declarations should be required. ........ 31
CONCLUSION ........ 32

# TABLE OF AUTHORITIES

## CASES

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) .................................................... 28, 29

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .................................................... 26, 27

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) .................................................... 9

*Am. Cargo Transp., Inc. v. United States*,
625 F.3d 1176 (9th Cir. 2010) .................................................... 32

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) .................................................... 28

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) .................................................... 21

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................... 16

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) .................................................... 9

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .................................................... 29, 30

*Child Trends, Inc. v. U.S. Dep't Educ.*,
787 F. Supp. 3d 81 (D. Md. 2025) .................................................... 12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971), *abrogated on other grounds by*
*Califano v. Sanders*, 430 U.S. 99, 105 (1977) .................................................... 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................... 13

*Cnty. of Santa Clara v. Astra USA, Inc.*,
588 F.3d 1237 (9th Cir. 2009), *rev'd on other grounds*, 563 U.S. 110 (2011) .................................................... 15

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .................................................... 17

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*,
247 F.3d 1378 (Fed. Cir. 2001) ........ 10

*Ctr. for Auto Safety v. Dole*,
846 F.2d 1532 (D.C. Cir. 1988) ........ 18

*Dalton v. Spector*,
511 U.S. 462 (1994) ........ 17

*Department of Education v. California*,
604 U.S. 650 (2025) ........ *passim*

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........ 25

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir. 1996) ........ 29, 31

*Edwards v. Aurora Loan Servs., LLC*,
791 F. Supp. 2d 144 (D.D.C. 2011) ........ 14

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ........ 25

*EPA v. Brown*,
431 U.S. 99 (1977) ........ 18

*Esteras v. United States*,
606 U.S. 185 (2025) ........ 21

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ........ 29

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 24

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........ 23, 25

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 17, 18

*GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, NA*,
671 F.3d 1027 (9th Cir. 2012) ........ 15

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ........ 10

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 13

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 18

*Heckler v. Turner*,
468 U.S. 1305 (1984) .......... 30

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) .......... 23

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*,
747 F.3d 44 (2d Cir. 2014) .......... 14

*Holley v. United States*,
124 F.3d 1462 (Fed. Cir. 1997) .......... 9

*Kidwell v. Dep't of Army*,
56 F.3d 279 (D.C. Cir. 1995) .......... 9

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 1999), *opinion amended on denial of reh'g*,
203 F.3d 1175 (9th Cir. 2000) .......... 15

*Leathers v. Medlock*,
499 U.S. 439 (1991) .......... 27

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 31

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 18, 19

*Longview Fibre Co. v. Rasmussen,*
980 F.2d 1307 (9th Cir.1992) .......... 21

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) .......... 17

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 17

*Maher v. United States*,
314 F.3d 600 (Fed. Cir. 2002) .......... 14

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .................... 8

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .................... 9

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) .................... 19

*Miller v. Lehman*,
801 F.2d 492 (D.C. Cir. 1986) .................... 20

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
498 U.S. 211 (1991) .................... 24, 25

*Munaf v. Geren*,
553 U.S. 674 (2008) .................... 7

*Murthy v. Missouri*,
603 U.S. 43 (2024) .................... 13, 31

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .................... 28

*National Institutes of Health v. American Public Health Ass'n*,
145 S. Ct. 2658 (2025) .................... 11, 12

*Nken v. Holder*,
556 U.S. 418 (2009) .................... 7, 30

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .................... 16

*Orff v. United States*,
358 F.3d 1137 (9th Cir. 2004), *aff'd,* 545 U.S. 596 (2005) .................... 15

*Palantir USG, Inc. v. United States*,
129 Fed. Cl. 218 (Fed. Cl. 2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) .................... 24

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) .................... 9

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
313 F. Supp. 3d 62 (D.D.C. 2018), *appeal dismissed*,
2018 WL 6167378 (D.C. Cir. Oct. 29, 2018).................... 19

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*,
175 F.3d 132 (2d Cir. 1999) .................... 11

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) ........ 27

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996) ........ 28

*Rudisill v. McDonough*,
601 U.S. 294 (2024) ........ 23

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 26, 27

*Sampson v. Murray*,
415 U.S. 61 (1974) ........ 29

*Sardarian v. Fed. Emergency Mgmt. Agency*,
No. 3:19-CV-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ........ 16

*Savantage Fin. Servs., Inc. v. United States*,
595 F.3d 1282 (Fed. Cir. 2010) ........ 24

*Sharp v. Weinberger*,
798 F.2d 1521 (D.C. Cir. 1986) ........ 12, 13

*Southwest Airlines Co. v. Saxon*,
596 U.S. 450 (2022) ........ 23

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) ........ 10

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) ........ 28

*Sustainability Inst. v. Trump*,
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ........ 12, 30

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026), *pet. for cert.*, No. 26-210 (Aug. 18, 2026) ........ *passim*

*Thakur v. Trump*,
787 F. Supp. 3d 955 (N.D. Cal. 2025), *aff'd in part, rev'd in part and remanded,*
176 F.4th 1187 (9th Cir. 2026) ........ 15

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........ 20

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) ........ 10

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
770 F. Supp. 3d 155 (D.D.C. 2025), *appeal dismissed*,
No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025) .......... 12

*U.S. Dep't of Educ. v. California*,
No. 24A910, 2025 WL 963588 (U.S. Mar. 28, 2025) .......... 11

*United States v. Fuller*,
531 F.3d 1020 (9th Cir. 2008) .......... 21

*United Aeronautical Corp. v. U.S. Air Force*,
80 F.4th 1017 (9th Cir. 2023) .......... 9

*United States v. Am. Library Ass'n*,
539 U.S. 194 (2003) .......... 27

*United States v. Texas*,
599 US 670 (2023) .......... 13

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) .......... 31

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999) .......... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 7, 28

*Wis. Pub. Power, Inc. v. Fed. Energy Regul. Comm'n*,
493 F.3d 239 (D.C. Cir. 2007) .......... 24

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) .......... 27

**STATUTES**

5 U.S.C. § 551 .......... 16

5 U.S.C. § 701 .......... 18

5 U.S.C. § 702 .......... 8, 18

5 U.S.C. § 704 .......... 16, 17

5 U.S.C. § 706 .......... 18

28 U.S.C. § 1346 .......... 1, 8

28 U.S.C. § 1491 .......... 1, 8

31 U.S.C. § 503 .......... 4

31 U.S.C. § 6307 .......... 4

42 U.S.C. § 284 .......... 20

**RULES**

Fed. R. Civ. P. 65 .......... 31

**REGULATIONS**

2 C.F.R. Part 200 .......... 3

2 C.F.R. Part 200, App. I .......... 4

2 C.F.R. § 200.2 .......... 14

2 C.F.R. § 200.340 .......... *passim*

2 C.F.R. § 200.341 .......... 2, 24

42 C.F.R. § 52.2 .......... 4

*Ending Radical and Wasteful Government DEI Program and Preferencing*, Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) .......... 2, 3

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......... 3

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) .......... 3

*Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) .......... 3

**OTHER AUTHORITIES**

A. Scalia & B. Garner, Reading Law 170 (2012) .......... 23

E. Crawford, Construction of Statutes 337 (1940) .......... 21

Statement, Nat'l Insts. of Health, "Advancing NIH's Mission Through a Unified Strategy" (Aug. 15, 2025) .......... 4, 24

## INTRODUCTION

Fourteen Plaintiffs seek to enforce contracts that are not their own, in a district court divested of jurisdiction by the Tucker Act, via judicial superintendence of grantmaking across the Federal Government.

First, this case is barred because it is premised "upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded [on such a contract]."). Under the Tucker Act, such actions must be brought in the Court of Federal Claims, as the Supreme Court recently emphasized in *Department of Education v. California*, 604 U.S. 650, 651 (2025) (per curiam) (citing 28 U.S.C. § 1491(a)(1)). Each of Plaintiffs' claims is premised on the existence of a contract and each form of requested relief is an effort to enforce those contracts and the continued disbursement of funds to nonparty educational institutions which are entitled to funds, if at all, only pursuant to those contractual agreements. None of that is within the ambit of the district courts. This critical bar defeats Plaintiffs' motion.

Second, Plaintiffs lack standing because they are not parties to any of the contracts they seek to enforce. Indeed, all of Plaintiffs' claims, including those premised on purportedly improper procedures, viewpoint discrimination, or other theories, are entirely aimed at invalidating termination of *other entities'* contracts, thereby enforcing the payment of monies from the United States to which they are not even owed. It is well established that only parties, or select nonparties (intended beneficiaries), may enforce contracts with the United States. Plaintiffs do not meet those well-worn requirements and therefore lack standing for the claims they bring and the relief they request. And Plaintiffs cannot meet the limited circumstances when plaintiffs may assert the rights of others. Even if that were not enough, Plaintiffs' alleged personal harms are too attenuated to support jurisdiction because any asserted harms must flow from independent choices made by the nonparty educational institutions.

Third, Plaintiffs' Administrative Procedure Act ("APA") claims move far beyond the bounds of what the APA permits, and seek to challenge funding decisions committed to agency

discretion by law. Nor did Defendants act unlawfully or in an arbitrary and capricious manner. The grant awards Plaintiffs cite, from the National Institutes of Health ("NIH"), all explicitly preserved the agencies' rights to terminate based on changing priorities, and a preexisting regulation, 2 C.F.R. § 200.340, supports such terminations. At heart, Plaintiffs object to the Executive Branch's discretion to implement policy priorities—but the law has long permitted such choices and preserved the authority to terminate grant awards to effectuate such changes.

Lastly, Plaintiffs do not establish the required irreparable harm and public interest in emergency relief. Plaintiffs must allege irreparable harm to themselves and only in rare circumstances can they rely on injury resulting from delayed monetary payments. Their personal harms fall short of the extraordinary burden required to demonstrate irreparable harm and accordingly their motion fails on that shortcoming alone. Finally, the Supreme Court has recently considered the balance of the equities in the context of terminated grants and held squarely for the Government, as this Court should here.

All told, Plaintiffs seek a novel mechanism to challenge recent Executive Branch decisions on funding priorities with respect to nonparties. But jurisdictional, procedural, and merits bars block the path that Plaintiffs seek to travel. The Court should accordingly deny their motion. Lastly, if the Court is inclined to grant Plaintiffs' requested relief, Defendants respectfully request that relief be appropriately narrowed and an appropriate bond be required.

## FACTUAL AND LEGAL BACKGROUND

*President Trump is Inaugurated and Sets Policy Priorities.* On January 20, 2025, President Trump assumed the office of President of the United States. On that day, and in the weeks after, he issued a variety of Executive Orders setting new policy priorities for his administration.

On January 20, the President issued Executive Order No. 14,151, 90 Fed. Reg. 8339, *Ending Radical and Wasteful Government DEI Program and Preferencin*g ("EO 14,151"). This Executive Order included a Termination Provision, which directed that within 60 days of the Order's issuance, each "agency, department, or commission head, in consultation with the

Attorney General, the Director of OMB, and the Director of OPM" shall "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts[.]" *Id.* § 2(b)(i). Similarly, on January 21, 2025, the President issued Executive Order No. 14,173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* ("EO 14,173"). This second Executive Order's "purpose" was to ensure that the federal government was "enforcing our civil-rights laws" by "ending illegal preferences and discrimination." *Id.* § 1. The Executive Order also included a Contract Terms Provision, which instructed the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures[.]" *Id.* § 3(c)(ii). Another Executive Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* ("EO 14,168"), provided, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). It also included a Promoting Gender Ideology Provision, which provided that "Federal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). All the orders make clear that they must be "implemented consistent with applicable law." *See* EO 14,151 § 4(b); EO 14,173 § 8(b); EO 14,168 § 8(b); *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order No. 14,222 §§ 3(b), 5(b), 90 Fed. Reg. 11,095 (Feb. 26, 2025)

*The Grant Award and Termination Process*. The President having set new policy priorities, agencies with grantmaking authority began reviewing existing grants and considering next steps. The Federal Government, through various agencies, provided funding to institutions, using contracts and grants that are subject to specified terms and conditions. As a default matter, Office of Management and Budget ("OMB") regulations generally govern a variety of terms for federal grants and contracts, which are incorporated into the terms of the relevant contractual instruments by reference. *See generally* 2 C.F.R. Part 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). Usually, an

agency will start with a notice of funding opportunity with eligibility information and details of what the agency wishes to fund. *See* 2 C.F.R. Part 200, App. I. In this context, the National Institutes of Health ("NIH") awards grants to grantee institutions, which include the designation of a principal investigator to lead the scientific and technical direction of research projects funded under the grant. *See* 2 C.F.R. Part 200, App. I (b)(2)(C); *see, e.g.*, 42 C.F.R. § 52.2 (discussing the role of principal investigators for grant awards at the NIH). Principal investigators and project managers are not themselves parties to the grant agreements.

Section 200.340, simply titled "[t]ermination" provides the key substantive and procedural guidelines for termination of awarded grants. Crucially, the Federal Government has preserved the authority to terminate "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, *if an award no longer effectuates the program goals or agency priorities*." *Id.* § 200.340 (emphasis added). This termination authority has been promulgated consistent with Congressional directives—delegating to OMB the power to manage various aspects of federal grants and contracts, including termination. *See* 31 U.S.C. § 503; *see also id.* § 6307. Awardees are accordingly informed that awards may be terminated based on changes in agency priorities.

In August, 2025, following a series of internal memoranda and discussions on grantmaking, NIH Director Jay Bhattacharya issued a statement on a "unified strategy" for NIH to "enhanc[e] oversight of funded research abroad and reinforc[e] its commitment to responsible stewardship of taxpayer dollars." Statement, Nat'l Insts. of Health, "Advancing NIH's Mission Through a Unified Strategy" (Aug. 15, 2025). This statement provided public guidance on NIH grantmaking, whether certain methodologies were more promising than others, and is the principal operative guidance implementing the President's executive orders. Prior guidance, including a February 21, 2025 NIH priority statement, also deprioritized certain topics such as DEI, gender ideology, and awards to China, which was gradually supplemented through May 2025 by the NIH's Office of Policy for Extramural Research Administration. Statement, Nat'l Insts. of Health, "Restoring Scientific Integrity and Protecting the Public Investment in NIH

Awards" (Feb. 21, 2025). Plaintiffs' grants were subject to any number of these varying policies. Am. Compl. ¶¶ 11-21.

*Named Plaintiffs' Allegations Regarding Grants from the NIH.* Fourteen Plaintiffs are named as putative class representatives in this lawsuit, but only a handful allege grant terminations or denials. *See* Am. Compl. ¶¶ 11, 13-14, 18, 20, 24 (respectively, Arghavan Salles, Andrea Rosso, Ann D. Cohen-Wilson, Jonathan Kyle Daw, Kelton Minor, and Mikaela Smith). The remainder have grants and would like to modify the terms, *see id.* ¶¶ 15-17 (respectively, Dolores Albarracin, Heidi Moseson, and Jade Pagkas-Bather), have grants but are worried they will be terminated for research product "inconsistent" with those grant terms, *id.* ¶¶ 21-23 (respectively, Michael D. Green, Sara Jackson, and Suzanne Bell), or have altogether declined to pursue a grant, *id.* ¶¶ 12, 19 (respectively, Abigail Hatcher and Katie Edwards).

First, no Plaintiff has alleged termination of an award or other contract between themselves and the Federal Government. Each grant award identified by Plaintiffs was between the NIH and a nonparty educational institution. Plaintiffs may have been involved in the process by which the nonparty entities applied for the grants, and some were designated as principal investigators or project managers, but none are parties to any contract. Second, each award contained an explicit condition stating that it was subject to termination for no longer effectuating program goals, agency priorities, funding objectives, or related discretionary rationale.

*This Suit.* On September 16, 2026, Plaintiffs filed this suit. Compl., ECF No. 1. And on September 24 and 25, Plaintiffs moved for a preliminary injunction and sought to certify a class, respectively. Pls.' Mem. in Supp. of Mot. for Prelim. Inj., ("PI Mot."), ECF No. 33-1; Pls.' Mot. for Class Certification, ECF No. 52. In compliance with the Court's denial of Plaintiffs' Motion to Proceed Pseudonymously, Text Order (Oct. 8, 2026), ECF No. 74, Plaintiffs filed an Amended Complaint on October 13, 2026, dropping Jordan Does 2, 3, and 4 from this suit. Am. Compl., ECF No. 78.

Plaintiffs' Amended Complaint brings several claims for relief: Plaintiffs bring viewpoint discrimination, compelled speech, and retaliation claims under the First Amendment to the U.S.

Constitution, Am. Compl. ¶¶ 202-18, 248-55, and several Administrative Procedure Act ("APA") claims, including that the challenged policies are contrary to the Constitution, *id.* ¶¶ 219-21, contrary to statute, *id.* ¶¶ 234-40, contrary to regulation, *id.* ¶¶ 241-44, and arbitrary and capricious, *id.* ¶¶ 222-33, 256-61. Plaintiffs request that the Court "permanently enjoin Defendants from applying the Challenged Policies or any substantially similar policy, guidance, or directive to coerce Plaintiffs and the class to avoid disfavored viewpoint-signifying terms, to condition NIH funding on the same, and/or to terminate, block or delay any new or continuation grants" and order NIH to "re-review applications that were denied or deferred based on the Challenged Policies" and remove any allegedly offending conditions in active grants. Am. Compl., Prayer for Relief. Plaintiffs seek similar relief in their emergency motion: a restoration of funding under existing awards, a bar on future award terminations, a bar on restricting or screening future awards for certain language, and nonenforcement of "compelled" award conditions in altered grants, which is essentially a modification of contract terms. PI Mot., Proposed Order ¶¶ 2-3, ECF No. 33-1 ("Proposed Order").

In another challenge to grant termination policies at other governmental grant-awarding bodies, a group of six plaintiffs, who later formed two certified classes, also raised First Amendment and APA claims. *Thakur v. Trump*, 176 F.4th 1187 (9th Cir. 2026). There, the Court determined Plaintiffs, whom the Government argued were nonparties to the grants, possessed standing. *Id.* at 1996-97. The Court also determined it properly possessed jurisdiction to hear Plaintiffs' claims, notwithstanding the Tucker Act, except as to Plaintiffs' APA claims regarding terminated grants. *Id.* at 1198-99. The Ninth Circuit concluded that the challenged policies violated the First Amendment and constituted viewpoint discrimination, *id.* at 1200-04, and the Government filed a petition for certiorari with the U.S. Supreme Court, seeking further review on whether the First Amendment prohibits the government from considering the viewpoints furthered by academic research projects when deciding whether to grant or terminate funding for those projects through competitive grant programs, *Trump v. Thakur,* No. 26-210, Pet. for Cert. (Aug. 18, 2026). Judge Lin stayed that claim in the lower court, pending Supreme Court action.

## STATEMENT OF ISSUES TO BE DECIDED

1. Is this case, which seeks to enforce the continued payment of contracts with the United States pursuant to the terms of those contracts, outside the jurisdiction of this Court?

2. Do Plaintiffs have standing to enforce contracts between the United States and nonparty educational institutions when Plaintiffs have no rights under those contracts and any asserted harm must flow from independent decisions of those institutions?

3. Are Plaintiffs' APA claims foreclosed by the lack of final discrete agency action and, if not, are these decisions committed to agency discretion or otherwise lawful and permissible when the relevant contracts provided termination authority for changing agency priorities?

4. Must Plaintiffs' constitutional challenges, which seek to forbid the United States from exercising discretion over its contracting decisions, succeed under Plaintiffs theories?

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. This Court lacks jurisdiction.

#### A. This Court lacks jurisdiction to review grant-termination claims.

This Court lacks jurisdiction over this matter because Congress has specifically divested federal courts of jurisdiction over matters like this one. In challenging the government's grant terminations, Plaintiffs seek an order to enforce the government's contractual obligation to pay.

Specifically, Plaintiffs request a restoration of funding under existing awards, a bar on future award terminations, a bar on restricting or screening future awards for certain language, and nonenforcement of "compelled" award conditions in altered grants, which is essentially a modification of contract terms. PI Mot., Proposed Order ¶¶ 2-3, ECF No. 33-1 ("Proposed Order"). And each of Plaintiffs' claims—whether they are styled as APA or First Amendment claims—is founded on maintaining parts of the contract, disabling the termination provisions, modifying existing provisions, and requiring the continued disbursement of funds. In short, Plaintiffs ask for specific performance or the modification of contractual agreements.

That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). And to begin, Plaintiffs acknowledge that binding Ninth Circuit precedent in *Thakur* requires their "termination class" APA claim be heard in the Court of Federal Claims, *Thakur*, 176 F.4th at 1198-99, but they nonetheless bring the claim for "preservation" purposes only; Plaintiffs' other APA claims should fail for the same reason.

The Tucker Act precludes relief under the APA or otherwise because the APA's waiver of sovereign immunity is limited to claims "seeking relief other than money damages," 5 U.S.C. § 702, and the APA does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *U.S. Dep't of Educ. v. California*, 604 U.S. 650, 651 (per curiam) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States"). In sum, if this action is founded upon a contract with the United States, this Court must dismiss for lack

of jurisdiction.[1] *But see Thakur v. Trump*, 176 F.4th 1187, 1998-99 (9th Cir. 2026) (concluding Tucker Act did not entirely divest court of jurisdiction).

Plaintiffs also raise self-styled constitutional claims, but that is of no moment. Courts must look to the claims' "substance, not merely [their] form." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). Thus, regardless of how a claim is styled, a district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful.").

Determining whether "a particular action" is "at its essence a contract action" not within the jurisdiction of the district courts, requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*). Both prongs point toward a lack of district court jurisdiction.

First, the source of the rights Plaintiffs assert are the grant agreements themselves. Specifically, Plaintiffs challenge the termination of grants under a variety of theories, but all ultimately stem from contracts without which no claims would exist. The First Amendment claims allege improper terminations or modifications of contracts and compelled speech in award

[1] The grant awards here are simply "contracts to set the terms of and receive commitments from recipients," *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The bar on district court jurisdiction therefore applies and a "suit in the Claims Court for damages relating to [the] alleged breach" is the only recourse. *Id.* Notably, this is not some unknown pathway. Class actions related to recent government actions have been filed in the Court of Federal Claims seeking payment of funds. *See, e.g.*, *Jane Doe, et. al.*, *v. United States*, 1:25-cv-947-EHM (Ct. Fed. Cl. filed June 5, 2025) (bringing breach of contract claims on behalf of a class of fellowship recipients).

applications; and the APA claims assert that the terminations of the contracts were without authority or were not sufficiently reasoned.

"Because the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over constitutional claim because it was contractually based). In other words, "it is likely that no cause of action would exist at all," in the absence of the contracts. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)*; see also Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

Indeed, the Supreme Court recently explained that the type of relief sought here is in the heartland of the Tucker Act's bar. There, several plaintiffs brought a similar APA challenge to termination of federal grants related to DEI—with the caveat that those plaintiffs were asserting their own rights under their own contracts. *California*, 604 U.S. at 651. The Court concluded that the lower court likely lacked jurisdiction because the remedy sought was ultimately an order to "enforce [the Government's] contractual obligation to pay money." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). The contracts at issue in *California* were government grants awards. *Id.* So the Court identified the contractual grant award, considered the remedy sought, and concluded jurisdiction was likely precluded.

Moreover, the Court saw no difference between jurisdiction over Plaintiffs' pre-termination claims and post-termination claims. A request to enjoin any future termination still seeks contractual money. *Id.* In fact, plaintiffs in *California* also sought "an injunction against further unlawful terminations" along with their request for reinstatement of already terminated

grants. Opp'n to Application at 25, *U.S. Dep't of Educ. v. California*, No. 24A910, 2025 WL 963588 (U.S. Mar. 28, 2025). Tellingly, the Supreme Court stayed the injunction in full.

Plaintiffs' relief can fare no better than the *California* plaintiffs' request. In their Proposed Order, Plaintiffs explicitly identify their remedy as enforcement of the government's purported obligations under contract: "Defendants are further preliminarily enjoined from enforcing award conditions resulting from compelled alterations or otherwise penalizing researchers for research-related speech consistent with the original terms of their grants during the pendency of this litigation." *E.g.*, Proposed Order at 3 (citation modified); *accord* Am. Compl., Prayer for Relief, ECF No.1. So the claims are founded, by definition, on contracts with the United States, and the relief sought is to preserve certain contractual terms and enforce specific performance. The Tucker Act "specifically bar[s] . . . any 'injunctive, mandatory or declaratory relief against government officials when the result would be the equivalent of obtaining of money damages'" and Plaintiffs' claims are accordingly outside this Court's jurisdiction. *See Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999).

In *National Institutes of Health v. American Public Health Ass'n*, the Supreme Court reiterated that the APA's "'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S. Ct. 2658, 2659 (2025) (mem.) (citing *California*, 604 U.S. at 651). Justice Barrett's concurrence provides that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)." *Id.* at 2661. And Justice Gorsuch's concurrence explains why *California*, despite being a decision regarding interim relief, should still carry precedential weight with respect to its reasoning. *Id.* at 2664. Justice Gorsuch notes that "even probabilistic holdings—such as *California*'s top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA,' must 'inform how a [lower] court' proceeds 'in like cases.'" *Id.* (internal citations omitted). Moreover, Justice Gorsuch dispensed with the court of appeals' argument that

*California* was distinguishable because the district court had only invoked the APA "to vacate the government's decision to terminate respondents' grants," stating that "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *Id*. Justice Gorsuch also disagreed with the court of appeals' assertion that the claims before it did not rely on the grant awards' terms and conditions, noting that "[i]n both cases, respondents' injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id*.

Plaintiffs' constitutional claims are also properly handled in the Court of Federal Claims. After *California*, the Fourth Circuit recently stayed a district court injunction similar to the one sought here. *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Plaintiffs there brought APA and ultra vires constitutional claims against Federal defendants and by virtue of those purported legal infirmities sought to reverse or prevent grant terminations. *Id.* Looking to *California*, and the law it applied, the Fourth Circuit concluded that those defendants were likely to succeed in showing that the district court lacked jurisdiction. "While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* The same is true here. The Circuit concluded that constitutional claims did not change this calculus, as they were still subsumed by the contracts and foreclosed by Congress's statutory scheme. *See id.*; *accord Child Trends, Inc. v. U.S. Dep't Educ.*, 787 F. Supp. 3d 81, 92 (D. Md. 2025) (rejecting motion for preliminary injunction where "Plaintiffs br[ought] claims under the APA, as well as nonstatutory claims seeking equitable relief" because of Tucker Act preclusion).

At bottom, in seeking an injunction to maintain payments pursuant to the schedule in a contract with the United States, Plaintiffs "want[] the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025), *appeal dismissed*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025). Because the claims here are "founded upon a contract" they "must be heard in Claims Court." *Id.* at 165 (quoting *Sharp v. Weinberger*,

798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations.")). That is true regardless of whether Defendants are ordered to reinstate the agreements cited by Plaintiffs, or are prevented from exercising contractual discretion for other grants. Either way, granting Plaintiffs' request would amount to an order to "enforce [the Government's] contractual obligation to pay money." *California*, 604 U.S. at 651 (citation omitted), and cannot move forward. This Court lacks jurisdiction over this challenge in full.

**B. Plaintiffs lack standing to challenge terminated grants.**

"[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) (internal quotation marks and citation omitted). To demonstrate Article III standing, a plaintiff must "show that she has suffered an injury in fact that is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (citation omitted). The asserted injury must be "legally and judicially cognizable," *United States v. Texas*, 599 US 670, 676 (2023) (citation omitted), and "concrete, particularized, and actual or imminent," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

The harms Plaintiffs allege here are attenuated. While Plaintiffs Arghavan Salles, Am. Compl. ¶ 11, Andrea Rosso, *id.* ¶ 13, Ann D. Cohen-Wilson, *id.* ¶ 14, Jonathan Kyle Daw, *id.* ¶ 18, Kelton Minor, *id.* ¶ 20, and Mikaela Smith, *id.* ¶ 24, allege grant terminations or denials, albeit to grants to which they are a nonparty, others have far less concrete injuries. For example, Plaintiffs Dolores Albarracin, *id.* ¶ 15, Heidi Moseson, *id.* ¶ 16, and Jade Pagkas-Bather, *id.* ¶ 17, applied for, received, and *accepted* grants all in compliance with the challenged policies, but they now dislike the terms to which were agreed and seek modification of those terms. Similarly, Plaintiffs Michael D. Green, *id.* ¶ 21, Sara Jackson, *id.* ¶ 22, and Suzanne Bell, *id.* ¶ 23, currently have grants but are worried they may be terminated, perhaps because their research product may be "inconsistent with the language" and terms to which were agreed, *see id.* ¶ 21. Lastly and

perhaps most starkly, Plaintiffs Abigail Hatcher, *id.* ¶ 12, and Katie Edwards, *id.* ¶ 19, have chosen not to apply at all, and Ms. Hatcher alleges she "is considering leaving research altogether"—an injury that has no plausible connection to Defendants' conduct.

Each of Plaintiffs' claims, and each form of relief, is premised on nonparty rights to contracts. For example, their First Amendment claims are based on alleged disfavoring of the speech in the grant applications submitted by nonparties and grant agreements signed by nonparties, or compelling certain speech in applications submitted by nonparties. Plaintiffs' APA claims are all premised on the theory that the United States improperly terminated the contracts with the nonparty universities (or will improperly terminate the contracts in the future) and require continued disbursements of funds under the individual contracts. Each form of relief seeks to enforce or preserve these nonparties' contracts and payment under those contracts. Plaintiffs accordingly do not assert their own rights and lack individual standing.[2]

Plaintiffs have no individualized standing to obtain a remedy enforcing continued payment of these contracts—to which they are nonparties. "In order to establish standing to enforce" payment of a government contract, or any other terms, a plaintiff must show that they are party to the contract or an intended third-party beneficiary. *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Maher v. United States*, 314 F.3d 600, 605 (Fed. Cir. 2002) ("The remaining shareholders [who were nonparties to the contract] did not have standing to sue and were not intended third-party beneficiaries.").

Plaintiffs are not in privity with the government and lack rights under these contracts—they are neither parties nor intended third-party beneficiaries. "Before a third party can recover

---

[2] NIH does not award grants to individuals. The recipient is always an organization, consistent with the definition of recipient at 2 C.F.R. § 200.2 ("*Recipient* means an entity that receives a Federal award directly from a Federal agency to carry out an activity under a Federal program. The term recipient does not include subrecipients or individuals that are participants or beneficiaries of the award.")

under a contract, it must show that the contract was made for its direct benefit—that it is an intended beneficiary of the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (discussing the federal common law of contract that governs when the United States is a party), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000). Plaintiffs do not argue that they are intended beneficiaries, nor could they. "[T]he third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Id.* at 1211. Courts apply a "'clear intent' hurdle [which] is not satisfied by a contract's recitation of interested constituencies, vague, hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind." *Cnty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009) *rev'd on other grounds*, 563 U.S. 110 (2011) (cleaned up). Indeed, a contract may "operate[] to the [researchers'] benefit by" providing funds that the institutions use to fund projects "entered into with the [researchers] in mind." *See Klamath Water Users Protective Ass'n*, 204 F.3d at 1212. None of that is sufficient to make Plaintiffs intended third-party beneficiaries. *Id.*

Indeed, the Ninth Circuit has emphasized time and again just how rare it is for a third party to be an intended beneficiary under a Government contract. The Court has said, for example, the individuals "[who] were explicitly referred to in and benefitted by the contract and were clearly 'in [the] mind' of the contracting parties" are still not intended beneficiaries. *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, NA*, 671 F.3d 1027, 1034 (9th Cir. 2012) (quoting *Orff v. United States*, 358 F.3d 1137, 1145-50 (9th Cir. 2004), *aff'd,* 545 U.S. 596 (2005)). The rarity of success flows inexorably from the "heightened standard required of third-party beneficiaries to government contracts." *Id.* Though, in the district court litigation in *Thakur,* Judge Lin was skeptical of the "intended beneficiaries" requirement for Article III standing, *Thakur v. Trump*, 787 F. Supp. 3d 955, 993 (N.D. Cal. 2025), *aff'd in part, rev'd in part and remanded,* 176 F.4th 1187 (9th Cir. 2026), nevertheless, the aforementioned Ninth Circuit precedent counsels otherwise.

In sum, Plaintiffs do not have "a legally protected interest" as project managers or principal investigators working for a nonparty who has received a Federal award. *See Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-00910 (OAW), 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022). In *Sardarian*, the plaintiff filed suit against FEMA and local and state agencies, alleging that "*his* grant" under FEMA's Hazard Mitigation Program "was unjustifiably terminated," and FEMA "misled him about *his* grant award limit," and his home "[was] under threat of constant flooding." *Id.* at *2. The court dismissed the suit for lack of standing, holding that the plaintiff did not have a "legally protected interest" under *Lujan,* because FEMA awarded "the grant in question" to the State of Connecticut and to the Town of Westport, and plaintiff was not the recipient of the Federal grant "for purposes of establishing jurisdiction." *Id.*

## II. Plaintiffs are not likely to succeed on the merits.

### A. Plaintiffs APA claims are foreclosed

Even if this Court concludes that Plaintiffs' APA claims are not precluded by the Tucker Act, and that Plaintiffs have standing, their APA claims fail at the threshold and on the merits. First, Plaintiffs do not challenge discrete final agency action. Second, the allocation of appropriations is committed to agency discretion by law. Third, the NIH's actions were consistent with applicable law. Fourth, the NIH did not act arbitrarily or capriciously.

#### *i. Plaintiffs do not challenge discrete final agency action.*

"[F]inal agency action" is a requirement for APA review. 5 U.S.C. § 704. Agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." *Id.* § 551(13). It must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Meanwhile, the Supreme Court has laid out a two-part test for finality, including that (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations

omitted). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

Plaintiffs' challenge to any current or future grant terminations at the NIH is definitionally a broad programmatic attack not based on the consummation of an agency's decisionmaking process. While each termination may eventually represent a final agency action (directed at nonparties) a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Indeed, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "Because 'an on-going program or policy is not, in itself, a "final agency action" under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform." *Id.*

Nor does it matter that the President has set policy directives that may flow to agencies (directives not challenged here). The Supreme Court has consistently held that "the President is not an 'agency' under that [APA]." *Dalton v. Spector*, 511 U.S. 462, 476 (1994). As a result, the APA, making "final agency action for which there is no other adequate remedy in a court are subject to judicial review," is inapplicable to the President. 5 U.S.C. § 704. This conclusion flows from "respect for the separation of powers and the unique constitutional position of the President[.]" *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). Indeed, the Court in Franklin directly confronted what would happen if a statute invested the President with the authority to take an administrative action—there to make certain calculations and a final apportionment from the census. *Id.* at 800. The Court concluded that the action was simply not subject to the requirements in the APA including, for example, arbitrary and capricious

requirements. *Id.* at 800–01. As a result, it is only the discrete final actions of agencies, not broad programmatic Presidential prerogatives, which are properly subject to APA review.

Accordingly, the Court should reject Plaintiffs' APA challenge as being beyond the bounds Congress has set out for such review. Even if it does not wholly toss the claims, it should at least apply the APA only to finally terminated grants (to the extent it determines that it has jurisdiction). And it certainly should not exercise authority over speculative future terminations, as "[f]or [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel." *EPA v. Brown*, 431 U.S. 99, 104 (1977).

***ii. The challenged conduct is committed to agency discretion by law.***

Withdrawal of funding is quintessential agency action "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, *id.* §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Although, where the statute does not provide any judicially manageable standard, "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review." *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

The Supreme Court has long recognized that an agency's determination of how to allocate appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or

another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citation omitted). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* (citation omitted). The APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

Moreover, Courts have made clear that *Lincoln*'s logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (citation omitted); *see also Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018), *appeal dismissed*, 2018 WL 6167378 (D.C. Cir. Oct. 29, 2018).

In sum, the NIH had broad discretion to set funding priorities and determine whether and when to exercise its contractual right to terminate grant agreements. The committed to agency by law bar accordingly applies.

***iii. The challenged conduct is not contrary to law.***

Plaintiffs allege violations of NIH's grant-making authority. PI Mot. at 26. Specifically, they argue "the policy violates Congress' explicit mandate that it is IC Directors who 'shall' 'review and make the final decision with respect to making [a research grant] award.'" *Id.* According to Plaintiffs, "[t]he word 'shall' is mandatory, meaning that the IC Director—and only the IC Director—must review and make the final decision regarding a new grant application." *Id.*

But the power to award NIH grants flows through the institute directors from the Secretary of Health and Human Services. Congress authorized "the Secretary, *acting through* the Director of each national research institute" "to encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences[,]" which "may be provided

through grants, contracts, and cooperative agreements." 42 U.S.C. § 284(b)(1). To that end, the HHS Secretary, acting through the NIH's institute directors, is directed to "review and make the final decision with respect to making the awards." *Id.* This delegation of authority is further made manifest as Congress requires the directors to "perform such other functions as the Secretary determines are needed to carry out effectively the purposes of the institute[,]" *id.* § 284(b)(1)(M), and to "report directly to the Director of National Institutes of Health[,]" by whom the institute directors are appointed, and whom the HHS Secretary "act[s] through[,]" *id.* § 284(a)(1). This language makes clear that the institute directors are not independent of the HHS Secretary, and any decision within the ambit of the institute directors may ultimately be made by the Director of National Institutes of Health or the HHS Secretary. *See*, *e.g.*, *Miller v. Lehman*, 801 F.2d 492 (D.C. Cir. 1986) (concluding where Congress directed Secretary of Defense to "act through" a "board" whom he appoints, "it leaves no doubt that the final decision is to be made by him"); *see also Trump v. Slaughter*, 146 S. Ct. 2283, 2294 (2026) (concluding principal officers "assist [the President] in discharging the duties of his trust" and the decisions of inferior officers must be "subordinate" to the President's or his designee).[3]

Plaintiffs also allege 42 U.S.C § 284(b)(3) instructs the institute directors to only "take into consideration, as appropriate":

> (i) the mission of the national research institute or national center and the scientific priorities identified in the strategic plan under section 282(m) of this title; (ii) programs or projects funded by other agencies on similar research topics; and (iii) advice by staff and the advisory council or board of such national research institute or national center.

when making grant determinations. *Id.* § 284(b)(3)(B). But this list is not exhaustive, and even if it were, the NIH need only "consider[]" such factors in grantmaking determinations. The doctrine of *expressio unius est exclusio alterius* ("the inclusion of one thing is the exclusion of others"), in which statutory lists are presumed to exclude nonincluded items, is " a descriptive

---

[3] 42 U.S.C. § 284(b)(3) also includes some limitations: "Before an award is made by a national research institute or by a national center for a grant for a research program or project (commonly referred to as an "*R-series grant*"), other than an award constituting a noncompetitive renewal of such a grant, or a noncompetitive administrative supplement to such a grant . . . [,]" which indicates institute directors only have this role for R-series grants.

generalization about language rather than a prescriptive rule of construction[.]" *United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008) (quoting *Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1313 (9th Cir.1992)). "*[E]xpressio unius* properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference[.]" *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting E. Crawford, Construction of Statutes 337 (1940)). Here, there is no such strong contrast. Surely the NIH may consider factors such as likelihood of fraud, scientific merit, the practical utility of such research, and public trust in certain techniques or methodologies, to name a few. Congress merely intended that these factors have weight in grantmaking determinations, not that they are dispositive of the decision-making process. *See Esteras v. United States*, 606 U.S. 185, 187 (2025) (concluding that factors that must be considered can be given "no weight").

Finally, Plaintiffs argue the challenged grant terminations violate 2 C.F.R. § 200.340, which explicitly permits agencies to terminate grants "if an award no longer effectuates the program goals or agency priorities," because the termination can only be based on priorities in place when the award was issued.

Plaintiffs emphasize that the regulatory text describes the relevant "program goals or agency priorities" as "the program goals or agency priorities," using the definite article "the." PI Mot. at 27. Plaintiffs then cite two cases for the general proposition that the use of the word "the" can be significant. *See id.* But Plaintiffs never explain why that usage is significant in any way that matters here. First, "the" modifies "program goals," not "agency priorities." But even if it modified both, nothing about the word "the" tells the reader whether "the . . . agency priorities" at issue are "the" current priorities or "the" old priorities. The word "the" simply doesn't answer (or even address) that question. Plaintiffs also parse the phrase "no longer effectuates," arguing that it "necessarily implies that the award previously effectuated the agency goals or priorities—meaning they must previously have been in place[,]" but no longer does so. *Id.* But that is equally true under Defendants' interpretation. On Defendants' interpretation, an award "no longer

effectuates" agency priorities, at least sometimes, because those priorities changed. So the phrase "no longer effectuates" is likewise little help to the Court in answering the question at issue here.

As 2 C.F.R. § 200.340(a)(4) contemplates explicitly, sometimes circumstances change after an award is issued. Maybe "the program goals" change. Maybe "agency priorities" change. Or maybe nothing changed at the program or the agency, but the grantee is no longer the best available choice—imagine, for example, a grant to a nonprofit whose CEO turns out to be a foreign spy. In situations like this (or countless others), an agency might reasonably conclude that "an award no longer effectuates the program goals or agency priorities." *Id*. The regulations explicitly contemplate that an agency may exercise that sort of discretion, as a responsible steward of the public fisc. The same could be true where there is a change in administration and policies.

Plaintiffs' view is that the only "agency priorities" that matter for purposes of this analysis are the "agency priorities" that "previously have been in place." PI Mot. at 27. But that limitation is entirely atextual—there is nothing in the text that takes such a restrictive view of the relevant "agency priorities." In plain English, if "an award no longer effectuates . . . agency priorities," that just means there is now a disconnect between the award and the priorities. But that disconnect can arise from changes on either end—either something happened to the award (e.g., the grantee is no longer the best choice), or something happened at the agency (e.g., the priorities changed), or both. Either way, the award "no longer effectuates . . . agency priorities" within the meaning of 2 C.F.R. § 200.340(a)(4). Plaintiffs identify nothing in the text of the regulation that narrows the relevant "agency priorities" so sharply.

Plaintiffs' interpretation is also inconsistent with the overall structure of 2 C.F.R. § 200.340. In particular, Plaintiffs ignore the immediately preceding sub-section, which generally allows the "recipient" of the grant to terminate it in part, after providing notice. *See id.* § 200.340(a)(3). Then, in the case of a partial termination by the grantee, when it comes to the leftover portion of the grant, the agency may then "terminate the Federal award in its entirety"—but only if the agency "determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made." *Id*. That is a backward-looking

inquiry, stated in the past tense, about the state of the world at the time "the Federal award was made." *Id.* (emphasis added). Why is this relevant? Because Plaintiffs' interpretation of 2 C.F.R. § 200.340(a)(4) requires implicitly reading into the regulation language that the drafters omitted—in particular, language restricting any consideration of the agency's priorities to those in effect at the time "the Federal award was made." 2 C.F.R. § 200.340(a)(3). So it is telling that the immediately preceding sub-section uses exactly that sort of language, and explicitly calls for the very sort of backward-looking, past-tense analysis that Plaintiffs insist is (silently) required by § 200.340(a)(4). But § 200.340(a)(4) contains no similar language. To the contrary, it is stated in the present tense—calling for a here-and-now analysis of whether the award currently "effectuates the program goals or agency priorities," in the present. 2 C.F.R. § 200.340(a)(4). "[W]e generally 'presume differences in language like this convey differences in meaning.'" *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)). And so, whether interpreting statutes, regulations, or contracts, "where [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (quoting A. Scalia & B. Garner, Reading Law 170 (2012)).

All told, Plaintiffs' scattershot statutory and regulatory objections cannot support their APA claims.

***iv. The challenged conduct survives arbitrary and capricious review.***

Even if the Court applied arbitrary and capricious review, the challenged terminations survive. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path

may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* Moreover, the judiciary affords a particularly lenient standard of review to agency action in the contracting context. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (citation omitted)); *cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (Fed. Cl. 2016) ("Effective contracting demands broad discretion" so contracting decisions are subject to a "highly deferential rational basis review." (citation omitted)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).

In conformity with 2 C.F.R. § 200.340, and the individual terms and conditions of the awards cited by Plaintiffs, an agency may generally terminate a federal award "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). NIH has moved toward prioritizing research utilizing well-defined, objective concepts and precise goals and away from research that attributes, without evidentiary basis, worse health outcomes in a particular population to poorly measured or unproven factors like systemic racism. Statement, Nat'l Insts. of Heatlh, "Advancing NIH's Mission Through a Unified Strategy" (Aug. 15, 2025). In addition, 2 C.F.R. § 200.341(a) requires an agency to "provide written notice of termination to the recipient or subrecipient," and include in that notice "the reasons for termination, the effective date, and the portion of the Federal award to be terminated." Each of the grants Plaintiffs cite were terminated in compliance with the terms permitting such terminations. Given that "reasonableness is a zone, not a pinpoint," *Wis. Pub. Power, Inc. v. Fed. Energy Regul. Comm'n*, 493 F.3d 239, 266 (D.C. Cir. 2007) (per curiam), Plaintiffs necessarily lack plausible allegations that the APA required Defendants to simply maintain grants that no longer effectuated their priorities and forego a regulatorily permitted termination pathway. *See, e.g.*, *Mobil Oil Expl. &*

*Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, . . . and priorities[.]" (internal citations omitted)). Moreover, the NIH's conduct was "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. In its notices, the NIH explained that the grants were ending based on termination authorities available when the grant awards issued. So the NIH, pursuant to terms previously laid out, effectuated a long-held authority to determine whether grant awards are in conformity with current priorities. That is well within the bounds of reasonable explanation. And it is exceedingly unlikely that anyone has a reliance interest in continued discretionary funding based on contractual provisions expressly authorizing termination. *Cf. Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). So no reliance interests can defeat the NIH's terminations. *See* Am. Compl. ¶¶ 108, 259.

In sum, arbitrary and capricious review of agency policy priorities and reasons is deferential because it "represents a substantial intrusion into the workings of another branch of Government." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). These terminations satisfied its strictures. The Court should accordingly reject Plaintiffs' arbitrary and capricious claim.

**B. Plaintiffs' First Amendment claims lack merit.**

Plaintiffs argue that Defendants' actions violate the First Amendment because they amount to viewpoint discrimination or compelled speech. Plaintiffs' claims fail because these provisions pertain to government's sponsorship of speech—not the regulation or compulsion of it. At the outset, Defendants recognize its argument that NIH can terminate grants based on the viewpoint of the project may be foreclosed following the Ninth Circuit's decision in *Thakur* but nonetheless reraise and preserve these arguments. *Thakur*, 176 F.4th at 1999-1204. Critically, Defendants still argue the speech at issue here is not Plaintiffs' speech.

Government spending is not subject to traditional First Amendment scrutiny. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not

discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*AID*") (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against an unconstitutional "condition." *Id.* at 213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize[,]" but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution and sex trafficking" is not, *id.* at 221 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19. That is; a pledge outside the program is different than the topic of the funds to be used. "By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, [an offending] condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id.* at 218 (quoting *Rust*, 500 U.S. at 197). This critical distinction decides the present case.

To start, Plaintiffs do not base their First Amendment claims on speeches, pledges, or other conditions outside of the federally funded activities. Just the opposite. Their First Amendment argument is tied directly to the topics of the grants—alleging that the grants themselves cover certain viewpoints and content that the NIH has decided that they no longer wish to promote. *See* PI Mot. at 2 ("Defendants have systematically terminated and renegotiated NIH grants and denied research proposals in an effort to silence certain disfavored views."). Though, Plaintiffs later claim

"Defendants are unconstitutionally screening for projects and *researchers* they expect to communicate these views in a wide variety of research areas, based both on their perception of the specific motivating ideology or the opinion or perspective of the, *researchers*[,]" Plaintiffs' proffered facts do not bear this out. *See id.* at 13 (citation omitted). Plaintiffs do not identify a single instance in which NIH targeted a researcher's grants for termination because of whom the researcher was, or anything they said about their research to any audience or in any forum. Rather, each instance of termination or term renegotiation related to the underlying research that was the subject of a grant itself.

In short, what Plaintiffs allege does not impose an unconstitutional condition on Plaintiffs' speech or amount to viewpoint discrimination; rather, as permitted under *Rust* and *AID*, the terminations align the government's sponsorship of activities with its policy priorities. In so doing, the terminations do not seek to regulate a grantee's speech "outside the contours of" any such policy initiatives—*i.e.*, they do not prohibit entities from engaging in protected speech on their "own time and dime." *AID*, 570 U.S. at 215, 218. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas[]"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality op.) (holding that a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) ("[The Government] is not required to subsidize First Amendment rights."). Simply put, the government is permitted to have policy priorities, and it does not violate the First Amendment by not funding awards that are out of alignment with those policies or encouraging research that support those policy priorities.[4]

[4] Plaintiffs invoke *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828-29 (1995). But *Rosenberger* is inapposite; there, the Supreme Court "found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because

In sum, the Federal Government may choose how it wishes to promote certain policy priorities within the bounds of the First Amendment. As *AID* and the related cases establish—considering the content of a grant is well within the bounds of the Government's discretion.

**III. Plaintiffs do not suffer imminent irreparable harm.**

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Here, for the reasons previously described, any harm to the actual Plaintiffs in this suit is impermissibly speculative and attenuated. *See supra* Part I.B; *Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."). But even putting that to the side, injunctive relief is still not warranted for Plaintiffs' claims in which the relief sought is for money to be dispersed to the nonparty institutions and to continue having that money disbursed. Where a plaintiff seeks money to be paid, and later payment is possible, there is rarely irreparable harm. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320-21 (9th Cir. 1994); *but see Thakur*, 176 F.4th at 1205 (concluding that a request for monetary relief accompanied by a temporary loss of a right can establish irreparable harm). For improper terminations, that remedy is available in the Court of Federal Claims. It is only when the harm complained of is like that of "[t]he threat of being driven out of business" that a delay of monetary disbursement "is sufficient to establish irreparable harm." *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).

Plaintiffs' allegations are not of this type. As an initial matter, while Plaintiffs sweep widely in their papers—citing programs, institutions, and other individuals—they may only succeed by showing irreparable harm *to themselves*. *See, e.g.*, *Adams v. Freedom Forge Corp.*,

---

the government had established a limited public forum[.]" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598-99 (1998) (Scalia, J., concurring). Here, Plaintiffs make no such showing.

204 F.3d 475, 485-86 (3d Cir. 2000) (partially vacating a preliminary injunction because "[i]nstead of making a case-by-case determination that each plaintiff demonstrated irreparable harm, . . . the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy that prong of the preliminary injunction test"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" before the court). Moreover, injunctive relief analysis should be limited to only named plaintiffs so long as there is no class certification, and the Court should accordingly look only at their irreparable harm. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996).

Plaintiffs do not demonstrate the magnitude of harms that justify extraordinary injunctive relief. The kinds of harms alleged by Plaintiffs include that "some researchers are scrubbing their grant applications of viewpoint-signifying terms," Am. Compl. ¶ 157, that "plaintiffs have been unwilling or unable to make the changes necessary to continue to compete for funding[,]" *id.* ¶ 175, and that "policies have led some Plaintiffs to curtail or fully abandon their quest for NIH funding," *id.* ¶ 187. Critically, these harms center around Plaintiffs' choices not to research Government-prioritized subject matter areas and, thus, are not the type of harms that warrant extraordinary relief.

Plaintiffs allege, in many ways, that they believe their research and certain projects will be hampered upon termination of funding to the nonparties. If these harms come to pass, such harms may be personally painful for Plaintiffs. But these are not the harms that support the extraordinary remedy of injunctive relief. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted); *see also Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial."). Plaintiffs have accordingly failed to establish irreparable injury.

**IV. The balance of the equities weigh in the Government's favor.**

Lastly, Plaintiffs cannot establish that the balance of equities and public interest favor granting the extraordinary remedy of a preliminary relief. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

The Supreme Court in *California* squarely explained that the balance of the equities favors the Federal Government in this context. The public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. *California*, 604 U.S. at 652. And the grantees have the choice of whether "to keep the programs operating," and if they choose not to, "then any ensuing irreparable harm would be of their own making." *Id.*; *see also Heckler v. Turner*, 468 U.S. 1305, 1307-08 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay of injunction); *cf. Sustainability Inst.*, 2025 WL 1587100, at *2 ("[T]he Government has demonstrated irreparable harm because it is being forced to disburse funds from a finite appropriation and will not be able to recoup those funds once expended.").

This is all in addition to the fact that any injunction interfering with the President's priorities is itself a substantial harm in the balance of the equities analysis. For, "[a]ny time [the Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). To the extent the Court finds the balance of various factors close, this equities analysis should tip against an injunction.

**V. Any injunctive relief should be narrowly tailored.**

Because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," the Court should be cautious in fashioning any injunction. *Califano*, 442 U.S. at 702. To the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to the NIH, Plaintiffs, and the provisions that affect them, and to leave intact the Executive's discretion to

engage in further consideration of the topic at hand and implement new policies consistent with law.

First, any injunction should be limited to Plaintiffs' NIH grants or grant applications only. The purpose of a preliminary injunction "to preserve the relative position[] *of the parties* until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (providing that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). Plaintiffs may seek to certify a class, but in this extraordinary relief posture, the Court should be cautious to allow mass judicial superintendence of NIH's grantmaking. And, if the Court does not certify a class, the relief should be only for named Plaintiffs. *Easyriders Freedom F.I.G.H.T.*, 92 F.3d at 1501.

And the Court should only order relief that flows from the claims it concludes are likely to succeed on the merits, to those Defendants for which the claims and relief are applicable. That result flows inexorably from *Murthy*'s command that "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief.'" *Murthy*, 603 U.S. at 61 (citation omitted).

## VI. Any injunctive relief should be accompanied by a bond and no declarations should be required.

Defendants respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may be lost forever once distributed. *California*, 604 U.S. at 652.

Finally, Plaintiffs ask that Defendants be made to serve declarations "[w]ithin 14 days of this Order," and that "Defendants shall file a declaration identifying the actions taken to comply

with this Order, the status of all affected awards and applications, any outstanding implementation steps, and the reasons those steps remain incomplete." Proposed Order ¶ 9. Defendants also believe that compliance with every relief Plaintiffs seek may take weeks. Instead, if the Court orders relief, the presumption of regularity should apply and the Court should presume the Federal Government will comply with any such order. *See Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010).

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction.

DATED: October 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Jordan A. Hulseberg*
JORDAN A. HULSEBERG
(D.C. Bar No. 90033542)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-3856
Email: Jordan.A.Hulseberg2@usdoj.gov

*Attorneys for United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2026, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

/s/ *Jordan A. Hulseberg*