**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
OLGA AKSELROD (NY Bar No. 4132825) (Appearance *Pro Hac Vice*)
oakselrod@aclu.org
VERA EIDELMAN (CA Bar No. 308535)
veidelman@aclu.org
RACHEL MEEROPOL (NY Bar No. 4100954) (Appearance *Pro Hac Vice*)
rmeeropol@aclu.org
ALEXIS AGATHOCLEOUS (NY Bar No. 4227062) (Appearance *Pro Hac Vice*)
aagathocleous@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2659

*Attorneys for Plaintiffs*

*(Additional Counsel on Following Page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ARGHAVAN SALLES; ABIGAIL HATCHER; ANDREA ROSSO; ANN D. COHEN-WILSON; DOLORES ALBARRACÍN; HEIDI MOSESON; JADE PAGKAS-BATHER; JONATHAN KYLE DAW; KATIE EDWARDS; KELTON MINOR; MICHAEL D. GREEN; SARA JACKSON; SUZANNE BELL; and MIKAELA SMITH, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services*; and UNITED STATES DOGE SERVICE,

Defendants.

Case No. 3:26-cv-10510-VC

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S NOV. 6 ORDER**

Judge: Hon. Vince Chhabria
Date: November 18, 2026
Time: 2:00 PM
Courtroom: 3 – 17th Floor

*(Additional Counsel on Behalf of Plaintiffs)*

**AMERICAN CIVIL LIBERTIES UNION**
**FOUNDATION OF NORTHERN CALIFORNIA**
GRAYCE ZELPHIN (CA Bar No. 279112)
gzelphin@aclunc.org
CHESSIE THACHER (CA Bar No. 296767)
cthacher@aclunc.org
NEIL K. SAWHNEY (CA Bar No. 300130)
nsawhney@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

**PROTECT DEMOCRACY PROJECT**
SHALINI AGARWAL (DC Bar No. 990963) (Appearance *Pro Hac Vice*)
shalini.agarwal@protectdemocracy.org
2020 Pennsylvania Avenue, NW, Suite 163
Washington, DC 20006
KENNETH PARRENO (TX Bar No. 24130477) (Appearance *Pro Hac Vice*)
kenneth.parreno@protectdemocracy.org
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582

**CENTER FOR SCIENCE IN THE PUBLIC INTEREST**
LISA S. MANKOFSKY (DC Bar No. 411931) (Appearance *Pro Hac Vice*)
lmankofsky@cspi.org
OSCAR HEANUE (DC Bar No. 90036939) (Appearance *Pro Hac Vice*)
oheanue@cspi.org
1250 I Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 777-8381

**JACOBSON LAWYERS GROUP PLLC**
DANIEL F. JACOBSON (DC Bar No. 1016621) (Appearance *Pro Hac Vice*)
dan@jacobsonlawyersgroup.com
LYNN D. EISENBERG (DC Bar No. 1017511) (Appearance *Pro Hac Vice*)
lynn@jacobsonlawyersgroup.com
STEPHEN K. WIRTH (DC Bar No. 1034038) (Appearance *Pro Hac Vice*)
stephen@jacobsonlawyersgroup.com
5100 Wisconsin Avenue, NW, Suite 301
Washington, DC 20016
Telephone: (301) 823-1148

## INTRODUCTION

Plaintiffs' Motion for Preliminary Injunction challenges as arbitrary and capricious Defendants' policy of discriminating against certain viewpoints in NIH funding, which can broadly be categorized as follows: "DEI"; "gender identity"; "climate change"; "misinformation/disinformation"; "vaccine hesitancy"; and "public policy". *See* ECF 33 at 19 (describing the Challenged Policies).[1] Defendants claim that the Bhattacharya Directive v2 is the "operative guidance," but in fact they continue to implement the Challenged Policies in full—which are also composed of the Memoli Directive, Bhattacharya Directive v1, implementing guidance from March through May of 2025, November Reminder, and December 2025 Guidance, and including the use of the trigger word list. Indeed, Defendants have now admitted that the "current operative guidance" is "largely consistent" with the Memoli Directive and themselves cite to the March 4 Guidance as indicative of the current review process. ECF 93 at 3 n.2, 5. These early iterations of the policy have already been declared arbitrary and capricious by another district court, *Am. Pub. Health Ass'n v. NIH* ("*APHA*"), 791 F. Supp. 3d 119, 179, 181–84 (D. Mass. 2025). And yet, Defendants persist in casting certain disfavored viewpoints as unscientific without reason (and, in some cases, without acknowledgement), and foreclosing funding as a result.

## ARGUMENT

### I. The Challenged Policies do not constitute reasoned decision-making because they contain no reasoned explanation for excluding certain views.

Defendants largely seek to defend the Challenged Policies by mischaracterizing Plaintiffs' argument as to what the Challenged Policies are, and why they are arbitrary and capricious. Defendants argue that NIH's "operative guidance" is "reasonable and reasonably explained" because it "prioritize[s] research that produces measurable, replicable results" and is not "vague." ECF 93 ("Supplemental Brief") at 4. Yet Plaintiffs are *not* challenging an NIH decision to "focus on solution-oriented approaches" and to deprioritize research into "poorly defined concepts." Nor have Plaintiffs argued that the Challenged Policies are "vague." Rather, Plaintiffs are challenging the NIH policy to disfavor

[1] Plaintiffs refer to ECF-generated page numbers when citing previously filed documents.

particular viewpoints that they characterize, without justification or explanation, as "poorly defined," "unfalsifiable," or not representing "gold-standard science." ECF 49-16 (Heanue Decl., Ex. 16) at 5–6.

Defendants continue to fail to articulate *why* or *how* the forbidden views constitute the type of "poorly defined concepts" or "unfalsifiable theories" that the Bhattacharya Directive ostensibly targets. Plaintiffs' opening brief asked four specific questions offering examples that demonstrate this lack of explanation: why "should measurable impacts of systemic racism be excluded from research relating to determinants of health;" why do Defendants "permit research into 'extreme weather' but not 'climate change;'" why allow "research into the harms of gender-affirming care but not its benefits;" and why limit research into the public health impacts of policy? ECF 33 at 34. How, in other words, do the excluded views constitute bad science? NIH's answer seems to be nothing more than "because we said so." And it is well established that "because we said so" is insufficient to withstand arbitrary and capricious review. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020). Instead, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citation and quotations omitted).

Neither the Challenged Policies nor Defendants' Supplemental Brief suggests that any such examination occurred.[2] The Challenged Policies offer only "conclusory statements" casting disfavored viewpoints as unscientific. Such statements do not constitute reasoned decision-making. *Ctr. for Biological Diversity v. DOI*, 837 F. Supp. 3d 1080, 1107 (N.D. Cal. 2026) (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" (emphasis in original) (citation omitted)).

In addition to relying on portions of the Bhattacharya Directive that are orthogonal to Plaintiffs' challenge, Defendants mischaracterize the portions that demonstrate Defendants' viewpoint bias. With respect to research related to gender identity, Defendants argue that the Bhattacharya Directive seeks only to deprioritize "research that assumes certain treatments are better over others." ECF 93 at 3 n.3.

[2] To the contrary, Defendants have suggested that these new agency priorities were adopted for political, rather than scientific, reasons. ECF No. 84 (Defs.' Opp'n. to Mot. for Prelim. Inj.) at 11–15.

But Bhatacharya Directive v1 explicitly states that "research that aims to identify and treat the harms" of gender-affirming care "is more promising" than studies that consider such care as potential "treat[ment]" for gender dysphoria. ECF 49-15 at 7. Defendants have offered no evidence that Bhattacharya Directive v2 changed this.[3] Perhaps most importantly, Defendants offer no explanation for the Challenged Policies' exclusion of the view that gender identity exists, period, separate from the role of gender-affirming care. And in trying (but failing) to deflect arguments concerning the government's unlawful bias against "DEI" research, Defendants ignore the Directive's categorical prohibition of any mention of "systemic racism"—which it characterizes, without evidence, as definitionally "poorly measured" and "unproven"—even as framing in "established background facts." In arguing that the Challenged Policies are facially neutral, Defendants do not grapple with these aspects of the Bhattacharya Directive, much less the other evidence Plaintiffs offered, of viewpoint bias. *See* ECF 33 at 23-28.

Defendants separately argue that research that "'could be expected' to return a predetermined result" does not deserve funding, ECF 93 at 6, but this misconstrues both Plaintiffs' challenge and their research. The conclusion of their research is not predetermined, *see, e.g.,* ECF 39 ¶¶ 35-36, but they have experienced discrimination because the *Government expects* it to be, due to its own viewpoint bias. *E.g.,* ECF 49-15 at 5-6.

Defendants also completely ignore Plaintiffs' argument that certain "agency priorities" have not even been publicly acknowledged. Though NIH has publicly stated that the Memoli Directive is no longer in effect and the Bhattacharya Directive does not explicitly address "vaccine hesitancy," "climate change," and "misinformation," ECF 49-15 at 2–6; ECF 49-16 at 2–6, the record reflects that NIH is continuing to implement these prohibitions. *See, e.g.*, ECF 35-2 (keyword list); ECF 43 ¶ 22 (NIH still barring discussion of "Climate Change" after Bhattacharya Directive).

Defendants further fail in their attempt to distinguish the Ninth Circuit's opinion in *Washington v. DOE*, 167 F.4th 1241 (9th Cir. 2026). *See* ECF 93 at 4, n.4. They specifically disregard the

---

[3] Even if v2 in fact reflected a change, the Government's justification for it does not explain it. Bhattacharya Directive v2 appears to distinguish between studies that "involve the use" of gender-affirming care and those that "aim[] to identify the utility" of such care, ECF 49-16 at 6—not between "research that assumes certain treatments are better" and those that do not. ECF 93 at 3, n.3.

*Washington* court's finding that DOE did act arbitrarily and capriciously in part by failing to "give the grantees an opportunity to learn about or address the Department's unpublished change in policy affecting its grant continuation process." 167 F.4th at 1247. Likewise, NIH is enforcing a policy while publicly representing that it has been rescinded.

**II. Defendants' keyword search is further evidence that the Challenged Policies are unreasoned and unreasonable.**

Defendants also argue that their extralegal process for implementing the Challenged Policies is reasoned and reasonable. ECF 93 at 5–6. This, too, misses the mark for four reasons.

*First*, the selection of keywords for screening is unreasonable. The keyword list was generated based on grants terminated under the Challenged Policies since January 2025, ECF 49-18 at 3, many of which were reinstated after courts considering the early iterations of the Challenged Policies determined that the Challenged Policies were "breathtakingly arbitrary and capricious." *APHA*, 791 F. Supp. 3d at 179. While Defendants' Supplemental Brief asserts that "[c]ertain terms are often paired with types of research that lack empirical measurements and rely on unproven, theoretical factors," ECF 93 at 5, Defendants have provided no basis for this assertion. And one need only look at the keyword list to see the problems inherent in Defendants' theory. Why would a grant that uses the words "gender," "LGBTQ," "fossil fuel," or "vaccine acceptance" be lacking in empirical measurability or replicability? Again, Defendants rely only on conclusory assertions, and not on the "examin[ation] of the relevant data" required by law. *State Farm,* 463 U.S. at 43.

*Second,* Defendants contend that "because the terms are merely used for "initial[] review" and "every grant or grant application receives manual and multi-layer review to determine whether it complies with the challenged policies and current agency priorities, NIH is not relying on these terms in a way that Congress did not intend." ECF 93 at 5. But this wholly ignores how the terms function. Defendants have selected keywords that they argue are associated with low-value research notwithstanding that many are the exact terms used by Congress in statutes telling NIH what to *prioritize*—not what to defund. *Compare, e.g.*, 42 U.S.C. §§ 283p; 282(h) (directing NIH to "improve research related to the health of sexual and gender minority populations" and to prioritize recruitment of

individuals from "disadvantaged backgrounds (including racial and ethnic minorities)") *with* ECF 35-2 at 2, 6 (listing "disadvantaged minorit[y]" and "sexual gender minorit[y]" as keywords for review).

*Third,* although Defendants claim that "NIH's review of grants centers around factors related to scientific merit and the mission of the NIH, such as measurability, replicability, objectivity, and the likelihood of meaningful results," ECF 93 at 5, those factors are already at the heart of the two-step peer review process. No grants or applications make it to extralegal review unless experts and IC Directors have already concluded that the project has scientific merit and meets the mission of the relevant IC.

*Fourth*, NIH does not use the keywords to initiate further review but rather use it as a list of banned words. Many of the Plaintiffs had to renegotiate grants or revise applications to remove disfavored keywords, and the policy is explicit that offending "language related to" certain concepts must be "removed" even where the project doesn't support any targeted "activities."[4] And while Defendants attempt to justify these renegotiations by arguing that they result in "more precise language or less divisive language to 'improve public trust,'" ECF 93 at 6, this assertion is again entirely devoid of reasoning. While Defendants make the conclusory assertion that they are prioritizing "more precise language," Plaintiffs have demonstrated that for researchers, these changes have actually reduced their ability to accurately describe their research and findings. ECF 33 at 30-32 (collecting examples).

Accordingly, the Challenged Policies are arbitrary and capricious.

[4] ECF 49-10. *See, e.g.*, ECF 39 ¶ 23 (NIH directed researcher to change "pregnant people" to "pregnant women" in research about abortion care); ECF 38 ¶ 26 (application funded after removal of words like "reluctance to vaccinate," "intentions to vaccinate," "vaccination norms"); ECF 46 ¶ 31 (researcher directed to change "climate change" to "extreme heat" and "pregnant people" to "pregnant women" in application). *See also* ECF 33 at 24-29 (collecting examples).

Dated: November 12, 2026

Respectfully submitted,

/s/ Alexis Agathocleous

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
ALEXIS AGATHOCLEOUS (NY Bar No. 4227062)
(Appearance *Pro Hac Vice*)
aagathocleous@aclu.org
RACHEL MEEROPOL (NY Bar No. 4100954)
(Appearance *Pro Hac Vice*)
rmeeropol@aclu.org
OLGA AKSELROD (NY Bar No. 4132825)
(Appearance *Pro Hac Vice*)
oakselrod@aclu.org
VERA EIDELMAN (CA Bar No. 308535)
veidelman@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2659

*Attorneys for Plaintiffs*